1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    GENNADY SHNAYDER, et al.,                 Case No. 23-cv-01811-AMO

8                    Plaintiffs,
                                               **ORDER RE MOTION TO DISMISS**
9            v.                                Re: Dkt. No. 96

10   ALLBIRDS, INC., et al.,

11                   Defendants.

12          This is a proposed securities fraud class action brought on behalf of all persons and entities

13   that purchased or otherwise acquired: (a) Allbirds Class A common stock pursuant and/or

14   traceable to the registration statement and prospectus (collectively, the "Challenged Registration

15   Statement") issued in connection with the company's November 2021 initial public offering

16   ("IPO," or "Offering"); and/or (b) Allbirds securities between November 4, 2021 and March 9,

17   2023 (the "Class Period"). On behalf of themselves and the proposed class, Lead Plaintiffs Qu

18   Jinghua and Yau Noi bring claims for violations of Sections 11 and 15 of the Securities Act of

19   1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Allbirds, its co-chief

20   executive officers and co-founders Joseph Zwillinger and Timothy Brown, its chief financial

21   officer Michael Bufano (together the "Individual Defendants" or "Exchange Act Defendants"), its

22   directors Neil Blumenthal, Dick Boyce, Mandy Fields, Nancy Green, Dan Levitan, and Emily

23   Weiss, and its underwriters Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, BofA

24   Securities, Inc., Robert W. Baird & Co. Incorporated, William Blair & Company, Piper Sandler &

25   Co., Cowen and Company, LLC, Guggenheim Securities, LLC, KeyBanc Capital Markets Inc.,

26   Stifel, Nicolaus & Company, Incorporated, Telsey Advisory Group LLC, C.L. King & Associates,

27   Inc., Drexel Hamilton, LLC, Loop Capital Markets LLC, Penserra Securities LLC, Samuel A.

28   Ramirez & Company, Inc., and Siebert Williams Shank & Co., LLC (collectively, "Defendants")

United States District Court
Northern District of California

move to dismiss Lead Plaintiffs' claims and, in connection with their motion, seek judicial notice of 20 documents. Lead Plaintiffs oppose the motion and take no position on the request for judicial notice. Having considered the papers filed by the parties and the relevant legal authority, the Court **GRANTS** the motion to dismiss and the request for judicial notice, for the reasons set forth below.[1]

## I.    BACKGROUND

### A.    Factual background[2]

With no prior retail experience, Zwillinger and Brown[3] founded Allbirds in 2015. SAC ¶¶ 63, 64. The company started selling products in 2016 as a direct-to-consumer online retailer. *Id.* It then expanded into the traditional retail sector by opening brick-and-mortar locations. *Id.*

Zwillinger and Brown built the Allbirds brand based on three "fundamental beliefs: first, climate change is an existential threat to the human race; second, consumers connect their purchase decisions with their impact on the planet; and lastly, consumers do not want to compromise between looking good, feeling good, and doing good." *Id.* ¶ 66.

"At its core, Allbirds is a footwear company that uses natural materials to construct its products, including wool, eucalyptus pulp, Brazilian sugarcane, and trino. Footwear represents the majority of the [Allbirds'] revenue and brand." *Id.* ¶ 65. The "lifestyle and performance shoes" among Allbirds' core products are "the Wool Runner," launched in 2016, "the Tree Runner," launched in 2018, and "the Dasher," launched in 2020. *Id.* ¶¶ 2, 60. Focusing on these products, Allbirds experienced "tremendous growth as a direct-to-consumer company. . . ." *Id.* ¶¶ 2, 60. In 2018, Allbirds became "a billion-dollar unicorn . . . thanks to a growing wave of

---

[1] In ruling on this motion, the Court has not considered arguments appearing in footnotes within the parties' briefs, which violate the Court's Standing Order for Civil Cases ¶ H.3. The Court will strike future similar filings.

[2] This background is based on the well-pleaded allegations in the operative consolidated second amended complaint, ECF 89 ("SAC"), which are taken as true and viewed in the light most favorable to Lead Plaintiffs for the purpose of the instant motion. *In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181, 1184 (9th Cir. 2024).

[3] Zwillinger had an MBA from the Wharton School and previously spent "six years at the biotech firm Terravia leading its renewable chemical business." SAC ¶ 64. Brown was "a former professional soccer player from New Zealand." *Id.*

United States District Court
Northern District of California

awareness among consumers of the environmental impact of fast fashion, i.e., inexpensive clothing produced rapidly by mass market retailers in response to the latest trends." *Id.* ¶ 66.

Leading up to and following the IPO, Allbirds changed its business strategy "in three fundamental ways[,]" by:

> 1) overemphasizing and overinvesting in new product offerings that did not resonate with core consumers, and underinvesting in the core offerings that made the Company successful pre-IPO;
> 2) aggressively expanding Allbirds' retail store fleet even though existing stores were floundering, with no regard to economics or proximity to existing locations, raising the risk of market saturation and cannibalization; and 3) slashing the brand marketing budget materially every year since 2019 despite the essentiality of, and the Company's stated commitment to, brand awareness.

*Id.* ¶ 68.

On August 31, 2021, Allbirds "filed its Registration Statement on Form S-1 with the SEC, which forms part of the [Challenged] Registration Statement." *Id.* ¶ 120. After a series of amendments, on October 25, 2021, Allbirds "filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the [Challenged] Registration Statement." *Id.* "The Registration Statement was declared effective on November 2, 2021[,]" and "[o]n November 4, 2021, Allbirds filed its prospectus on Form 424B4 with the SEC, which also forms part of the [Challenged] Registration Statement." *Id.* In its IPO, Allbirds "sold approximately 16,850,799 shares of Class A common stock at a price of $15.00 per share[,]" generating approximately $237 million from the offering. *Id.* ¶¶ 115, 274. The underwriters received discounts and commissions of approximately $22 million. *Id.*

**B. Procedural background**

After Allbirds' stock dropped to $1.06 per share, Gennady Shnayder filed an initial class action complaint on April 13, 2023. ECF 1 ¶ 8. A second putative class action – *Delgado v. Allbirds, Inc.*, No. 3:23-cv-02372-AMO – followed on May 16, 2023. The Court related the actions on June 16, 2023. *Id.* On July 25, 2023, the Court consolidated the two related cases, appointed Yau Noi and Qu Jinghua as Lead Plaintiffs, and approved their selection of Pomerantz LLP as interim lead counsel. ECF 47.

On September 15, 2023, Lead Plaintiffs filed a consolidated amended complaint. ECF 52.

The Court granted Defendants' motion to dismiss that complaint with leave to amend on May 10, 2024. ECF 86. Lead Plaintiffs filed the operative SAC on June 24, 2024. ECF 89. On September 5, 2024, Defendants filed a motion to dismiss the SAC, with a request for judicial notice. ECF 95 ("Mot."); ECF 96 ("RJN"). Lead Plaintiffs filed their opposition to the motion on November 4, 2024, with no response to Defendants' request for judicial notice. ECF 97 ("Opp."). Defendants filed their reply in support of the motion on December 4, 2024. ECF 98 ("Reply").

## II.    LEGAL STANDARDS

### A.    Motion to dismiss

Federal Rule of Civil Procedure 8 requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure Rule 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss, the factual allegations in the plaintiff's complaint " 'must . . . suggest that the claim has at least a plausible chance of success.' " *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (alterations in original)). In ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

"[A]llegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). The court may dismiss a claim "where there is either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal claim." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011) (citing *Johnson v. Riverside Healthcare Sys.*, LP, 534 F.3d 1116, 1121 (9th Cir. 2008)). "[T]he non-conclusory 'factual content' and reasonable inferences from that content must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

For claims sounding in fraud or mistake, a plaintiff must "state with particularity the

circumstances regarding the fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff must set forth " 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

A claim for violations of Section 10(b) and Rule 10b-5 "must meet both the heightened pleading requirements for fraud claims under Fed. R. Civ. P. 9(b)," *see In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)), . . . and "the exacting pleading requirements, . . . of the Private Securities Litigation Reform Act ('PSLRA') . . . ." *Id.*

In assessing whether a securities fraud claim meets this heightened pleading standard, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322-23.

### B.    Request for judicial notice

A district court may take judicial notice of facts that are "not subject to reasonable dispute" because they are (1) "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). "Accordingly, '[a] court may take judicial notice of matters of public record.' " *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). A court cannot, however, "take judicial notice of disputed facts contained in such public records." *Id.*

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims." *Id.* at 1002. "Although the incorporation-by-reference doctrine is designed to prevent artful pleading by

United States District Court
Northern District of California

plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id.* at 1003.

In applying this standard, the Ninth Circuit instructs:

> When a general conclusion in a complaint contradicts specific facts retold in a document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, those specific facts are controlling. Similarly, where a complaint incorrectly summarizes or characterizes a legally operative document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, the document itself is controlling. . . . But if specific facts alleged in the complaint contradict specific facts related in a non-legally-operative document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, the conflict is resolved in the plaintiff's favor.

*In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023) (citations omitted).

## III.    DISCUSSION

The Court first takes up Defendants' request for judicial notice before turning to the motion to dismiss.

### A.    Request for judicial notice

Defendants seek judicial notice of Exhibits A-T,[4] described below, and additionally ask that Exhibits A-E, G-L, and N-T be deemed incorporated by reference:

- Exhibit A: Allbirds' Form S-1/A Registration Statement, filed with the SEC on October 25, 2021, and referenced in paragraphs 1-2, 4-5, 18, 20-22, 24-29, 49, 102, 106, 113, 120-143, 273, 277, 293-294, 297, and 299 of the SAC.

- Exhibit B: Allbirds' November 30, 2021 press release titled, *Allbirds Reports Third Quarter 2021 Financial Results*, filed with the SEC as an exhibit to Allbirds' Form 8-K on November 30, 2021, and referenced in paragraphs 144-145 of the SAC.

- Exhibit C: Allbirds' February 23, 2022 press release titled, *Allbirds Reports Fourth Quarter and Full Year 2021 Financial Results*, filed with the SEC as an exhibit to

---

[4] The documents are attached to the declaration of Lisa R. Bugni.  ECF 95-1 ("Bugni Decl.").

Allbirds' Form 8-K on February 23, 2022, and referenced in paragraphs 163-164 of the SAC.

- Exhibit D: Allbirds' May 10, 2022 press release titled, *Allbirds Reports First Quarter 2022 Financial Results*, filed with the SEC as an exhibit to Allbirds' Form 8-K on May 10, 2022, and referenced in paragraphs 187-188 of the SAC.

- Exhibit E: Allbirds' August 8, 2022 press release titled, *Allbirds Reports Second Quarter 2022 Financial Results*, filed with the SEC as an exhibit to Allbirds' Form 8-K on August 8, 2022, and referenced in paragraphs 210-211 of the SAC.

- Exhibit F: Allbirds' November 8, 2022 press release titled, *Allbirds Reports Third Quarter 2022 Financial Results*, filed with the SEC as an exhibit to Allbirds' Form 8-K on November 8, 2022.

- Exhibit G: The transcript of Allbirds' Third Quarter 2021 earnings call held on November 30, 2021, referenced in paragraphs 146-150 of the SAC.

- Exhibit H: The transcript of Allbirds' Fourth Quarter 2021 earnings call held on February 23, 2022, referenced in paragraphs 165-168 of the SAC.

- Exhibit I: Allbirds' Form 10-K for the year ended December 31, 2021, filed with the SEC on March 16, 2022, and referenced in paragraphs 169-186 of the SAC.

- Exhibit J: The transcript of Allbirds' First Quarter 2022 earnings call held on May 10, 2022, referenced in paragraphs 189-197 of the SAC.

- Exhibit K: Allbirds' Form 10-Q for the quarter ended March 31, 2022, filed with the SEC on May 11, 2022, and referenced in paragraphs 198-209 of the SAC.

- Exhibit L: The transcript of Allbirds' Second Quarter 2022 earnings call held on August 8, 2022, referenced in paragraphs 212-220 of the SAC.

- Exhibit M: The transcript of Allbirds' Third Quarter 2022 earnings call held on November 8, 2022.

- Exhibit N: Allbirds' March 9, 2023 press release titled, *Allbirds Reports Fourth Quarter and Full Year 2022 Financial Results*, filed with the SEC as an exhibit to Allbirds' Form 8-K on March 9, 2023, and referenced in paragraphs 7 and 248-249

of the SAC.

- Exhibit O: The transcript of Allbirds' Fourth Quarter and Full Year 2022 earnings call held on March 9, 2023, referenced in paragraphs 9 and 250-256 of the SAC.

- Exhibit P: Allbirds' Form 10-Q for the quarter ended September 30, 2021, filed with the SEC on December 7, 2021, and referenced in paragraphs 151-162 of the SAC.

- Exhibit Q: Allbirds' Form 10-Q for the quarter ended June 30, 2022, filed with the SEC on August 9, 2022, and referenced in paragraphs 221-231 of the SAC.

- Exhibit R: Allbirds' Form 10-Q for the quarter ended September 30, 2022, filed with the SEC on November 9, 2022, and referenced in paragraphs 232-241 of the SAC.

- Exhibit S: Zwillinger's Forms 4 filed with the SEC on January 27, 2023, February 22, 2023, and February 24, 2023, which reflect the stock sales referenced in paragraphs 117 and 270 of the SAC.

- Exhibit T: Bufano's Forms 4 filed with the SEC on September 6, 2022, December 6, 2022, and March 6, 2023, which reflect the stock sales referenced in paragraphs 118 and 271 of the SAC.

RJN at 2-6; Bugni Decl. ¶¶ 3-22.

Given the references in the SAC to Exhibits A-E, G-L, and N-T, those exhibits are properly incorporated by reference. *See Khoja*, 899 F.3d at 1006 (district court did not abuse its discretion by incorporating Form S-8 registration statement where complaint alleged the registration statement "incorporated by reference the Company's materially misleading . . . Form 8-K"). The exhibits are also proper subjects of judicial notice, as are Exhibits F and M. *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 872 (N.D. Cal. 2023).

### B.    Motion to dismiss

Defendants seek dismissal of the SAC with prejudice because Lead Plaintiffs impermissibly base their claims on a theory of fraud by hindsight. Mot. at 19-20, 38. With respect to Lead Plaintiffs' Section 11 claim specifically, Defendants argue that Lead Plaintiffs

have failed to plead sufficient facts establishing that their shares are traceable to the Registration Statement and that not one of the misstatements or omissions on which Lead Plaintiffs base their Section 11 claim is actionable. *Id.* at 20-30. With respect to Lead Plaintiffs' Section 10(b) claim, Defendants argue that Lead Plaintiffs fail to plead an actionable false statement or omission, a strong inference of scienter, loss causation, or the requisite scheme under Rule 10b-5. *Id.* at 30-38. As for the derivative claims under Sections 15 and 20(a), Defendants argue that those are subject to dismissal for lack of an adequately pleaded primary claim under Section 11 or Section 10(b). Because Defendants challenge Lead Plaintiffs' statutory standing to bring their Section 11 claim, the Court analyzes it before turning to the Section 10(b) claim.

### 1. Section 11

Section 11 of the Securities Act provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [certain enumerated parties].

*Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) (quoting 15 U.S.C. § 77k(a)) (modifications in original). "To prevail in such an action, a plaintiff must prove (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotations and citation omitted).

Lead Plaintiffs based their Section 11 claim on the following statements:[5]

- **Statement 1**: Our emphasis on design that removes unnecessary details to highlight

---

[5] In the SAC, Lead Plaintiffs use "[b]old and italics . . . to identify the misleading portion of alleged misstatements. Bold and italics are not used where falsity is alleged as to the entire statement/paragraph." SAC at 32 n.4. The statements are reproduced here consistent with the manner in which Lead Plaintiffs have incorporated bold and italics in the SAC.

our "Hero" materials **allows us to capitalize on existing designs.** Between our major materials innovations, we deliver product newness and brand excitement from **incremental launches** across color, pattern, exclusive partnerships, and additional features. Within our footwear line, we can leverage existing shoe sole tooling by modifying upper designs to create entirely new styles, transforming iconic styles into franchises. We did this with our first performance running product, the Tree Dasher, by extending that revolutionary midsole and outsole unit to the Wool Dasher Mizzle (weather-resistant), Tree Dasher Relay (laceless design), and our Allbirds x Staple collaboration (inside-out design). We believe **this approach to reinventing classic silhouettes creates timeless product style that reduces potential fashion risk that other companies fall prey to.**

We intentionally launched into the footwear category first given its technical nature, building credibility and trust with consumers before moving up the body into apparel. **We believe our foundation in comfort and simple design, coupled with our success in manufacturing high-quality, sustainable footwear gives us a distinct advantage as we expand into adjacent categories.** SAC ¶ 122.

- **Statement 2**: By making great products and telling the story of an inspirational, purpose-driven brand, **we have formed a deep connection with our community of customers.** *Id.* ¶ 124.

- **Statement 3**: As a brand with a digitally-led vertical retail distribution strategy, we are able to own the customer experience, which allows us to use data to determine **who our customers are, what is important to them, and what products are most relevant and when, allowing us to create a strong connection with our customers.** We have learned that our customers live an active and curious lifestyle, care about health and well-being, prioritize quality over price, frequently purchase products online, live in urban center settings, and appreciate socially conscious brands. In addition to communicating more effectively with our customers, **these insights allow us to meet customers' needs through the creation of new products and enhancements to our existing line.**

Further, to illustrate **the importance of engaging our customer base**, the average spend by a repeat customer in a given cohort is over 25% more in their second year as compared to what was spent in the first year, and the average spend by a repeat customer continues to increase each subsequent year. *Id.* ¶ 126.

- **Statement 4**: Our digital commerce experience is complemented by a thriving retail store fleet. With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns. All U.S. stores that were operating in 2019 generated approximately $4.3 million in average unit volume, or AUV, in their first 12 months of operation, including the stores that had their first 12 months of sales affected by COVID-19 after March 2020. **Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.** While our store channel already generates strong results on a

standalone basis, the real power of our vertical retail strategy is the synergy between the physical and digital sides of our business. ***This synergy takes the form of increased brand awareness*** and website traffic in the regions where we open new stores, driving an overall lift in sales. *Id.* ¶ 128.

- **Statement 5**: Our supply chain infrastructure is advanced compared to other brands of similar age and size. The unique relationships we have with our vendors give us agility to respond to consumer demands, where inventory can go from purchase order to ex-factory in as little as 45 days. *Id.* ¶ 130.

- **Statement 6**: After comprehensively describing why Allbirds had been successful to date and how it had created a "durable, competitive advantage," the Registration Statement went on to detail why Allbirds "***will <u>continue</u> to be successful***." Specifically, Defendants stated that they would continue to focus on and "***expand our core product families***" and touted new apparel offerings, citing the Company's "***expertise with materials***" but did not reveal the significant quality issues with the material and silhouettes used for the apparel offerings and the failure to design the apparel for Allbirds' core target consumer. *Id.* ¶ 131.

- **Statement 7**: By deepening our relationships with our repeat customers, we believe we are well-positioned to capture a greater share of the approximately seven pairs of shoes and 68 pieces of clothing that the average American bought in 2018 and realize substantial growth in our business. *Id.* ¶ 132.

- **Statement 8**: We are in the early phase of a ramp towards hundreds of potential locations in the future, ***with strong unit economics.*** Furthermore, as our store fleet expands, ***we expect our growth to accelerate***, as compared to 2020, through more efficient customer acquisition, while also receiving the benefit of increasing digital traffic as more people learn about our brand through our stores. ***Based on our stores' pre-COVID-19 performance, we believe our new stores will also be highly profitable***, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic. *Id.* ¶ 134.

- **Statement 9**: *Thought leadership moments*. We will continue to be leaders in the fight against climate change, from open-sourcing our Carbon Footprint methodology to vocally challenging copycat brands to copy our sustainability practices and not just ourdesigns. This has helped to amplify our voice and introduce us to new customers who connect with the values of our brand.

  *Community.* In 2020, we formalized our community marketing efforts by launching the Allgood Collective, a global community of ambassadors who promote the power of collective action as a force for good, embracing the Allbirds brand and products as a vehicle for positive change. The Allgood Collective is how we personify and extend our mission and values into tangible experiences, encouraging meaningful conversations and strengthening our relationship with our existing fans while also allowing us to reach and engage new groups of people.

  *Expanding our brand beacon through physical touchpoints.* Our stores are situated in

high-traffic, popular locations and serve as billboards while providing an immersive and tactile introduction to the brand.  Historically, we have seen significant awareness boosts in store markets and efficient new customer acquisition, and we expect this trend to continue with the rollout of additional locations throughout the world.

*Full-funnel marketing.*  We are at a scale now where it is effective to broaden our marketing funnel from emphasizing direct, digital conversion marketing to a full-funnel approach that utilizes TV and other mediums.  We anticipate this will result in expanding our consumer reach to a wider population, showcasing a broader array of products, and taking consumers through the entire brand journey, from awareness through consideration to conversion.  As we increase awareness, add stores, and broaden our product assortment, we believe this full-funnel approach will increase marketing efficiency.  *Id.* ¶ 136.

In addition to the above statements, Lead Plaintiffs also base their Section 11 claim on alleged violations of Item 105 of Regulation S-K, 17 C.F.R. § 229.105, and Item 303 of Regulation S-K, 17 C.F.R. § 229.303(b)(2), arising from Defendants' alleged failure "to disclose the material risk that Allbirds' underinvestment in core products and overinvestment in new products, the inventory shortages of core products and inventory excess of new products, its overly aggressive and unprofitable pace of store openings, and its evisceration of the brand marketing budget had and would continue to negatively impact the Company's financial results" and "the known trends that Allbirds' underinvestment in core products and overinvestment in new products, the inventory shortages of core products and inventory excess of new products, its overly aggressive and unprofitable pace of store openings, and its evisceration of the brand marketing budget were having a material adverse impact on its business and financial results." SAC ¶¶ 139-142.

For Lead Plaintiffs to prevail on their Section 11 claim, they must first satisfy the threshold element of statutory standing.  *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1109 (9th Cir. 2013) ("Plaintiffs' failure to plead the traceability of their shares means they lack *statutory* standing under § 11, but failure to allege statutory standing results in failure to state a claim on which relief can be granted[.]").  Lead Plaintiffs must therefore plead sufficient facts to plausibly establish that they "purchased shares traceable to the allegedly defective registration statement."  *See Slack Techs.*, 598 U.S. at 770.  In the SAC, Lead Plaintiffs allege that they "purchased or otherwise acquired Allbirds common stock pursuant and/or traceable to the

1   Registration Statement issued in connection with the Company's IPO . . . ."  SAC ¶ 18.  They

2   contend "***Allbirds issued shares in a single offering under one registration statement***[,]" and

3   thus, "[s]tatutory standing is . . . adequately pled."  Opp. at 18.  Not so.

4          The Registration Statement, which is incorporated by reference in the SAC, provides:

5              [B]eginning at the commencement of trading of our Class A
               common stock on the first trading day on which our common stock
6              is listed on Nasdaq and through the seventh consecutive trading day
               thereafter, any of our current employees (but excluding current
7              executive officers and directors) may sell in the public market up to
               25% of the shares of our common stock, including any vested
8              securities convertible into or exercisable or exchangeable for our
               common stock, held by such individual as of September 8, 2021,
9              which we refer to as the first release period[.]

10  ECF 95-3 at 219.  This is significant because "[t]ypically, when a company goes public it issues

11  new shares pursuant to a registration statement[,]" but "a company's early investors and

12  employees may own preexisting shares . . . not subject to registration requirements."  *Slack Techs.*,

13  598 U.S. at 763.  While "alleging that the plaintiff's shares are 'directly traceable' to the offering

14  in question might well suffice . . . when all of the company's shares were issued in a single

15  offering under a single registration statement," here, "further factual enhancement is needed

16  because by definition [not] *all* of the company's shares will be directly traceable to the offering in

17  question."  *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1107.  Lead Plaintiffs may

18  thus not rely on a cursory allegation that their stock is "traceable to the Registration Statement

19  issued in connection with the Company's IPO" to establish statutory standing.  *See id.* at 1108

20  ("Standing alone, the conclusory allegation that plaintiffs 'purchased Century Aluminum common

21  stock directly traceable to the Company's Secondary Offering' does not allow us to draw a

22  reasonable inference about anything because it is devoid of factual content.").

23         For these reasons, the Court **GRANTS** Defendants' motion to dismiss the Section 11 claim

24  for lack of statutory standing, without reaching the parties' remaining arguments about the claim.

25  The derivative Section 15 claim is also dismissed.  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697

26  F.3d 869, 886 (9th Cir. 2012).  Because Plaintiffs may be able to state a Section 11 claim, as well

27  as a derivative Section 15 claim, if they can in good faith add allegations that their shares are

28  directly traceable to Registration Statement, the Court cannot conclude amendment would be

United States District Court
Northern District of California

13

futile, and therefore grants the motion with leave to amend.  *See Barahona v. Union Pac. R.R. Co.*, 881 F.3d 1122, 1134 (9th Cir. 2018) ("[L]eave to amend should be denied as futile 'only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense.' ").  The Court now turns to Lead Plaintiffs' Section 10(b) claim.

### 2.   Section 10(b)

Section 10(b) of the Exchange Act proscribes "manipulative or deceptive" practices in connection with the purchase or sale of registered securities on a national securities exchange.  15 U.S.C. § 78j(b).  Implementing Rule 10b-5 is "coextensive" with Section 10(b).  *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023).  To state a claim under Section 10(b) and Rule 10b-5(b), Lead Plaintiffs "must allege: (1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation."  *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024) (citing *In re Bofi Holding, Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020)).

Lead Plaintiffs identify the following statements[6] as giving rise to their Section 10(b) claim:

- **Statement 10**: We saw ***strong consumer response*** in the quarter to our new product innovation, including our new Perform Apparel line.  We're aligning our purpose of reversing climate change with our ***product quality*** and financial outcomes.  SAC ¶ 144.

- **Statement 11**: We opened our first store in 2017.  And despite the slowdown of this channel during the pandemic, we now operate a fleet of 35 stores globally with 23 in the U.S.  ***Each store has strong standalone four wall economics***.

  ***Our stores generate strong returns on invested capital*** and have attractive payback periods.  And ***when we open new stores, it drives increased brand awareness, provides a halo effect on the overall business.***  And hence we approve the efficacy of our marketing spent these impacts along with lower return rates and more efficient transportation means that growth in physical retail also drives margin expansion.

  ***We have a strong pipeline of new stores ahead, and ultimately we see white space for hundreds of stores over time.***  *Id.* ¶ 146.

---

[6] The Court lists all of the statements Lead Plaintiffs identify, even those that, apart from the dates they were made, appear to be duplicates.

- **Statement 12**: And ***now that we have gained consumers trust, we believe they will now embrace our material innovations apply to apparel categories.***

  Underpinning the opportunity to drive growth in our retail and international businesses is an incredible product pipeline, led by footwear ***with a growing and important apparel offering.*** Our robust R&D engine means that we're continually innovating, in our short history, ***we've proven that our material and innovation platform creates a powerful flywheel, enabling us to build winning franchises while empowering us to expand into new categories.*** *Id.* ¶ 148.

- **Statement 13**: We saw a ***great response in the quarter to our product innovation with strong traction*** from the Wool Piper Mid, Sugar Rover and Perform Apparel launch in August, an exciting new collection to complement our performance footwear offering. *Id.* ¶ 149.

- **Statement 14**: In addition to seeking to acquire new customers, ***we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions.***

  It is critical that we maintain our long-trusted commitment to offering the most comfortable, ***high performance***, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with ***new products appealing to our existing customers.*** *Id.* ¶ 151.

- **Statement 15**: In addition, ***our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers***, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. ***If existing customers no longer find our products appealing***, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

  ***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.*** *Id.* ¶ 153.

- **Statement 16**: ***If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns***, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. ***If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected. If product quality issues are widespread*** or result in product recalls, our brand and reputation could be harmed, we could incur

substantial costs, and our results of operations and financial condition could be adversely affected.  *Id.* ¶ 155.

- **Statement 17**: Marketing expense consists of advertising costs incurred to acquire new customers, ***retain existing customers***, and ***build our brand awareness***.  We expect marketing expense to continue to increase in absolute dollars as we ***continue to expand our brand awareness***, introduce new product innovations across multiple product categories, and implement new marketing strategies.  *Id.* ¶ 156.

- **Statement 18**: We create differentiated brand marketing content and utilize performance marketing to drive customers from awareness to consideration to conversion, and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app.  *Id.* ¶ 158.

- **Statement 19**: With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns.  We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy.  ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.***  *Id.* ¶ 159.

- **Statement 20**: ***Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows.***  For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices at our outlet store in Northern California.

  Conversely, ***if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.***  *Id.* ¶ 161.

- **Statement 21**: Importantly, we believe that our innovation engine, continued retail store expansion, and increasing international presence will continue to drive an accelerating topline growth rate in 2022.  *Id.* ¶ 163.

16

- **Statement 22**: *Consumers had a positive reaction on the apparel side*, to our comfy and cozy loungewear.  *Id.* ¶ 165.

- **Statement 23**: In apparel, we launched a switch product that has been *well received by our customers* and embodies our key differentiator, leveraging unique natural materials to deliver next to skin comfort, a hallmark of the Allbirds brand, which we expect will help us win long-term.  And then lastly, apparel is a journey.  We continue to see that as something that can augment footwear franchises increase average order value, repeat purchase rate, *the strategy is working*.  *Id.* ¶ 166.

- **Statement 24**: *Awareness is one aspect that we're focused on*.  *Id.* ¶ 166.

- **Statement 25**: Our emphasis on design that removes unnecessary details to highlight our "Hero" materials *allows us to capitalize on existing designs*.  Between our major materials innovations, we deliver product newness and brand excitement from *incremental launches* across color, pattern, exclusive partnerships, and additional features.  *Id.* ¶ 169.

- **Statement 26**: As a brand with a digitally-led vertical retail distribution strategy, we are able to own the customer experience, which allows us to use data to determine *who our customers are, what is important to them, and what products are most relevant and when, allowing us to create a strong connection with our customers*.  We have learned that our customers live an active and curious lifestyle, care about health and well-being, prioritize quality over price, frequently purchase products online, live in urban center settings, and appreciate socially conscious brands. In addition to communicating more effectively with our customers, *these insights allow us to meet customers' needs through the creation of new products and enhancements to our existing line.  Id.* ¶ 171.

- **Statement 27**: In addition to seeking to acquire new customers, *we continuously seek ways to engage with our large and growing base of over four million existing customers.  We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions.*

  It is critical that we maintain our long-trusted commitment to offering the most comfortable, *high performance*, and sustainable products.  Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with *new products appealing to our existing customers.  Id.* ¶ 173.

- **Statement 28**: In addition, *our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers,* particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer.  *If existing customers no longer find our products appealing*, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the

future.

*If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.* *Id.* ¶ 175.

- **Statement 29**: If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. *If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.* If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected. *Id.* ¶ 177.

- **Statement 30**: Marketing expense consists of advertising costs incurred to acquire new customers, *retain existing customers,* and *build our brand awareness*. We expect marketing expense to continue to increase in absolute dollars as we *continue to expand our brand awareness*, introduce new product innovations across multiple product categories, and implement new marketing strategies.

  *We are focused on increasing brand awareness and consumer touchpoints through the following marketing initiatives:*

    Spreading our message through word-of-mouth, thought leadership and PR, partnerships, and community.

    Extending our reach and connecting with our customers through digital and performance marketing, TV and other media, stores as physical brand beacons, and customer experience.

  *We create differentiated brand marketing content* and utilize performance marketing to drive customers from awareness to consideration to conversion, and *promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing* campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app. *Id.* ¶¶ 178, 179, 181.

- **Statement 31**: With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns. We expect our stores to rebound to pre-COVID levels over time following the

broader reopening of the economy. **Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.** *Id.* ¶ 182.

- **Statement 32**: Inventory levels in excess of customer demand **may result** in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which **could** cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices at our outlet store in Northern California.

  Conversely, **if we underestimate customer demand for our products** and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and **we may experience inventory shortages**. Inventory shortages in our stores or third-party distribution centers **could** result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows. *Id.* ¶ 185.

- **Statement 33**: We remain focused on driving the topline through our core growth pillars of **delivering product innovation, growing our store portfolio** and expanding internationally, with those growth pillars highlighted in 2022 by what we believe is the most exciting new product roadmap in the history of the company. *Id.* ¶ 187.

- **Statement 34**: **Designed to perform equally well on a first run on race day or anything in between. The Tree Flyer has gone through extensive development and testing both in our innovation lab and on the road with countless iterations developed to perfect the shoe. The shoe has been road tested by more than 100 runners over 6,000 miles across a wide array of conditions and climates to validate its remarkable performance attributes.** We are incredibly excited about this launch and as our first high-performance product expected to meaningfully increase our credibility in this category.

  The core of what makes the Tree Flyer so special is SweetFoam a first of its kind midsole technology. **The result is a shoe made for runners of all stripes** with our highest rebound rate yet at 70%. While midsoles are usually made from petroleum and logan at 100% synthetic, SweetFoam leverages plant-based oils enabling a 20% reduction in carbon footprint versus petroleum-based synthetic alternatives. Tree Flyer's bouncy airy SweetFoam midsoles are 30% more responsive, 25% lighter and require less energy to manufacture than our existing SweetFoam. A strong testament to Allbirds' **commitment to sustainable innovation and relentless improvement**, while continuing to tap into the design white space of reductive design to provide style versatility for **even the best runners.** *Id.* ¶ 189.

  **Statement 35**: Now I'll turn to our third growth pillar, the store portfolio and our

19

broader distribution strategy. ***Our retail footprint is highly productive and serves as an efficient means to acquire new customers. Opening new stores drive increased brand awareness and provides a halo effect on the overall business***, including an increase in the absolute number and mix of repeat customers who shop with us both digitally and in stores. *Id.* ¶ 191.

- **Statement 36**: We're continuing to see that trend really positively. And this is all about using that flywheel of distribution and then, great brand great brand building techniques around partnerships and other campaigns that we're running. So it's all about methodically building that with stores with great marketing. And as we're doing that we're seeing not only good awareness lift, but also good awareness lift in the right factors. *Id.* ¶ 193.

- **Statement 37**: So I think all that consumer research is saying, yes sustainability matters, but it's only in service of better product experiences. And that's our focus. And I think in performance and in ***the flyer I think is a great example of us executing that at a very high level.*** *Id.* ¶ 194.

- **Statement 38**: So during COVID we started signing leases in lifestyle centers in suburban malls and whatnot. ***Those have performed really, really well. And those have proven to be much more resilient regardless of the consumer behaviors, or restrictions in the regions and whatnot.***

   So we are continuing to – we are continuing to focus on those types of real estate transactions when we're signing leases and ***we're seeing quite a bit of positive uplift in those as we start up new stores as well.*** But that said, ***looking at the Flatiron launch that we just did about a month ago it's been a really, really fantastic launch for us for a new store*** and gives us a lot of confidence in the comeback for Manhattan, which is I think a really nice bellwether for a lot of urban environments. ***And if you couple that with our store in SoHo we're just seeing a nice trend and that gives us a lot of confidence to hit on those targets we mentioned.*** *Id.* ¶ 196.

- **Statement 39**: In addition to seeking to acquire new customers, ***we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions.***

   It is critical that we maintain our long-trusted commitment to offering the most comfortable, ***high performance,*** and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with ***new products appealing to our existing customers***. *Id.* ¶ 198.

- **Statement 40**: In addition, ***our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers***, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. ***If existing customers no longer find our products appealing***, are not satisfied with our customer service, or if we are unable to timely update our

products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

*If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.* Id. ¶ 200.

- **Statement 41**: If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. *If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.* If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected. Id. ¶ 202.

- **Statement 42**: Marketing expense consists of advertising costs incurred to acquire new customers, *retain existing customers*, and *build our brand awareness*. We expect marketing expense to continue to increase in absolute dollars as we *continue to expand our brand awareness*, introduce new product innovations across multiple product categories, and implement new marketing strategies.

  We create differentiated brand marketing content and utilize performance marketing to drive customers from awareness to consideration to conversion, and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app. Id. ¶¶ 203, 205.

- **Statement 43**: With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns. We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy. *Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic*. Id. ¶ 206.

- **Statement 44**: Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse

effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices through our own channels and certain thirdparty retailers.

Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.  *Id. ¶ 208.*

- **Statement 45**: In this operating environment, we are focused on controlling what we can control and have implemented a series of Simplification Initiatives focused on automating and expanding our supply chain and streamlining our operating structure. These Simplification Initiatives are expected to generate annualized SG&A expense savings of $13 million to $15 million beginning in 2023 and significant cost of revenue savings in future years.  ***We will reinvest some of these savings into building brand momentum*** through product innovation, marketing, retail stores, and marquee third party partnerships.  ***We are confident that these investments in the customer***, coupled with our Simplification Initiatives, will help us navigate this consumer slowdown and position us for accelerated profitable growth when the headwinds pass.  *Id. ¶ 210.*

- **Statement 46**: As per product, Q2 also saw the ***highly successful launch of our first high-performance running shoe, the Flyer***.  *Id. ¶ 212.*

- **Statement 47**: And the response from both consumers and media alike has been ***overwhelmingly*** positive.  In fact 43% of Flyer sales in the first 30 days post launch were to new customers, which we believe is ***a strong proof point that our performance offering is not only resonating with our existing audience, but bringing new customers into the Allbird' brand***.  *Id. ¶ 213.*

- **Statement 48**: ***Our stores are not only the best expression of the Allbirds brand, but are a fantastic customer acquisition tool, all while delivering strong four-wall economics.***

During the quarter, our US store sales increased nearly 120% year-over-year. We opened seven stores in Q2, bringing us to a total of 46 as of June 30. To highlight a few. In the US, we opened in Fashion Island in Newport Beach in early June, which is our first store in Orange County and seventh in Southern California and it has exceeded our expectations.

As we build stores in the region, such as Southern California, ***we see meaningful gains in awareness, drive strong store economics across the region, while substantially lifting overall commerce across channels***.  *Id. ¶ 215.*

- **Statement 49**: When we decided to connect our successful footwear franchises to apparel offerings, we leverage unique natural materials to deliver next to skin comfort, a consistent hallmark of the Allbirds brand. ***This is reflected in the success of some of our core apparel offerings including our socks, underwear, our classic T-shirts, and sweats, which continue to perform well as expansions of our material platforms and articulations of supernatural comfort. . . . The innovation and product focus remains vastly on footwear.*** *Id.* ¶ 217.

- **Statement 50**: We've done such a good job of early diversification of the media spend that we have that we come back to a place where our overall business can still have leverage on the marketing line item, ***while we're investing and doubling down in brand. And that to us is the right long-term formula, so that we can be adaptive and dynamic to the current situation, while not sacrificing any of the long-term possibility that this brand has***. *Id.* ¶ 219.

- **Statement 51**: In addition to seeking to acquire new customers, ***we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions.*** It is critical that we maintain our long-trusted commitment to offering the most comfortable, ***high performance***, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with ***new products appealing to our existing customers***. *Id.* ¶ 221.

- **Statement 52**: In addition, ***our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers***, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. ***If existing customers no longer find our products appealing***, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

  ***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.*** *Id.* ¶ 223.

- **Statement 53**: If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. ***If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.*** If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected. *Id.* ¶ 225.

- **Statement 54**: Marketing expense consists of advertising costs incurred to acquire new customers, ***retain existing customers***, and ***build our brand awareness***.  We expect marketing expense to continue to increase in absolute dollars as we ***continue to expand our brand awareness***, introduce new product innovations across multiple product categories, and implement new marketing strategies.

  We create differentiated brand marketing content and utilize performance marketing to drive customers from awareness to consideration to conversion, and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app.  *Id.* ¶¶ 226, 228.

- **Statement 55**: Inventory levels in excess of customer demand may result in inventory write-downs, inventory write-offs, donations by us of our unsold products, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows.  For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices through our own channels and certain third-party retailers.  Additionally, for the three months ended June 30, 2022, we recognized a non-cash inventory write-down, primarily for certain first-generation apparel products.

  Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.  *Id.* ¶ 230.

- **Statement 56**: In addition to seeking to acquire new customers, ***we continuously seek ways to engage with our large and growing base of over four million existing customers.  We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions.***

  It is critical that we maintain our long-trusted commitment to offering the most comfortable, ***high performance***, and sustainable products.  Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with ***new products appealing to our existing customers***.  *Id.* ¶ 232.

- **Statement 57**: In addition, ***our future success depends in part on our ability to***

*increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers*, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. *If existing customers no longer find our products appealing*, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

*If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.* *Id.* ¶ 234.

- **Statement 58**: If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. *If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.* If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected. *Id.* ¶ 236.

- **Statement 59**: Marketing expense consists of advertising costs incurred to acquire new customers, *retain existing customers*, and *build our brand awareness*. We expect marketing expense to continue to increase in absolute dollars as we *continue to expand our brand awareness*, introduce new product innovations across multiple product categories, and implement new marketing strategies.

   *We create differentiated brand marketing content* and utilize performance marketing to drive customers from awareness to consideration to conversion, *and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective*, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app. *Id.* ¶¶ 237, 239.

- **Statement 60**: Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices through our own channels and certain third-party

retailers.

> Conversely, if we underestimate customer demand for our products and fail to place
> sufficient orders with our manufacturers in advance, then our manufacturers may not
> be able to deliver products to meet our requirements and we may experience inventory
> shortages. Inventory shortages in our stores or third-party distribution centers could
> result in delayed shipments to customers, lost sales, a negative customer experience,
> lower brand loyalty, and damage to our reputation and customer relationships, any of
> which could have an adverse effect on our results of operations, financial condition,
> and cash flows. *Id.* ¶ 240.

In addition to the above statements, Lead Plaintiffs also base their Section 10(b) claim on alleged violations of Item 105 of Regulation S-K, 17 C.F.R. § 229.105, and Item 303 of Regulation S-K, 17 C.F.R. § 229.303(b)(2), arising from Defendants' allege failure "to disclose the material risk that Allbirds' underinvestment in core products and overinvestment in new products, the inventory shortages of core products and inventory excess of new products, its overly aggressive and unprofitable pace of store openings, and its evisceration of the brand marketing budget had and would continue to negatively impact the Company's financial results" and "the known trends that Allbirds' underinvestment in core products and overinvestment in new products, the inventory shortages of core products and inventory excess of new products, its overly aggressive and unprofitable pace of store openings, and its evisceration of the brand marketing budget were having a material adverse impact on its business and financial results." SAC ¶¶ 243-246.

Defendants contend dismissal of Lead Plaintiffs' Section 10(b) is warranted because none of the above statements or omissions are actionable, and because Lead Plaintiffs have failed to adequately allege facts establishing scienter, loss causation, or scheme liability. Mot. at 30-38. Since the failure to sufficiently allege facts establishing scienter is sufficient to warrant dismissal of the Section 10(b) claim, the Court addresses that issue without reaching the parties' remaining arguments about the claim.

To plead scienter, Lead Plaintiffs' complaint "must 'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)). "A 'strong inference' exists

26

'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " *Glazer Cap. Mgmt., L.P., v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (quoting *Tellabs*, 551 U.S. at 324). In evaluating whether this standard is met, the court first "determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter." *Id.* (internal quotations and citation omitted). "[S]econd, if no individual allegations are sufficient, [the court] conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Id.* (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009)).

Lead Plaintiffs' scienter allegations are as follows: "Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading." SAC ¶ 263. They "knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws." *Id.* "The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Allbirds, their control over, and/or receipt and/or modification of Allbirds' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Allbirds, participated in the fraudulent scheme." *Id.*

Lead Plaintiffs also rely on reports from confidential witnesses, including two who described Zwillinger's and Brown's managerial style "as very hands on and controlling." *Id.* ¶ 264. One of these confidential witnesses – CW4 – reported that Allbirds was "the Tim and Joe show." *Id.* The other – CW7 – confirmed that "no decisions were made without them." *Id.* Other confidential witnesses "confirmed that the Individual Defendants attended countless meetings during which they were informed that apparel had quality and fit issues, apparel did not resonate with customers, retail stores struggled to sell apparel and had excess inventory, Allbirds retail fleet was not profitable, and Allbirds needed to grow brand awareness and thus needed to correct its lopsided marketing budget." *Id.* ¶ 265. These meetings, which Lead Plaintiffs allege

United States District Court
Northern District of California

took place both before and during the Class Period, included monthly sales and operations meetings, monthly real estate meetings, monthly retail store performance meetings, monthly apparel meetings; and monthly marketing meetings, monthly leadership meetings, monthly "all hands" meetings, the yearly "Flock Week" held in January, and the yearly "Back to Birdhouse" event in September.[7]  *Id.*

Lead Plaintiffs highlight the March 9, 2023 disclosure to establish scienter.  In that disclosure, "Defendants admitted that they 'made some strategic and executional missteps that impacted results,' (i.e., the issues discussed at the many meetings described supra) which included that they: 1) 'overemphasized products that extended beyond our core DNA;' 2) 'were spending significant time and resources on these new products that did not resonate well;' 3) 'overinvested in seasonal trend colors and new silhouettes;' 4) 'underinvested in our core consumers' favorite products,' 5) 'shifted our focus away from our core consumer;' 6) 'did not increase our brand awareness,' and 7) opened stores too aggressively and thus needed to 'slow[] the pace of new store openings.' "  *Id. ¶ 267.*

Lead Plaintiffs also rely on personnel changes at the executive level to establish scienter. They allege that "[t]he Exchange Act Defendants' awareness that operations had deteriorated as a result of their strategic 'missteps' led them to bring in Chief Operating Officer Joseph Vernachio in July 2021 to clean up the 'mess,' according to CW4."  *Id. ¶ 266.*  "[I]n 2022, Defendants hired Chief Transformation Officer Jared Fix, who brought in the Boston Consulting Group, to transform and reignite the brand in the wake of Defendants' failed pivots.  *Id.*  After the March 9, 2023 disclosure, Allbirds also announced that "Bufano was stepping down as the Company's CFO and that Annie Mitchell was taking his place, effective April 24, 2023."  *Id. ¶ 268.*  On May 4, 2023, Allbirds also "announced amidst a series of layoffs that Defendant Brown would step down

---

[7] "Allbirds held two big management meetings every year for store managers.  One called Flock Week in January, for the purpose of reviewing financials and goal setting for the year, and one called Back to the Birdhouse in September, to check in on how they performed in the previous year and to look ahead to the following year."  SAC ¶ 80.

as co-CEO effective immediately and would transition into the role of Chief Innovation Officer, a non-executive role." *Id.* ¶ 269.

Finally, Lead Plaintiffs allege that certain stock sales are indicative of scienter. "Zwillinger sold 166,665 shares of Allbirds stock for proceeds of $461,786," and "[a]ll of these sales took place between January 25, 2023 and February 23, 2023[,] . . . in the weeks leading up to the March 9, 2023 corrective disclosure." *Id.* ¶ 270. "Bufano sold 32,739 shares of Allbirds stock for proceeds of $103,408 in three separate sales, the last of which occurred on March 2, 2023, seven days before the corrective disclosure." *Id.* ¶ 271. Lead Plaintiffs also point to Zwillinger's, Brown's, and Bufano's compensation for the year 2022. Zwillinger and Brown "each received a $365,462 salary, $2,012,471 in stock awards, and $2,059,226 in option awards[,]" and "Bufano received a $395,557 salary, and $1,296,687 in stock awards." *Id.* ¶ 272.

Viewed individually or holistically, none of these allegations is sufficient to give rise to a strong inference of scienter. Lead Plaintiffs' allegations that Defendants knew the statements made to the public were false or misleading because they were so hands on that it would be absurd to suggest they lacked such knowledge are not adequately pleaded. "The 'core operations' doctrine allows the knowledge of certain facts that are critical to a business's 'core operations' to be attributed to a company's key officers." *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018). The cases in which the doctrine "has supported a strong inference of scienter typically involve specific admissions from top executives that they are involved in every detail of the company, or where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter[.]" *See Espy v. J2 Global, Inc.*, 99 F.4th 527, 539 (9th Cir. 2024). Here, Lead Plaintiffs allege that Defendants "periodically review inventory and mark provisions as necessary to appropriately value slow-moving, damaged, and excess inventory," and even if confidential witnesses were accurate in describing Allbirds as the "Tim and Joe show," SAC ¶ 264, and characterizing their involvement "as very hands on and controlling," *id.*, such that they were aware of the major swifts in a strategy that ended up failing, that is not enough. *See Espy*, 99 F.4th at 539 (concluding that executives "signed off on every acquisition, received detailed reports, or were 'obsessed with numbers,' d[id] not compel a strong

1    inference that they had knowledge of the alleged omitted information about particular

2    underperforming acquisitions under [the company's] umbrella and . . . cover[ed] them up."); *Webb*

3    *v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) (alleging defendants "had a hands-on style

4    and general accounting acumen, but not that they were involved in accounting decisions as minute

5    as the [actual] calculation[s]" was insufficient to invoke the core operations doctrine); *cf. In re*

6    *Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706-707 (9th Cir. 2021) (finding a strong inference that

7    executive had the requisite knowledge where the plaintiffs alleged that key officers and directors

8    had directed to conceal information to "buy time" during a period of "heightened public and

9    regulatory scrutiny").

10        The purported admissions Defendants made on March 9, 2023 are likewise insufficient to

11   support a strong inference of scienter.  Lead Plaintiffs allege that on that date:

> Defendants admitted that they "made some strategic and executional
> missteps that impacted results," (i.e., the issues discussed at the
> many meetings described supra) which included that they:
> 1) "overemphasized products that extended beyond our core DNA;"
> 2) "were spending significant time and resources on these new
> products that did not resonate well;" 3) "overinvested in seasonal
> trend colors and new silhouettes;" 4) "underinvested in our core
> consumers' favorite products," 5) "shifted our focus away from our
> core consumer;" 6) "did not increase our brand awareness," and
> 7) opened stores too aggressively and thus needed to "slow[] the
> pace of new store openings."

18   SAC ¶ 267.  That Defendants acknowledged these missteps does not support an inference that they

19   acted with intent to defraud.  "Management simply may have been confident that they could

20   overcome the problems or merely underestimated the severity of such problems."  *Aramic LLC v.*

21   *Revance Therapeutics, Inc.*, No. 21-CV-09585-AMO, 2024 WL 1354503, at *14 (N.D. Cal. Apr.

22   2, 2024) (internal quotations and citations omitted).  *Cf. Thomas v. Magnachip Semiconductor*

23   *Corp.*, 167 F. Supp. 3d 1029, 1042-43 (N.D. Cal. 2016) (finding an inference of scienter where

24   management admitted participating in improper practices, including circumvention of internal

25   controls under their control); *Luna v. Marvell Tech. Grp.*, No. C 15-05447 WHA, 2017 WL

26   2171273, at *4 (N.D. Cal. May 17, 2017) ("admissions that senior management employed an

27   inappropriate 'tone at the top' that applied pressure to meet revenue targets not only on sales

28   personnel. . . but also on finance personnel" supported an inference of scienter).

United States District Court
Northern District of California

1      Lead Plaintiffs' reliance on confidential witness statements is also misplaced.  Statements

2  by confidential witnesses[8] that executives were mismanaging Allbirds, that they were presented

3  with data showing their anticipated path forward would lead to failure, or that they were making

4  mistakes by reducing spending on brand marketing and core products in favor of other approaches

5  do not, without more, plausibly suggest that Allbirds executives adopted employees' views and

6  moved forward believing that failure would be the inevitable end result of continuing down the

7  path employees were cautioning against.  *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir.

8  2021) (declining to credit, in assessing falsity, former employees' statement that production goals

9  were impossible to achieve where the "[p]laintiffs had failed to plead facts showing that [the]

10  defendants adopted the conservative timeline for production on which these employees'

11  pessimism was based."); *Espy*, 99 F.4th at 537 ("Former employee's criticisms "even if . . .

12  reliable . . . are simply negative opinions of [the defendant's] business practices or compensation

13  structures, not statements which are 'themselves . . . indicative of scienter.' ") (quoting *Zucco*, 552

14  F.3d at 995); *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1001 (N.D. Cal. 2017) ("[T]he

15  former opinions of former employees do not generally rise to the level of falsity.").  Thus,

16  statements from confidential witnesses offered here are not, on their own, sufficient to give rise to

17  a strong inference of scienter.

18      Nor do the personnel changes to which Lead Plaintiffs point.  The personnel changes,

19  unaccompanied by additional allegations of wrongdoing are insufficient.  To support a strong

20  inference of scienter, "a plaintiff must allege sufficient information to differentiate between a

21  suspicious change in personnel and a benign one."  *Zucco*, 552 F.3d at 1002.  Lead Plaintiffs have

22  made no such allegations here, and without them "the inference that the defendant corporation

23  forced certain employees to resign because of its knowledge of the employee's role in the

24

25  [8] Information provided by former employees must "pass two hurdles" to establish scienter.  *Zucco*,
552 F.3d at 995.  "First, the confidential witnesses whose statements are introduced to establish
26  scienter must be described with sufficient particularity to establish their reliability and personal
knowledge. . . .  Second, those statements which are reported by confidential witnesses with
27  sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Id.*
(citation omitted).  The Court assumes, without deciding, that these prerequisites are met.
28

United States District Court
Northern District of California

1    fraudulent representations will never be as cogent or as compelling as the inference that the

2    employees resigned or were terminated for unrelated personal or business reasons." *Id.*  Indeed,

3    Lead Plaintiffs allege that neither Brown nor Zwillinger "had retail experience prior to founding

4    Allbirds." SAC ¶¶ 64.  Their lack of experience[9] is more compelling an explanation for why they

5    lost their positions.  Lead Plaintiffs' allegations about personnel changes thus fail give rise to a

6    strong inference of scienter.

7           Zwillinger's and Bufano's stock sales are likewise insufficient.  Between January 25, 2023

8    and February 23, 2023, Zwillinger sold 166,665 shares of Allbirds stock for $461,786.  SAC

9    ¶ 117.  "Bufano sold 32,739 shares of Allbirds stock for proceeds of $103,408 in three separate

10   sales, the last of which occurred on March 2, 2023, seven days before the corrective disclosure."

11   *Id.* ¶ 118.  In their opposition, Lead Plaintiffs describe these stock sales as "suspicious," without

12   pointing to any allegations in the complaint.  Assuming that Lead Plaintiffs' description derives

13   from the timing of Zwillinger's and Bufano's stock sales, the timing alone is not enough,

14   particularly where, as here, another executive – Brown – sold no stock.  *See Hampton v. Aqua*

15   *Metals, Inc.*, No. 17-CV-07142-HSG, 2020 WL 6710096, at *16 (N.D. Cal. Nov. 16, 2020) ("The

16   absence of sales by [one executive], who made many of the statements at issue, and [other

17   executives'] retention of more than 90% of their holdings, contradict any inference of scienter.").

18          "[S]tock sales by corporate insiders are suspicious only when they are dramatically out of

19   line with prior trading practices at times calculated to maximize the personal benefit from

20   undisclosed inside information."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*

21   *Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) (citations and quotations omitted).  To

22   determine this, courts consider three factors: "(1) the amount and percentage of shares sold by

23   insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's

24   prior trading history."  *Id.*  In light of the relevant factors, the timing alone is not sufficient to

25   plausibly suggest that the stock sales at issue were suspicious enough to support a strong inference

26

27   _____

     [9] Lead Plaintiffs do not address that these departures followed a "deep consumer study" discussed
28   on the March 9, 2023 earnings call.  *See* ECF 95-17 at 6, 20.  The timing of the study in relation to
     the leadership changes cuts against a strong inference of scienter because the more cogent
     explanation is that Allbirds made those changes as a reaction to the study's findings.

United States District Court
Northern District of California

1    of scienter.  The Court does not reach Defendants' assertions that the stock sales occurred pursuant

2    to a Rule 10b5-1 trading plan or two cover tax withholding obligations.

3        Finally, Lead Plaintiffs' allegations about executives' compensation do not give rise to a

4    strong inference of scienter.  "A strong correlation between financial results and stock options or

5    cash bonuses for individual defendants may occasionally be compelling enough to support an

6    inference of scienter."  *Zucco*, 552 F.3d at 1004.  Lead Plaintiffs, however, do not allege facts

7    plausibly suggesting such a correlation.  *Cf. In re Lucid Grp., Inc. Sec. Litig.*, No. 22-CV-02094-

8    AMO, 2024 WL 3745605, at *21 (N.D. Cal. Aug. 8, 2024) (finding allegations of financial gain

9    sufficient to support an inference of scienter where the plaintiff alleged executive was under

10   pressure to maintain certain capitalization thresholds in order to receive lucrative stock options

11   valued at hundreds of millions of dollars).  Thus, the mere receipt of compensation is not enough

12   to support a strong inference of scienter: "[i]f simple allegations of pecuniary motive were enough

13   to establish scienter, virtually every company in the United States that experiences a downturn in

14   stock price could be forced to defend securities fraud actions."  *Zucco*, 552 F.3d at 1004.

15       For the reasons explained above, whether taken individually or holistically, Lead

16   Plaintiffs' allegations fail to give rise to a strong inference of scienter.  Defendants' motion to

17   dismiss is therefore **GRANTED** as to Lead Plaintiffs' Section 10(b) claim and, consequently, as

18   to the derivative Section 20(a) claim.  *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th at

19   1180 ("Controlling persons liability under Section 20(a) of the Exchange Act is derivative, such

20   that there is no individual liability where there is no primary violation of securities law.") (citing

21   *Dearborn Heights*, 856 F.3d at 623; 15 U.S.C. § 77o); *Zaidi v. Adamas Pharms., Inc.*, 650 F.

22   Supp. 3d 848, 865 (N.D. Cal. 2023) (dismissing Section 20(a) claim to the extent the plaintiff had

23   not stated a primary violation of Section 10(b)).  Because Lead Plaintiffs may be able to state

24   additional good faith allegations sufficient to state a viable Section 10 claim, as well as a

25   derivative Section 20 claim, the Court cannot conclude amendment would be futile, and therefore

26   grants the motion with leave to amend.  *See Barahona*, 881 F.3d at 1134.

27   **IV.    CONCLUSION**

28       For the reasons set forth above, Defendants' motion and request for judicial notice are

United States District Court
Northern District of California

33

**GRANTED**.  Should Lead Plaintiffs wish to file a further amended complaint, they may do so within 21 days of this order.  The amended complaint must be accompanied by the redline required by the Court's Standing Order for Civil Cases ¶ H.1, with courtesy copies delivered to chambers within three days of filing.  In drafting their further amended complaint, Lead Plaintiffs should consider including only the statements they can fully defend within the default page limits applicable to any future briefing.  The Court also puts the parties on notice that in the event either side fails to sufficiently address any particular statement in future briefing, the Court may deem any arguments as to that statement waived.

      **IT IS SO ORDERED.**

Dated: June 23, 2025

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**