POMERANTZ LLP
Tamar Weinrib (*pro hac vice*)
600 Third Avenue, 20th floor
New York, New York 10016
Telephone: 212-661-1100
taweinrib@pomlaw.com

*Attorney for Plaintiffs*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

QU JINGHUA and YAU NOI, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

ALLBIRDS, INC., JOSEPH ZWILLINGER, TIMOTHY BROWN, MICHAEL BUFANO, NEIL BLUMENTHAL, DICK BOYCE, MANDY FIELDS, NANCY GREEN, DAN LEVITAN, EMILY WEISS, MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., ROBERT W. BAIRD & CO., WILLIAM BLAIR & COMPANY, L.L.C, PIPER SANDLER & CO., COWEN AND COMPANY, LLC, GUGGENHEIM SECURITIES, LLC, KEYBANC CAPITAL MARKETS INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED, TELSEY ADVISORY GROUP LLC, C.L. KING & ASSOCIATES, INC., DREXEL HAMILTON, LLC, LOOP CAPITAL MARKETS LLC, PENSERRA SECURITIES LLC, SAMUEL A. RAMIREZ & COMPANY, INC., and SIEBERT WILLIAMS SHANK & CO. LLC

Defendants.

Case No. 3:23-cv-01811-AMO

**CLASS ACTION**

**CONSOLIDATED THIRD AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 5

PARTIES ............................................................................................................................ 6

SUBSTANTIVE ALLEGATIONS .................................................................................... 13

Background ........................................................................................................................ 18

    Allbirds Underinvests in Core Offerings and Overemphasizes Ill-Conceived New Products ........ 20

    Allbirds Pursues an Overly Aggressive and Unprofitable Pace of Store Openings ........................ 26

    Allbirds Underinvests in Brand Awareness, Shifting Focus from Brand Marketing to Performance
    Marketing ...................................................................................................................... 31

    Defendants' Compensation and Insider Sales ..................................................................... 34

Materially False and Misleading Statements Issued in the False Registration Statements in Violation
of Section 11 of the Securities Act .................................................................................. 35

    Regulation S-K Item 105 ................................................................................................. 43

    Regulation S-K Item 303 ................................................................................................. 43

Materially False and Misleading Statements Issued During the Class Period in Violation of Section
10(b) of the Exchange Act ............................................................................................... 44

    Regulation S-K Item 105 ................................................................................................. 76

    Regulation S-K Item 303 ................................................................................................. 76

    The Truth Emerges ......................................................................................................... 77

SECTION 10(b) SCIENTER ALLEGATIONS ............................................................... 81

PLAINTIFF'S CLASS ACTION ALLEGATIONS .......................................................... 85

UNDISCLOSED ADVERSE FACTS ............................................................................... 89

LOSS CAUSATION ........................................................................................................ 90

NO SAFE HARBOR ........................................................................................................ 90

COUNT I .......................................................................................................................... 91

    (Violations of Section 11 of the Securities Act Against the Securities Act Defendants) ......... 91

COUNT II ......................................................................................................................... 92

    (Violations of Section 15 of the Securities Act Against the Securities Act Individual
    Defendants) .................................................................................................................... 92

COUNT III ........................................................................................................................ 93

    (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
    Against Allbirds and the Exchange Act Individual Defendants) ............................................ 93

COUNT IV ........................................................................................................................ 96

(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants) ................................................................................................................... 96

PRAYER FOR RELIEF ............................................................................................................... 97

DEMAND FOR TRIAL BY JURY ............................................................................................. 98

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiffs Qu Jinghua and Yau Noi ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, the investigation by Plaintiffs' counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Allbirds, Inc. ("Allbirds" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Allbirds; and (c) review of other publicly available information concerning Allbirds.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired: (a) Allbirds Class A common stock pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's November 2021 initial public offering ("IPO" or the "Offering") or the Forms S-8 filed on November 3, 2021 or March 28, 2022 each of which incorporated the Registration Statement by reference (collectively, the "False Registration Statements"); and/or (b) Allbirds securities between November 4, 2021 and March 9, 2023, inclusive (the "Class Period"). Plaintiffs pursue claims against Defendants under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

2.      Co-Chief Executive Officer ("CEO") Defendants Joseph Zwillinger ("Zwillinger") and Timothy Brown ("Brown") co-founded Allbirds in 2015. Allbirds describes itself as a "global lifestyle brand that innovates with naturally derived materials to make better footwear and apparel products in a better way, while treading lighter on our planet." As recently as the Company's 2022

10-K filed on March 10, 2023, the Company has made clear, however, that "footwear represents the vast majority of our revenue and is the foundation of our brand." Allbirds' core products include lifestyle and performance shoes, such as the Wool Runner, the Tree Runner, and the Dasher, which the Company successfully launched in 2016, 2018, and 2020 respectively. With its focus on these core products, Allbirds enjoyed tremendous growth as a direct-to-consumer company and pushed forward toward an IPO. On November 4, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold 23,221,152 shares of Allbirds Class A common stock (16,850,799 shares by Allbirds and 6,370,353 shares by certain existing stockholders) at a price of $15.00 per share. Allbirds received proceeds of approximately $253 million from the Offering, net of underwriting discounts and commissions.

3.     As the Company's IPO loomed, and in the years that followed, the Company's co-founders made significant missteps by shifting Allbirds' business strategy in three fundamental ways. First, Allbirds tried to expand too quickly by overinvesting in and overemphasizing new products that did not resonate with consumers, including apparel with quality and fit issues, while underinvesting in its core footwear products and shifting focus away from its core consumer. Second, Allbirds pursued an aggressive pace of store openings, though existing stores struggled to attain profitability, and did not slow down that pace despite the dismal performance of its stores' due to: (i) inability to sell new product offerings, (ii) market saturation, and (iii) "cannibalization" where new stores opened in close proximity to existing stores. Third, though publicly acknowledging throughout its existence that the "Allbirds brand is integral to our business strategy and our ability to attract and engage customers," the Company slashed its brand marketing budget by half every year beginning in 2019, abandoning its commitment to growing brand awareness. These material internal missteps continued throughout the Class Period, unbeknownst to investors.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

4.      This hidden reality did not match Defendants'[1] public statements, both in the Registration Statement at the time of the IPO, and then during the Class Period in press releases, Forms 10-Q and 10-K, and on quarterly earnings calls with analysts. Specifically, Defendants represented that they were "continuously seeking ways to engage" with Allbirds' core consumers, claimed that its "high quality" and "high performance" new products appealed to its existing consumers and had a strong customer response, and stated that the Company continued to focus and capitalize on core designs. Defendants also touted their increasing retail store fleet, citing historical profitability as a strong predictor of new stores' success, and claiming their stores had strong economics and strong returns. Finally, Defendants emphasized their continued focus on building and expanding brand awareness through brand marketing campaigns.

5.      These false and misleading statements in the False Registration Statements and in filings throughout the Class Period misled investors because: (i) Allbirds was overemphasizing and overinvesting in new products, including apparel, that extended beyond the Company's core offerings; (ii) the Company's non-core products had a narrower appeal and did not resonate with customers as well as the Company's core products; (iii) Allbirds was underinvesting in its core consumers' favorite products to push the Company's newer products with narrower appeal; (iv) underinvesting in Allbirds' core products was negatively impacting the Company's sales; (v) the Company pursued an aggressive pace of store openings though its existing stores struggled and though new stores failed to attain profitability due to ill-received product offerings, market saturation, and cannibalization; (vi) Allbirds' retail stores had significant inventory issues including insufficient inventory of core products that customers wanted and excess inventory of new products that did not resonate with consumers, and thus did not sell; (vii) the Company shifted its marketing strategy toward performance marketing at the expense of brand marketing despite

---

[1] The precise Defendants that issued each misleading statement and that are the subject of each distinct claim asserted herein are delineated in detail below.

the significance of brand awareness to its success; and (viii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.    Defendants Zwillinger, Brown, and Chief Financial Officer ("CFO") Michael Bufano ("Bufano"), attended multiple monthly meetings throughout the Class Period, described below, geared toward *inter alia* sales and operations, apparel, marketing and real estate, during which issues with the new product offerings (including poor quality and excessive inventory levels because the products did not resonate with consumers and thus did not sell well), "dismal" results from the aggressively expanding retail store fleet which was "hemorrhaging money," and the lopsided marketing budget following severe cuts to brand marketing, were extensively discussed. Nevertheless, Defendants continued to issue false and misleading statements relevant to each of these issues, without divulging the seismic and disastrous shift in their business strategies.

7.    On March 9, 2023, after the market closed, Allbirds issued a press release reporting fourth quarter and full year 2022 financial results (the "4Q22 Press Release"), which revealed, among other things, a full year 2022 net loss of $101.4 million, a fourth quarter net loss of $24.9 million, a 13% decrease in net revenue as compared to the fourth quarter of 2021, a full year 2022 adjusted EBITDA loss of $60.4 million, and a fourth quarter 2022 adjusted EBITDA loss of $12.5 million that included "a $3.5 million loss primarily associated with the previously announced discontinuation of certain first-generation apparel." In the press release, Allbirds conceded that to turn things around it needed to "execut[e] a highly focused brand strategy that reconnects with core consumers" and "slow [the] pace of [store] openings."

8.    Also on March 9, 2023, after the market closed, Allbirds announced that Defendant Bufano was stepping down.

9.      The Company held an earnings call with analysts the same day to discuss the disappointing results. On the call, Defendant Zwillinger admitted that, *for at least two years*, the Company had "made some strategic and executional missteps that impacted results," which included that Allbirds: 1) "overemphasized products that extended beyond our core DNA;" 2) "were spending significant time and resources on these new products that did not resonate well;" 3) "overinvested in seasonal trend colors and new silhouettes;" 4) "underinvested in our core consumers' favorite products," 5) "shifted our focus away from our core consumer," 6) "did not increase our brand awareness," and 7) opened stores too aggressively and thus needed to "slow[] the pace of new store openings."

10.      On this news, the Company's stock price fell $1.11, or 47%, to close at $1.25 per share on March 10, 2023, thereby injuring investors.

11.      On May 4, 2023, the Company announced amidst a series of layoffs that Defendant Brown would step down as co-CEO effective immediately and would transition into the position of Chief Innovation Officer, a non-executive role.

12.      Allbirds' stock price closed at approximately $.55 per share on June 5, 2024, a 96.3% decline from the Company's $15.00 per share IPO price.

13.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), Sections 10(b) and 20(a) of the Exchange Act (15

U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

18.     Plaintiffs, as set forth in the certifications that accompanied their Lead Plaintiff motion, incorporated by reference herein (Doc. No. 30-5), and as described further *infra*, purchased or otherwise acquired Allbirds common stock pursuant and/or traceable to the False Registration Statements issued in connection with the Company's IPO and/or Allbirds securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.     Defendant Allbirds is incorporated under the laws of Delaware with its principal executive offices located in San Francisco, California. Allbirds' shares trade on the NASDAQ stock market under the symbol "BIRD."

20.     Defendant Zwillinger was, at all relevant times, a Co-CEO and a Director of the Company. Zwillinger signed or authorized the signing of the Company's False Registration Statements filed with the SEC.

21.     Defendant Brown was, at all relevant times, a Co-CEO of the Company. Brown signed or authorized the signing of the Company's False Registration Statements filed with the SEC. On May 4, 2023, the Company announced that Defendant Brown would step down as co-CEO effective immediately and would transition into the role of Chief Innovation Officer, a non-executive role.

22.     Defendant Bufano was, at all relevant times, the CFO of the Company. Bufano signed or authorized the signing of the Company's False Registration Statements filed with the SEC.

23.     Defendants Zwillinger, Brown, and Bufano (collectively, the "Individual Defendants" or the "Exchange Act Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and

were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

24.    Defendant Neil Blumenthal ("Blumenthal") was a Director of the Company and signed or authorized the signing of the Company's False Registration Statement filed with the SEC.

25.    Defendant Dick Boyce ("Boyce") was a Director of the Company and signed or authorized the signing of the Company's False Registration Statements filed with the SEC.

26.    Defendant Mandy Fields ("Fields") was a Director of the Company and signed or authorized the signing of the Company's False Registration Statements filed with the SEC.

27.    Defendant Nancy Green ("Green") was a Director of the Company and signed or authorized the signing of the Company's False Registration Statements filed with the SEC.

28.    Defendant Dan Levitan ("Levitan") was a Director of the Company and signed or authorized the signing of the Company's False Registration Statements filed with the SEC.

29.    Defendant Emily Weiss ("Weiss") was a Director of the Company and signed or authorized the signing of the Company's False Registration Statements filed with the SEC.

30.    The Individual Defendants and Defendants Blumenthal, Boyce, Fields, Green, Levitan, and Weiss are collectively referred to hereinafter as the "Securities Act Individual Defendants."

31.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the Company's IPO. In the IPO, Morgan Stanley agreed to purchase 5,637,136 shares of the Company's common stock, exclusive of the over-allotment option.

32.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO. In the IPO, J.P. Morgan agreed to purchase 5,637,136 shares of the Company's common stock, exclusive of the over-allotment option.

33.     Defendant BofA Securities, Inc ("BofA") served as an underwriter for the Company's IPO. In the IPO, BofA agreed to purchase 3,587,269 shares of the Company's common stock, exclusive of the over-allotment option.

34.     Defendant Robert W. Baird & Co. Incorporated ("Baird") served as an underwriter for the Company's IPO. In the IPO, Baird agreed to purchase 775,385 shares of the Company's common stock, exclusive of the over-allotment option.

35.     Defendant William Blair & Company, L.L.C ("William Blair") served as an underwriter for the Company's IPO. In the IPO, William Blair agreed to purchase 775,385 shares of the Company's common stock, exclusive of the over-allotment option.

36.     Defendant Piper Sandler & Co. ("Piper Sandler") served as an underwriter for the Company's IPO. In the IPO, Piper Sandler agreed to purchase 775,385 shares of the Company's common stock, exclusive of the over-allotment option.

37.     Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the Company's IPO. In the IPO, Cowen agreed to purchase 581,538 shares of the Company's common stock, exclusive of the over-allotment option.

38.     Defendant Guggenheim Securities, LLC ("Guggenheim") served as an underwriter for the Company's IPO. In the IPO, Guggenheim agreed to purchase 581,538 shares of the Company's common stock, exclusive of the over-allotment option.

39.     Defendant KeyBanc Capital Markets Inc. ("KeyBanc") served as an underwriter for the Company's IPO. In the IPO, KeyBanc agreed to purchase 581,538 shares of the Company's common stock, exclusive of the over-allotment option.

40.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter for the Company's IPO. In the IPO, Stifel agreed to purchase 581,538 shares of the Company's common stock, exclusive of the over-allotment option.

41.     Defendant Telsey Advisory Group LLC ("Telsey") served as an underwriter for the Company's IPO. In the IPO, Telsey agreed to purchase 242,307 shares of the Company's common stock, exclusive of the over-allotment option.

42.     Defendant C.L. King & Associates, Inc. ("C.L. King") served as an underwriter for the Company's IPO. In the IPO, C.L. King agreed to purchase 72,692 shares of the Company's common stock, exclusive of the over-allotment option.

43.     Defendant Drexel Hamilton, LLC ("Drexel Hamilton") served as an underwriter for the Company's IPO. In the IPO, Drexel Hamilton agreed to purchase 72,692 shares of the Company's common stock, exclusive of the over-allotment option.

44.     Defendant Loop Capital Markets LLC. ("Loop Capital") served as an underwriter for the Company's IPO. In the IPO, Loop Capital agreed to purchase 72,692 shares of the Company's common stock, exclusive of the over-allotment option.

45.     Defendant Penserra Securities LLC ("Penserra") served as an underwriter for the Company's IPO. In the IPO, Penserra agreed to purchase 72,692 shares of the Company's common stock, exclusive of the over-allotment option.

46.     Defendant Samuel A. Ramirez & Company, Inc. ("Samuel A. Ramirez") served as an underwriter for the Company's IPO. In the IPO, Samuel A. Ramirez agreed to purchase 72,692 shares of the Company's common stock, exclusive of the over-allotment option.

47.     Defendant Siebert Williams Shank & Co., LLC ("Siebert Williams") served as an underwriter for the Company's IPO. In the IPO, Siebert Williams agreed to purchase 72,692 shares of the Company's common stock, exclusive of the over-allotment option.

48.     Defendants Morgan Stanley, J.P. Morgan, BofA, Baird, William Blair, Piper Sandler, Cowen, Guggenheim, KeyBanc, Stifel, Telsey, C.L. King, Loop Capital, Penserra, Samuel A. Ramirez, and Siebert Williams are collectively referred to hereinafter as the "Underwriter Defendants."

49.     The Underwriter Defendants sold approximately 17 million shares of Allbirds Class A common stock in the IPO at $15 per share. The Underwriter Defendants' failure to conduct

adequate due diligence in connection with the IPO and the preparation of the False Registration Statements was a substantial factor leading to the harm complained of herein.

50. The Underwriter Defendants together with the Securities Act Individual Defendants are referred to hereinafter as the "Securities Act Defendants."

## **CONFIDENTIAL WITNESSES[2]**

51. Confidential Witness ("CW") CW 1 worked as a Senior Analyst, Global Supply Planning for Allbirds from May 2020 to May 2021. CW1 had direct contact with Defendants Zwillinger, Brown and Bufano, including *inter alia* at monthly meetings described *infra*.

52. CW2 worked for Allbirds from August 2019 to May 2023 as a Flagship Store Leader (until July 2022) and a Manager, Retail Insights (until May 2023). CW2 held weekly (sometimes bi-weekly) meetings with retail teams in each store to gather data on, *inter alia,* products, in-store experience, in-store marketing, and to gather intel on why certain products did not sell. CW2 had direct contact with Defendants Zwillinger, Brown and Bufano, including *inter alia* at monthly meetings described *infra*.

53. CW3 worked as the Director of Retail for North American for Allbirds from May 2021 to December 2022 and in that role handled everything pertaining to the retail stores, including financial results, personnel, training, and operations. CW3 had direct contact with Defendants Zwillinger, Brown and Bufano, including *inter alia* at monthly meetings described *infra*.

54. CW4 worked as a former high-level member of the brand marketing team with responsibilities including visual merchandizing and retail marketing from Fall 2020 until Fall

---

[2] Certain of the confidential witnesses described herein held job titles unique to them and thus requested that the Third Amended Complaint only include a general description of their position rather than their precise title for fear of identification and retaliation. *See Cohen v. Kitov Pharm. Holdings, Ltd.*, 2018 U.S. Dist. LEXIS 45676, at *25 (S.D.N.Y. Mar. 20, 2018)(crediting CW allegations though the complaint generically described them as "former consultants of Kitov with knowledge of the clinical trial results" because "any more detailed description in this case likely would reveal the identity of the source"). Nevertheless, the descriptive information provided regarding each CWs role at Allbirds sufficiently sets forth a basis for their knowledge as to the facts contained in statements attributed to them herein. To the extent the Court requires additional descriptive information to credit the statements attributed to any CW, Plaintiffs will provide a document containing such information for *in camera review.*

2022. CW4 had direct contact with Defendants Zwillinger, Brown and Bufano, including *inter alia* at monthly meetings described *infra*.

55.    CW5 worked as a high-level executive in marketing at Allbirds from the Summer of 2017 through the Summer of 2022. CW5 had direct contact with Defendants Zwillinger, Brown and Bufano, including *inter alia* at monthly meetings described *infra*.

56.    CW6 managed stores for Allbirds from January 2020 to September 2022. CW6's responsibilities included hiring, training, communicating product needs, and communicating product feedback. CW6 had direct contact with Defendants Zwillinger, Brown and Bufano, including *inter alia* at meetings described *infra*.

57.    CW7 worked as Global Head of Creative for Allbirds from February 2020 to January 2023 and reported directly to Defendant Brown. CW7's responsibilities included overseeing brand marketing and the creative direction of the Company. CW7 also had regular contact with Defendants Zwillinger and Bufano, including but not limited to participation at monthly meetings described *infra*.

58.    CW8 worked as an inventory specialist from January 2019 to July 2019 and a Senior Accountant Inventory from July 2019 to January 2022. CW8 recorded inventory and did a lot of systems work. As a Senior Accountant, CW8 worked closely with the supply chain employees.

59.    CW9 worked for Allbirds from January 2019 through March 2022 as a store leader and reported to Heads of Retail Travis Boyce and Audrey Miller. In addition to the traditional responsibilities for a store leader, including personnel and payroll, CW9 also assisted with the opening of new retail store locations.

60.    CW10 worked as a member of the finance team at Allbirds from January 2021 to October 2023 and reported to the Senior Director of Accounting. CW10's responsibilities included *inter alia* reconciling inventory balances for on-hand inventory and transit inventory from Allbirds' retail locations to warehouses internationally and domestically.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

61.     CW11 worked as a member of the marketing team from April 2022 to November 2022 and reported to Director of Brand Activation Noemi Adler. CW11 oversaw marketing on all of Allbirds' social media channels and in that role had the task of ensuring that each team, including *inter alia,* the performance marketing team, retail team, and email team, all told the same consistent marketing message for any given brand campaign.

62.     CW12 worked in the retail segment of Allbirds from June 2019 to January 2023 and reported to Head of Global Retail Operations Travis Boyce. In that role, CW12 worked, *inter alia*, on in-store marketing campaigns.

63.     CW13 worked as a high-level employee in Retail Operations during the Class Period. CW13's responsibilities included, *inter alia*, running Allbirds' U.S. retail operation.

## **SUBSTANTIVE ALLEGATIONS**

### **Plaintiffs Purchased Allbirds Shares Pursuant and/or Traceable to the False Registration Statements**

64.     On August 31, 2021, the Company filed its Registration Statement on Form S-1 with the SEC, which forms part of the Registration Statement. The Company subsequently made several amendments to the Form S-1. On October 25, 2021, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1/A (the "Form S-1/A"), which forms part of the Registration Statement. The Registration Statement was declared effective on November 2, 2021. On November 4, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. On November 5, 2021, Allbirds closed its IPO and issued 23,221,152 shares of Class A common stock pursuant to the Registration Statement, consisting of 16,850,799 shares offered by Allbirds and 6,370,353 shares offered by certain existing stockholders. The Registration Statement made clear that:

> We intend to file one or more registration statements on Form S-8[3] under the Securities Act to register all shares of Class A and Class B common stock issuable under our 2015 Plan, 2021 Equity Incentive Plan and 2021 Employee Stock Purchase Plan. We expect to file the registration statement covering shares offered

---

[3] Form S-8 is a registration statement that registers securities for future issuance under employee benefit plans.

pursuant to these stock plans shortly after the date of this prospectus, permitting the resale of such shares in the public market without restriction under the Securities Act, subject to vesting restrictions, any applicable lockup agreements described above and the Rule 144 limitations applicable to affiliates.

65.    Indeed, during the Class Period, Allbirds filed three Forms S-8 registering additional shares of Class A common stock: (i) on November 3, 2021 (the day after the SEC declared the Registration Statement effective and two days before Allbirds closed its IPO), Allbirds registered 7,672,080 shares of Class A common stock for resale by "Selling Stockholders" who acquired the shares pursuant to Allbirds' 2015 Equity Incentive Plan or "other employee benefit plans"; (ii) on the same day, November 3, 2021, Allbirds registered a total of 34,572,986 shares of Class A common stock for issuance under the 2021 Equity Incentive Plan and 2021 Employee Stock Purchase Plan, and 16,979,592 shares of Class B common stock for issuance under the 2015 Equity Incentive Plan; and (iii) on March 28, 2022 Allbirds registered an additional 7,352,625 shares total of Class A common stock for issuance under the 2021 Equity Incentive Plan and 2021 Employee Stock Purchase Plan. Each of these Forms S-8 incorporated the Registration Statement. In other words, the Registration Statement and all three Forms S-8 (collectively, the "False Registration Statements")—which were the only Registration Statements filed during the Class Period—*each contained the same false and misleading statements set forth herein, at ¶¶132-50*.

66.    Plaintiffs, who acquired their shares between November 3, 2021 (the first day of trading) and June 30, 2022 (Doc. No. 30-5), thus purchased or otherwise acquired Allbirds common stock pursuant and/or traceable to the False Registration Statements during the Class Period. While the Registration Statement contains a provision permitting "current employees" to sell up to 25% of their shares of Allbirds common stock (1,865,398 shares total) during the first seven days of trading post-IPO ("early release shares"), *there is no language in the Registration Statement excluding these shares from registration under the Registration Statement*. Rather, the Registration Statement simply placed limitations on when, and in what amounts, existing security holders could sell their holdings regardless of any applicable lock-up agreements. The

1  fact that a share is subject to a lock-up agreement does not *ipso facto* mean it is unregistered; it

2  simply means that company insiders cannot sell their holdings for a set period of time.[4]

3        67.    In any event, even if the Registration Statement did not cover the early release

4  shares (and there is nothing to suggest that is the case), it is plausible (indeed, virtually certain)

5  that Plaintiffs purchased registered shares. First, there is no evidence that a single current

6  employee actually sold any early release shares. Second, Lead Plaintiff Yau Noi purchased 2,200

7  shares of Allbirds common stock on the first day of trading, November 3, 2021. Even in the

8  unlikely scenario that current employees sold the entirety of the 1,865,398 early release shares

9  on that first day of trading **before Lead Plaintiff purchased a single share,** bringing the total

10  number of Allbirds shares in the market to 25,086,550, the odds that Lead Plaintiff Noi purchased

11  only unregistered shares are virtually zero. Specifically, the early release shares would have

12  constituted approximately 7.4% of the total shares sold, so the probability that Lead Plaintiff Noi

13  bought **one** unregistered share is 7.4%. However, the probability that he bought **two** unregistered

14  shares drops to 0.5525%; the odds that he bought **three** unregistered shares drops to 0.0413%

15  and so on. In other words, the chance of Lead Plaintiff Noi randomly acquiring 2,200 unregistered

16  shares out of a population of 25,086,550 shares on November 3, 2021 is mathematically

17  negligible and thus effectively impossible.

18        68.    Further, any remaining shares subject to lock-up, *even if unregistered*, could not

19  have entered the market prior to February 25, 2022 in accordance with the Registration

20  Statement. Even assuming that all 1,865,398 early release shares were unregistered **and** sold into

21  the market before February 25, 2022 (a proposition for which there is no evidentiary support),

22  Plaintiffs collectively purchased **51,966** shares of Allbirds common stock **before** any other

23  unregistered shares could have entered the market (Lead Plaintiff Noi purchased 40,666 shares

24  between November 3, 2021 and January 28, 2022; Lead Plaintiff Qu Jinghua purchased 11,300

25  shares between February 17 and February 23, 2022 (Doc. No. 30-5)). Based on established

---

[4] https://www.sec.gov/answers/lockup.htm (last visited July 10, 2025).

probability principles, it is statistically implausible, indeed nearly mathematically impossible, that all of the **51,966** shares that Plaintiffs purchased before February 25, 2022 were unregistered.

69.     Moreover, Rule 144 under the Securities Act of 1933 permits the resale of "restricted securities" or "control securities" without registration, subject to volume, manner of sale, and holding period limitations. However, if an affiliate (any person with a relationship of control with the issuer, e.g. a large shareholder) sold restricted shares following the lock-up period in excess of 5,000 shares (or for proceeds in excess of $50,000), Rule 144 requires that affiliate to file a Form 144 with the SEC. Only two Forms 144 were filed during the Class Period, both on March 2, 2023. Not only did Plaintiffs purchase the vast majority of their Allbirds shares before March 2, 2023, but they in fact did not purchase *any shares at all* between March 2, 2023 and March 9, 2023, the end of the Class Period. The foregoing plausibly establish that Plaintiffs acquired shares pursuant and/or traceable to the False Registration Statements.

70.     Regardless, discovery can prove concretely that Plaintiffs purchased their shares pursuant and/or traceable to the False Registration Statements based on a review of Depository Trust Company ("DTC")[5] records.

71.     *First*, the DTC offers an IPO Tracking Service that tracks registered shares issued in a public offering for 90 calendar days post-IPO.[6] The system uses tracking identifiers at the CUSIP level to distinguish IPO-issued shares from other shares, such as unregistered or restricted securities. It enables enforcement of lock-up agreements, helps prevent unauthorized resale of restricted stock, and facilitates post-offering compliance tracking. Most importantly, the IPO Tracking Service can support post-trade tracing of share origin, which, with the benefit of discovery would enable a concrete determination of whether shares were registered in the offering or entered the market through another channel (e.g., Rule 144).

---

[5] The DTC is a central securities depository that is responsible for the clearing and settlement of securities transactions. DTC acts as a custodian for securities, using a "book-entry" system to record ownership and facilitate transfers electronically.

[6]                         https://www.dtcc.con/~/media/Files/Downloads/Settlement-Asset-Servives/Underwriting/IPO.pdf (last visited July 10, 2025).

72.    *Second*, even after the 90-day post-IPO period, shares are held by individual DTC participants and the movement of discrete identifiable shares from each DTC participant is tracked and maintained by DTC in detailed transaction-based records called Personal Daily Activity Statements ("PDAS").[7] PDAS' include CUSIP numbers of securities delivered or received, quantity of shares, DTC participant IDs of sender and receiver, activity codes such as DO (Deliver Order), PO (Payment Order), SLC (Stock Loan Close), and RV (Reversal), and the date and time of settlement.[8] Therefore, upon information and belief, PDAS' reflecting transactions in Allbirds common stock will reveal that the shares issued pursuant and/or traceable to the Registration Statement went into a specific individual DTC custodial account and that subsequent transactions involving those shares between DTC participant accounts were tracked and reflected in DTC records that contain transactional coding explicitly denoting the identity of DTC participants, the settlement path taken by specific share blocks, and the timing and volume of each share delivered. The PDAS', along with underwriter allocation records, transfer agent

---

[7] DTCC maintains Participant Daily Activity Statements with individual transactions for each Participant. DTCC,
*Product and Services Menu*, https://dtcclearning.com/products-and-services/settlement/view-activity-position.html
("Your activities and money involving securities are recorded by DTC on your Participant Daily Activity Statement .
. . ."). In addition, broker-dealers are required to maintain detailed transactional data pursuant to their regulatory
reporting obligations. 17 CFR § 240.17a-3(a)(6)(i)(A) (broker-dealers maintain detailed records on individual orders
including "the time the order was received, the time of entry, the price at which executed, the identity of each
associated person, if any, responsible for the account . . . and, to the extent feasible, the time of execution or
cancellation"); DTCC, *Settlement: Service Guide*, at **5-6 (Dec. 20, 2024), https://www.dtcc.com/-
/media/Files/Downloads/legal/service-guides/Settlement.pdf (last visited July 10, 2025); DTC,
*Service      Guide:      About      IPO*,      at      Appendix      C
https://www.dtcc.com/~/media/Files/Downloads/Settlement-
Asset-Services/Underwriting/IPO.pdf (last visited July 10, 2025).
[8] *Id.;* DTCC Learning, *Settlement Web*, *Viewing Activity & Position* (Apr. 26, 2024),
https://dtcclearning.com/productsand-services/settlement/settlement-web.html (last visited July 10, 2025).

data, and broker trade confirmations, enable the mapping of shares to determine with certainty whether they are registered shares.

73.    In other words, the foregoing establishes that, while it is entirely plausible based on currently available data that Plaintiffs purchased shares pursuant to the False Registration Statements, it is nonetheless possible to trace the movement of newly issued shares across deposits to and transfers within segregated identifiable DTC accounts to establish this with certainty.

### **Background**

74.    Co-CEO Defendants Zwillinger and Brown co-founded Allbirds in May 2015 and began selling products in 2016. The startup began as a direct-to-consumer online retailer but then expanded into the traditional retail space with the launch of brick-and-mortar locations.

75.    Defendants Zwillinger and Brown had a very hands-on and controlling managerial stye, according to CW4 and CW7, each of whom had direct contact with the co-CEOs. As CW4 explained, Allbirds was "the Tim and Joe show," and CW7 confirmed that "no decisions were made without them." However, neither co-CEO had retail experience prior to founding Allbirds. While Defendant Zwillinger earned an MBA at the Wharton School, his experience consisted of six years at the biotech firm Terravia leading its renewable chemical business. Defendant Brown is a former professional soccer player from New Zealand. Under their leadership, the Company has incurred significant net losses since inception and has stated that it anticipates that it will continue to incur losses for the foreseeable future.

76.    At its core, Allbirds is a footwear company that uses natural materials to construct its products, including wool, eucalyptus pulp, Brazilian sugarcane, and trino. Footwear represents the majority of the Company's revenue and brand. Its core products include lifestyle and performance shoes, such as the Dasher and the Runner. In March 2016, Time Magazine called Allbirds' Wool Runner "the world's most comfortable shoes," and in May 2020, Runner's World stated that, "the Dasher oozes casual comfort, but is a legit running shoe. Seriously." Allbirds' core

customer is 30-40 years old, 55% female, 45% male, with over 60% earning $100,000 or more annually.

77.    Prior to its IPO, which took place on November 3, 2021, Allbirds had always differentiated itself by focusing on brand, which its co-founders purportedly built based on three fundamental beliefs: first, climate change is an existential threat to the human race; second, consumers connect their purchase decisions with their impact on the planet; and lastly, consumers do not want to compromise between looking good, feeling good, and doing good. Indeed, Allbirds shot to success, becoming a billion-dollar unicorn in 2018 thanks to a growing wave of awareness among consumers of the environmental impact of fast fashion, i.e., inexpensive clothing produced rapidly by mass market retailers in response to the latest trends.

78.    As Defendants have acknowledged in each quarterly and annual filing during the Class Period:

> **The Allbirds brand is <u>integral</u> to our business strategy and our ability to attract and engage customers. As a result, our success <u>depends</u> on our ability to maintain and enhance the value and reputation of the Allbirds brand**.

79.    However, with an eye toward the looming IPO, and continuing in the years that followed, Defendants changed Allbirds' business strategy in three fundamental ways that contradicted their public statements and led the Company into a downward spiral. Specifically, unbeknownst to investors, the Company began: 1) overemphasizing and overinvesting in new product offerings that did not resonate with core consumers, and underinvesting in the core offerings that made the Company successful pre-IPO; 2) aggressively expanding Allbirds' retail store fleet even though existing stores were floundering, with no regard to economics or proximity to existing locations, raising the risk of market saturation and cannibalization; and 3) slashing the brand marketing budget materially every year since 2019 despite the essentiality of, and the Company's stated commitment to, brand awareness.

## Allbirds Underinvests in Core Offerings and Overemphasizes Ill-Conceived New Products

80.    Defendants have always touted Allbirds' core strengths, including its ability to innovate and make new products while continuing to focus on the Company's core products.

81.    However, as CW1 explained, even though collectively the Company's core offerings such as the Tree shoes and Wool shoes account for approximately 80% of the business, which CW6 corroborated, in the months leading up to the IPO Allbirds shifted its focus to new apparel offerings, beginning with t-shirts in October 2020. *See also* https://www.cnn.com/2020/10/20/business/allbirds-sustainable-apparel/index.html. CW5 stated that the shift away from core offerings began in 2019 as the Company headed toward its IPO. CW1 corroborated that by the time CW1 joined the Company in May 2020, the decision had already been made to expand into the apparel market.

82.    CW3 and CW4 confirmed that the Company did not know how to make apparel. As CW5 explained, the launch of apparel in October 2020 represented a massive departure from Allbirds' core mission-- making and selling unique sustainable shoes-- and this departure negatively impacted the brand. Moreover, CW5 noted that an industrial designer named Jamie McLellan (a friend of Defendant Brown) designed the apparel, not an apparel designer.

83.    CW1, CW2, and CW10 each made clear that apparel was unsuccessful from the time of its launch, and that this fact was well known by everyone working at the Company. According to CW8, "everyone knew apparel was going to fail" and that Allbirds tried to expand too quickly. CW1, CW3, CW4, and CW12 corroborated that the Company introduced too many apparel products too quickly with insufficient product testing, no planning, and no concrete long-term strategy in place. As CW12 put it, the Company kept "throwing [stuff[ against the wall to see what sticks." Indeed, immediately after launching the t-shirts in October 2020, the Company launched its run collection, which included tank tops, sports bras, leggings, and biker shorts, and then immediately moved on to the rest and relaxation vignette, adding hats, beanies, and scarves

for the holidays. As CW1 described, and CW3 confirmed, Allbirds went from one t-shirt to thirty different apparel offerings by the end of 2020.

84. According to CW6, because apparel did not sell well from the time it launched, the Company had too much inventory which it sent to its stores with no markdown or transfer strategy. CW6 explained that the Company also failed to market properly. For example, though the Company produced a wide range of sizing, it never marketed the apparel to plus size consumers, so nobody knew they carried those sizes. Ultimately, significant overage became "part of the wholesale channel" and ended up in TJ Maxx among other places. CW3 similarly stated that one of the reasons Allbirds opened outlet stores was, *inter alia*, to offload the apparel it could not sell. CW2 and CW10 each confirmed that stores had excess inventory of apparel because it did not sell well across the board, and that the excess inventory went to wholesale, liquidation, and outlets. CW10 stated that everybody at Allbirds knew and spoke about the massive excess of non-core inventory.

85. According to CW4, the Company overinvested in apparel, made too much, and charged too much, for products with quality issues that did not fit well. For example, CW6 stated that the t-shirts were expensive but deteriorated very quickly based on feedback from countless consumers complaining of holes in the shirts. CW9 and CW12 corroborated that the apparel was poor quality. CW9 stated that the t-shirts fell apart, had a "clunky design," and were poorly received by customers. Indeed, Allbirds constructed its apparel from merino wool which, while better for the environment, is not as durable as nylon or polyester.

86. CW2 and CW3 both confirmed that Allbirds' apparel offerings did not fit any of its customers properly, regardless of body type, a fact they each separately relayed to the co-CEOs. CW2 also reported the poor performance of apparel in the stores CW2 oversaw directly to co-CEO Defendants Zwillinger and Brown during monthly on-site visits beginning in late October 2020 soon after the t-shirt launch.

87. Additionally, each month Allbirds held a sales and operations meeting attended by approximately ten participants including co-CEO Defendants Zwillinger and Brown as well

as Defendant Bufano and other senior executives. CW1 stated that at each of the monthly meetings CW1 attended following the launch of apparel, the participants discussed the poor sales performance of the apparel products. CW3 confirmed that participants during the monthly meetings, including the co-CEO Defendants, reviewed the poor financial performance of apparel and discussed the negative customer feedback regarding the fit and feel of the apparel products.

88.     Specifically, CW1 explained that attendees discussed the fact that the Company had introduced too much apparel too quickly, which did not "sell through" as originally planned. CW4 and CW7 corroborated that at monthly apparel meetings, attended by twenty participants including the co-CEOs and other senior executives, attendees discussed that apparel "was not a hit." CW6 and CW8 also both stated that despite the fact that apparel did not sell, the Company didn't slow down apparel production and actually continued to create more.

89.     During one monthly apparel meeting, according to CW7, where Chief Product Officer Susi Proudman presented the merino wool fabric Allbirds intended to use for its leggings launch, CW7 warned her and the co-CEOs that the fabric was transparent but the co-CEOs "just didn't want to hear it." The Company went ahead with the leggings launch anyway, and according to CW4, the first collection of leggings Allbirds produced in the Spring of 2021 had to be thrown away because they were transparent. As CW4 and CW8 both stated, for a Company that preached sustainability, there was a lot of waste.

90.     A Wall Street Journal article, titled How Allbirds Lost Its Way, published on July 16, 2023 ("WSJ Article"), verifies these accounts. Specifically, the article states:

> In 2021, employees gathered in its San Francisco headquarters to see its next big product: wool leggings. When a model tried them on, employees noticed they were see-through. "I can see your underwear," one exclaimed. By then, Allbirds had already ordered tens of thousands of pairs—many of which were unsellable, according to people familiar with the situation.

The leggings, which were made from a blend of wool and other fibers, also did not hold their shape.

91.     CW6 stated that, in addition to the monthly meetings, Allbirds held two big management meetings every year for store managers. One called Flock Week in January, for the

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

purpose of reviewing financials and goal setting for the year, and one called Back to the Birdhouse in September, to check in on how they performed in the previous year and to look ahead to the following year. CW6 stated that all the store managers, buyers, and product designers attended these meetings as well as Defendants Zwillinger, Brown, and Bufano, and other senior executives including CCO Sandeep Verma, and Chief Product Officer Susi Proudman. At each of these meetings the participants discussed that apparel did not sell as projected. Rather than reassess the new products, marketing strategy, or renewed emphasis on core offering, Defendants simply told the store managers to "sell more."

92.    At these meetings, the senior executives set unrealistic goals, according to CW6, which were met with skepticism and questions from store managers in attendance who provided Defendants Zwillinger, Brown, and Bufano with negative feedback regarding the apparel.

93.    Moreover, despite the clear admitted significance of Allbirds' core offerings to the Company's bottom line (as evidenced by the non-public pie chart below presented during Flock Week which shows the breakdown of sales from 2020) and the dismal performance of apparel, Defendant Bufano emphasized the plan to continue expanding the Company's product offering beyond its core styles:



CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

94.     During those meetings, Proudman discussed the target customer for apparel, referred to as "Charlie," a Generation Z customer, that was between 20-30 years old, fashion forward, and eco-conscious:



95.     As CW13 put it, Allbirds was having an "identity crisis – it wanted Gen Z to be the customer; instead, Gen Z's dad was the customer." In other words, Allbirds disregarded its core customer, who is traditionally between 30-40 years old and making $100,000 a year or more, because the younger demographic which does not earn as much cannot afford Allbirds expensive products, which don't last.

96.     As the WSJ Article explained, "The company lost focus, unsure if it was selling to sneakerheads or soccer moms, said the people who are familiar with Allbirds' product development and marketing." It's attempt to capture the younger demographic failed miserably though because, as the WSJ Article stated, its designs "tended to skew older. As one insider put it, Allbirds wasn't going to convince kids in downtown Oakland, Calif., to ditch their Air Jordans when it was selling ballet flats."

97.     According to CW1 and CW4, as a result of the disastrous apparel launches, Allbirds terminated Proudman in early 2021. CW4 and CW7 both stated that Defendants Zwillinger, Brown, and Bufano took no accountability as business deteriorated further as a result of the failed product offerings, aggressive store openings, and marketing strategy shift, even though all the decision making lay with them. Instead, they'd blame and fire anyone that disagreed with them. According to CW3, the Company laid off employees in May or June 2022 as a result of the failed apparel lines (and floundering stores, as described below). Moreover, CW2 started noticing apparel product cancellations around January 2023 and according to CW2, the Company laid off everyone on the apparel team in May 2023.

98.     The Company also floundered with the launches of the Flyer and Pacer shoes in June 2022 and September 2022. CW2 stated that the Flyer and Pacer shoes did not sell well because, like apparel, the Company did not execute or market them properly. The Company marketed the Flyer shoes to runners but due to its construction from natural materials, the shoes could not withstand the wear and tear of running. Moreover, disregarding their core target consumers, the Company marketed the Pacer shoes to a younger fashion forward and performance-oriented demographic. The materials used to construct the Pacer gave the shoes a stiffness and therefore did not provide the same level of comfort as the original Wool and Tree shoes that led to the Company's early success. As with apparel, Allbirds overinvested in Pacer and Flyer at the expense of Runner and Dasher, its core franchises.

99.     CW9 also confirmed that Company went into a downward trajectory with the launch of apparel in October 2020 and then with the launch of the Flyer and Pacer shoes. According to CW9, when the Company focused on the Tree Runner, Wool Runner, and Dasher, i.e., the products that its core consumers loved, Allbirds did so well that the stores could not stock enough to meet demand. CW9 stated at all the retail store employees questioned why Allbirds made its foray into apparel and running shoes because, "this is not our customer." As CW9 made clear, As soon as the Company's vision shifted, as a result of the IPO, sales "started to fall off." Moreover, CW9 described the dual pronged inventory issues that plagued Allbirds' retail

stores—insufficient product to meet the demand for what customers actually wanted and excess product of what customers did not want. CW9 stated that "we were screaming, we need to be on our core product, our core customer," but Allbirds' leadership "didn't listen to anybody." Indeed, CW9 communicated these concerns directly to Defendants Zwillinger and Brown, and also communicated these concerns to Travis Boyce and to Senior Manager of Global Retail Communications, Engagement and Training, Scott Thomas during weekly Company calls where other call participants voiced the same concerns. CW9 stated that the feedback on these calls was thereafter relayed to Defendants Zwillinger and Brown by Boyce and Thomas.

100.    CW4 and CW6 corroborated that not only did Defendants' overinvestment in new product offerings lead to excess inventory, but its underinvestment in core products led to insufficient inventory of the core footwear items that Allbirds' consumers actually wanted to buy.

101.    Nevertheless, while neglecting their core customers and products, Defendants stated throughout the Class Period that they were "continuously seeking ways to engage" with Allbirds' core consumers, continued to focus and capitalize on core designs, and claimed that its new product offerings appealed to its existing consumers and had a strong customer response. Moreover, though Defendants generically warned investors of the risks of inventory shortage and inventory excess, Defendants never revealed that those risks had already come to pass due to their overinvestment in new product offerings and underinvestment in core products.

**Allbirds Pursues an Overly Aggressive and Unprofitable Pace of Store Openings**

102.    In the retail real estate world, "cannibalization" occurs when sales at an existing store decrease because customers begin shopping at a new nearby store for the same brand. Cannibalization negatively impacts profitability for both the existing and new location. *See*, e.g*.,* https://www.investopedia.com/terms/m/marketcannibilization.asp#:~:text=Market%20cannibal ization%20is%20a%20sales,share%20the%20same%20customer%20base. ("Cannibalization as a marketing strategy is generally frowned upon by stock analysts and investors, who see it as a potential drag on short-term profits. As companies design their marketing strategies, marketing cannibalization needs to be avoided…")

103. Nevertheless, according to CW3 and CW4, Allbirds opened new stores at an aggressive "dizzying pace," often in close proximity to where the Company already had stores, *even though existing stores struggled to attain profitability*. This aggressive pace of store openings led to oversaturation and cannibalization. For example, CW3 stated that in one year Los Angeles went from having one Allbirds store to five; Boston had four, one of which was three blocks from the other; and in New York City Allbirds opened a store in the Flatiron District in close proximity to its flagship store in Soho. CW9 stated that when finding out the Company planned to open another store in Boston, CW9 warned the co-CEOs of cannibalization and market saturation.

104. Indeed, according to CW13, Allbirds instituted an aggressive initiative in early 2022 called "Retail 100," with the stated purpose of expanding the retail fleet to 100 stores by the end of 2025. As part of the Retail 100 initiative, CW13's team opened 30 stores in a short five-month period, despite the dismal state of the existing fleet with retail stores in the red overall. Additional CWs similarly described the breakneck pace of Allbirds' retail store expansion. According to CW3, the Company went from 11 retail stores in May 2021 to 46 retail stores in December 2022, with plans to open more in 2023, even though according to CW7, Defendants knew in the first quarter of 2021 that many of its existing 11 retail stores were struggling.

105. Indeed, CW7 stated that Defendants Zwillinger and Brown along with Head of Global Retail Operations Travis Boyce (Director Dick Boyce's son) told employees at an all hands meeting during the first quarter of 2021 that all 11 retail stores were profitable. However, during a smaller monthly retail meeting during that same timeframe held in person at the Company's headquarters in San Francisco and attended by around five people, including CW7, Defendants Zwillinger, Brown, Bufano and Travis Boyce, Travis Boyce gave a presentation to Defendants and wrote in this report that the stores are struggling, and they needed to close them because they are hemorrhaging money. CW7 recalls a slide projected on a screen listing the fact that retail is unproductive as an issue the Company needed to resolve.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

106.    CW3 also warned co-CEO Defendants Zwillinger and Brown regarding the poor store performance that resulted from the excessive and poorly planned store openings during monthly real estate meetings that CW3 attended along with approximately twenty people (including Defendants Zwillinger, Brown, and Bufano, CTO Benny Joseph, COO Joe Vernachio, CCO Sandeep Verma, as well as the Vice Presidents and Directors of the inventory, finance, planning, merchandising, retail, real estate departments), both in person and via Zoom, where attendees discussed the lack of profitability in Allbirds' stores. During those meetings, the attendees would review the financial performance of each store for the previous month. CW4 confirmed that the financial performance of the stores discussed at the monthly meetings was consistently dismal, and that the co-CEO Defendants had full knowledge that Allbirds' retail fleet struggled overall. As CW3 and CW4 both described, because the stores could not move their inventory, Allbirds had to open outlets to try and offload the new product offerings that were not performing. However, excess inventory was not the only issue. Because the Company underinvested in its core offerings and struggled to plan its inventory properly given the overly aggressive pace of store openings, its retail stores also had insufficient inventory of core offerings that its customers actually wanted to buy.

107.    CW3 stated that at these monthly real estate meetings, Director of Global Real Estate Talia Lowenstein would present hard data for the co-CEO Defendants to assess so they could determine whether to approve the opening of proposed new stores. After reviewing the numbers, and against objections by other attendees including CW3, the co-CEO Defendants would conclude that the economics do not work because the numbers presented in Lowenstein's presentations would confirm the stores could not attain profitability, *but would sign off on the store openings anyway*. For example, CW3 stated that around June 2022 when assessing whether to open a new retail location in Boston (the Prudential store) one mile from Allbirds' existing Newberry location, the co-CEO Defendants reviewed Lowenstein's presentation, which included comparables from other retail stores in the area and a mock profit and loss statement for the proposed store, showing the store could not generate more than $2 million in top line revenue.

The calculations demonstrated that the store ultimately would not yield a profit, **which the co-CEO Defendants acknowledged** but then proceeded to approve it anyway and the store opened in November 2022. As another example, CW3 provided the Columbus, Ohio store, proposed at a meeting during the second half of 2022 which the co-CEO Defendants also signed off on though the data demonstrated the store would not attain profitability. In fact, Allbirds opened the store in mid-2023 and subsequently had to close it due to poor performance. CW3 confirmed that this happened with many other proposed store openings, and that indeed, the only new store opened during CW3's tenure that earned a profit from inception was the Avalon store in Atlanta.

108.    Moreover, CW3 confirmed that the co-CEO Defendants not only reviewed these presentations during the monthly meetings they attended along with CW3, but also received monthly profit and loss reports **on each existing store** and weekly store performance reports **on each existing store** from the finance department that included weekly, month to date, quarter to date and year to date performance numbers and a comparison to key performance indicator goals provided to the stores. CW3 made clear that the co-CEO Defendants were on the distribution list for these emails, which demonstrated that a majority of Allbirds' stores were losing money "clear as day," and that as a whole, Allbirds' retail fleet did not perform well. CW3 also stated that the co-CEO Defendants explicitly acknowledged that, overall, the retail fleet was "in the red" but the co-CEO Defendants did not care about the actual performance or condition of the retail stores and continued recklessly opening retail stores at "breakneck speed" to increase top line revenue with no regard to long term profitability.

109.    According to CW7, without any regard to whether the economics made sense and without any regard to whether other Allbirds stores already existed in the same locations, Defendants aggressively snapped up leases to take advantage of lower lease prices post-Covid in a misguided attempt to increase visibility to potential consumers and to make it look like the Company was growing, a strategy doomed to fail because the pace of openings was too aggressive particularly given that the stores struggled to move inventory of new products that did not resonate with consumers. CW12 confirmed that Allbirds' expanded its retail store fleet too

quickly because the Company was getting favorable lease deals due to Covid but this "hyper focus" on expansion came at the expense of its existing retail stores. CW12 explained that the existing stores did not get the resources they needed to succeed. CW13 confirmed that most stores were not properly set up to sell apparel and many did not even have dressing rooms. CW3 and CW4 made clear that Defendants Zwillinger and Brown personally approved each store opening during the monthly meetings.

110.    CW4 also warned the co-CEOs, who CW4 explained lacked any long-term strategy for the Company, that they were opening too many stores too quickly but stated that Defendants wanted to show shareholders they were "growing" post-IPO by increasing their retail store fleet. However, this tactic did not lead to profitability and the stores floundered. CW4 described the co-CEOs modus operandi as short-term thinking on a whim rather than long term strategy to grow the business. CW3 and CW7 confirmed that despite the dismal numbers and over vociferous objections, the co-CEOs nevertheless continued to aggressively open new stores in a misguided effort to increase "top line" revenue numbers by adding gross volume and sales overall. CW7 corroborated that Defendants Zwillinger and Brown spent recklessly to increase top line, gross revenue as much as possible with nary a thought toward long term profitability.

111.    CW4 stated that operations had become "such a mess" given the shoddy apparel offerings and aggressive store openings that the co-CEOs had to bring in a new Chief Operating Officer, Joseph Vernachio, in an attempt to clean it up in July 2021.

112.    Moreover, at the Back to the Birdhouse meeting held on September 13-15, 2021, attendees voiced frustration to senior executives including Defendants Brown and Zwillinger regarding the rapid pace of store openings and concern regarding cannibalization and inventory management, particularly given the disastrous new product offerings. Indeed, according to CW9, at one such meeting in response to concerns voiced over lack inventory for core product offerings, Defendants Zwillinger and Brown admitted that the lack of core product inventory resulted from the focus on new product expansion.

113.    Nevertheless, senior executives set forth a plan to open eighteen more retail stores in 2022. CW6 stated that at this meeting senior executives flagged that its customer retention rate had been declining and the number of purchases remained flat. While Average Order Value increased, that was only because Allbirds had increased its prices; e.g., Wool runners went from $99 to $120 a pair, not because new products resonated with consumers. The stores CW6 managed, as with most other Allbirds stores, never attained profitability.

114.    CW3 stated that Defendants Zwillinger, Brown, and Bufano acknowledged that their aggressive store opening tactic, including the Retail 100 plan, did not work during an "all hands" meeting in the Summer of 2022 to explain and justify a recent round of layoffs. Nevertheless, CW3 stated that new store openings and investment in new product continued *even after this meeting*.

Despite the foregoing, in the False Registration Statements as well as in filings throughout the Class Period, Defendants have consistently touted Allbirds' "thriving" fleet of retail stores, claiming its stores had strong economics and strong returns.

## **Allbirds Underinvests in Brand Awareness, Shifting Focus from Brand Marketing to Performance Marketing**

115.    Brand marketing is long-term strategic planning that focuses on establishing and growing the relationship between a brand and consumers. It is about raising brand awareness and the consumer's perception of the Company as a whole rather than a particular product.

116.    Performance marketing, on the other hand, is geared toward short term sales and consists of paying for results from marketing campaigns—like sales, leads, or clicks—conducted through third-party channels such as direct mail providers, search engines, and social media sites.

117.    Brand marketing is geared toward a long-term return on investment ("ROI") while performance marketing is geared toward a short-term ROI.

118.    Allbirds made clear in the False Registration Statements, and in every quarterly and annual filing with the SEC, that:

> The Allbirds brand is integral to our business strategy and our ability to attract and engage customers. As a result, our success depends on our ability to maintain and enhance the value and reputation of the Allbirds brand.

When CW5 started at Allbirds, brand meant everything because when you have a strong brand, your customers are loyal, and you don't need to spend as much to attract new customers. When you stop investing, you lose what makes the brand special and unique.

119.    However, according to CW5 Allbirds shifted its marketing strategy from brand marketing to performance marketing, which hurt the brand as a whole. Rather than hire a Chief Marketing Officer, CW5 stated that Defendant Zwillinger oversaw brand marketing and Defendant Brown oversaw performance marketing. According to CW5, Defendant Brown made the decision to switch Allbirds' focus from brand to performance marketing, a shift that began in 2019 as the Company headed toward its IPO. Specifically, CW5 explained that the brand marketing budget shrank from $10 million in 2018 to $6 million in 2019, then to $4 million in 2020, and to $2 million in 2021 while the performance marketing budget ballooned to between $30 and $40 million per year. CW7 confirmed that the Company had already shifted its strategy from brand marketing to performance marketing before CW7 began working at Allbirds and corroborated the budget cut figures CW5 described.

120.    With the excessive brand marketing budget cuts, the focus on brand awareness—the significance of which the Company continued to acknowledge at the time of the IPO and beyond—went out the window. As CW7 explained, you have to win the mind share of your consumer before you win the wallet share of your consumer. Mind share is how much consumers love your brand, which is built via brand awareness through brand marketing. CW7 stated that due to Defendant Zwillinger and Brown's inexperience in retail, and the fact that "brand" is not easily quantifiable, they short sightedly slashed brand marketing to focus on increasing short term valuation with performance marketing.

121.    CW11 also confirmed that the majority of the marketing budget went to performance marketing. According to CW11, the debate between performance marketing and brand marketing was a constant "point of tension" across all media channels. CW11 made clear

that the Company had no "brand loyalty building agenda" and that the Company focused on one-time "performance clicks" rather than keeping customers engaged and excited about the brand long-term.

122.    To illustrate the significance, and the Company's prior success, utilizing brand marketing prior to the extreme budget cuts, CW5 stated that the Company focused on brand marketing when it introduced its Tree shoe in 2018. The Company launched a massive strategic brand campaign; because Tree is "light and breezy" (as compared to Wool which is "soft and cozy") the Company launched Tree in the Spring, making the benefits of the product clear for the consumer. The Company also entered partnerships with Complex and Paper Magazine. CW5 stated that for the holiday campaign Allbirds partnered with a fashion designer and provided her with reams of extra shoe fabric to make custom clothing, which was photographed in Paper magazine and installed in The Oculus Center in New York City. It generated substantial buzz about the brand. Performance marketing on the other hand, as CW5 described, consists of social media ads, email campaigns, and other "bottom-funnel" tactics that are not geared toward building brand awareness and long-term ROI. While CW5 stated that performance marketing has its benefits, it should only be a part of the picture, not a majority of the picture—particularly for a Company like Allbirds where brand is everything.

123.    CW5 explained that when the Company was still focused on brand marketing, it had a very healthy baseline where it attributed at least 40% of total sales to the strength of the brand, but when Allbirds shifted to short term marketing channels like social media, that baseline deteriorated.

124.    CW5 attended monthly marketing meetings with thirty other participants where the participants reviewed Allbirds' ROI, discussed marketing tactics, and the distribution of the marketing budget between brand and performance marketing. Defendants Zwillinger, Brown, and Bufano, among other high-level executives (including CCO Sandeep Verma, COO Joe Vernachio, and CTO Benny Joseph) attended each of these monthly marketing meetings. According to CW5, Global Vice President of Marketing Julie Channing, among other attendees,

vociferously objected to the lopsided marketing budget that continued to invert year after year. The objections fell on deaf ears. Defendants Zwillinger and Brown focused on short term strategy with an eye toward the IPO, and thereafter increasing the Company's top line valuation superficially, rather than building brand awareness and long-term ROI.

125.     Nevertheless, despite the seismic shift in favor of performance marketing, the Registration Statement, as well as every quarterly and annual report filed subsequent to the IPO, stated that the Company utilized both brand and performance marketing,[9] touting Allbirds' focus on brand marketing and emphasizing the significance of brand awareness to Allbirds' success.

*** 

126.     With the Company floundering as a result of Defendants' undisclosed strategic "missteps," Defendants belatedly hired Chief Transformation Officer Jared Fix in 2022, who brought in the Boston Consulting Group, to transform and reignite the brand in the wake of Defendants' failed pivots.

### Defendants' Compensation and Insider Sales

127.     In the IPO, the Company sold approximately 16,850,799 shares of Class A common stock at a price of $15.00 per share, and received proceeds of approximately $237 million from the Offering, net of underwriting discounts and commissions. The Underwriter Defendants received underwriting discounts and commissions of approximately $22 million.

128.     Selling stockholder Director Defendant Levitan sold 2,000,000 shares of Allbirds stock two days after the Company's IPO, earning proceeds of $30 million, and earned additional proceeds from another sale of 2 million shares sold by Maveron Equity Partners V, L.P. for $30

---

[9] For example, the Registration Statement stated: "We create differentiated brand marketing content and utilize performance marketing to drive customers from awareness to consideration to conversion, and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app."

million, because Levitan is one of four managing members of Maveron General Partner V LLC, Maveron Equity's general partner.

129.    During the Class Period, Defendant Zwillinger sold 166,665 shares of Allbirds stock for proceeds of $461,786. All of these sales took place between January 25, 2023 and February 23, 2023. In other words, Defendant Zwillinger disposed of these holdings in the weeks leading up to the March 9, 2023 corrective disclosure.

130.    During the Class Period, Defendant Bufano sold 32,739 shares of Allbirds stock for proceeds of $103,408 in three separate sales, the last of which occurred on March 2, 2023, seven days before the corrective disclosure.

131.    In 2022, Defendants Zwillinger and Brown each received a $365,462 salary, $2,012,471 in stock awards, and $2,059,226 in option awards. Defendants Zwillinger's and Brown's performance-based stock awards exceeded their base salaries by an astounding ~ 450%, and each of their total compensation in 2022, at the height of the fraud, skyrocketed to more than 950% of their total compensation in 2021 (each receiving $4,449,210 in 2022 compared to $392,827 in 2021). Defendant Bufano received a $395,557 salary, and $1,296,687 in stock awards, as well as beneficially acquired 328,706 additional shares through conversions of Restricted Stock Units ("RSUs") at no transaction cost – a substantial savings.

**Materially False and Misleading Statements Issued in the False Registration Statements in Violation of Section 11 of the Securities Act**[10]

132.    The False Registration Statements were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation. Under applicable SEC rules and regulations, the Registration Statement

---

[10] Bold and italics are used herein to identify the misleading portion of alleged misstatements. Bold and italics are not used where falsity is alleged as to the entire statement/paragraph.

was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

133.    In the False Registration Statements, Defendants touted the Company's core strengths, including its ability to innovate and make new products while continuing to focus on the Company's core products. The False Registration Statements[11] highlighted why the Company had been successful prior to the IPO and touted its "durable, competitive advantage." In describing one such strength, "product innovation based on materials R&D and simple, purposeful design," Defendants stated that they continued to focus on core products, i.e., existing designs like the Dasher, and pointed to the credibility and trust they built with consumers with their "high-quality" core products as the reason the Company would succeed with apparel:

> Our emphasis on design that removes unnecessary details to highlight our "Hero" materials ***allows us to capitalize on existing designs***. Between our major materials innovations, we deliver product newness and brand excitement from ***incremental launches*** across color, pattern, exclusive partnerships, and additional features. Within our footwear line, we can leverage existing shoe sole tooling by modifying upper designs to create entirely new styles, transforming iconic styles into franchises. We did this with our first performance running product, the Tree Dasher, by extending that revolutionary midsole and outsole unit to the Wool Dasher Mizzle (weather-resistant), Tree Dasher Relay (laceless design), and our Allbirds x Staple collaboration (inside-out design). We believe ***this approach to reinventing classic silhouettes creates timeless product style that reduces potential fashion risk that other companies fall prey to.***

> We intentionally launched into the footwear category first given its technical nature, building credibility and trust with consumers before moving up the body into apparel. ***We believe our foundation in comfort and simple design, coupled with our success in manufacturing high-quality, sustainable footwear gives us a distinct advantage as we expand into adjacent categories.***

134.    The False Registration Statements were false and misleading, and had no reasonable basis, because the Company did not in fact "capitalize on existing designs," i.e., core products, but rather underinvested in core products and shifted focus to new apparel offerings that

---

[11] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

were not "high-quality" and which the Company did not tailor toward its core target consumer. Moreover, Allbirds did not do "incremental launches" of new products, but rather went from one apparel offering to thirty by the end of 2020 without adequate testing or planning. As such, Defendants had not in fact employed the approach they claimed would "reduce[] potential fashion risk that other companies fall prey to," and did not have a "distinct advantage as we expand into adjacent categories."

135.    As another reason for its success, the Company listed a "deep connection with our community of customers," and touted that "[a]pproximately 53% of our net sales in 2020 came from repeat customers":

> By making great products and telling the story of an inspirational, purpose-driven brand, *we have formed a deep connection with our community of customers*.

136.    This statement misled investors because, while acknowledging the significance of Allbirds' core customers to the brand's success, the Registration Statement failed to disclose that the Company had begun neglecting its "deep connection with [its] community of customers" by shifting focus away from its core consumer and putting its resources toward overemphasizing new product offerings (e.g., apparel) extending beyond its core DNA.

137.    The False Registration Statements further acknowledged the "importance of engaging our customer base" and went on to boast that the Company's digitally-led vertical retail distribution strategy enabled Defendants to precisely determine who Allbirds' customers are, what is important to them, and therefore what products would resonate with them:

> As a brand with a digitally-led vertical retail distribution strategy, we are able to own the customer experience, which allows us to use data to determine *who our customers are, what is important to them, and what products are most relevant and when, allowing us to create a strong connection with our customers*. We have learned that our customers live an active and curious lifestyle, care about health and well-being, prioritize quality over price, frequently purchase products online, live in urban center settings, and appreciate socially conscious brands. In addition to communicating more effectively with our customers, *these insights allow us to meet customers' needs through the creation of new products and enhancements to our existing line*.

Further, to illustrate **the importance of engaging our customer base**, the average spend by a repeat customer in a given cohort is over 25% more in their second year as compared to what was spent in the first year, and the average spend by a repeat customer continues to increase each subsequent year.

138.    The foregoing statements misled investors because, despite the acknowledged "importance of engaging our customer base," the Company did not use data regarding who its customers are, what's important to them, and what products are most relevant to create a strong connection with its customers, but rather shifted focus away from its existing customer base, underinvested in its core consumers' favorite products (like the Runner and Dasher), and spent significant time and resources on new poorly crafted and poorly marketed products that did not resonate with "who [Allbirds'] consumers are."

139.    Defendants touted Allbirds' "thriving retail store fleet" as another reason for its pre-IPO success, promising that investors could expect similar success in new store openings based on historical performance and based on the "synergy between the physical and digital sides of our business" which "takes the form of increased **brand awareness**…"

Our digital commerce experience is complemented by a thriving retail store fleet. With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns. All U.S. stores that were operating in 2019 generated approximately $4.3 million in average unit volume, or AUV, in their first 12 months of operation, including the stores that had their first 12 months of sales affected by COVID-19 after March 2020. **Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.** While our store channel already generates strong results on a standalone basis, the real power of our vertical retail strategy is the synergy between the physical and digital sides of our business. **This synergy takes the form of increased brand awareness** and website traffic in the regions where we open new stores, driving an overall lift in sales.

140.    These statements misled investors and had no reasonable basis because, while predicting new stores opened would similarly thrive, falsely citing "increased brand awareness" as the lynchpin of that prediction, the Registration Statement did not inform investors that many of Allbirds' stores in fact were not profitable, the Company's store opening strategy-- designed

38

to increase the Company's valuation pre-IPO-- was overly aggressive, included opening stores too close to existing locations, and did not include an effective plan to manage inventory in the stores. These statements further misled investors because Defendants had shifted Allbirds' marketing strategy from brand marketing to performance marketing, neglecting "brand awareness," and thus could not depend on "brand awareness" to drive a lift in sales.

141.    Indeed, the False Registration Statements further touted Allbirds' supply chain infrastructure as a competitive advantage over other similar brands, though in reality, Allbirds could not properly manage its inventory and thus struggled to attain profitability at its retail store locations:

> Our supply chain infrastructure is advanced compared to other brands of similar age and size. The unique relationships we have with our vendors give us agility to respond to consumer demands, where inventory can go from purchase order to ex-factory in as little as 45 days.

Indeed, as numerous CWs attested (*see supra*), Allbirds' retail stores had severe inventory problems. They had shortages of the core products customers actually wanted and a tremendous excess of inventory in new product offerings that did not resonate with customers and thus did not sell.

142.    After comprehensively describing why Allbirds had been successful to date and how it had created a "durable, competitive advantage," the Registration Statement went on to detail why Allbirds "***will underline continue to be successful***." Specifically, Defendants stated that they would continue to focus on and "***expand our core product families***" and touted new apparel offerings, citing the Company's "***expertise with materials***" but did not reveal the significant quality issues with the material and silhouettes used for the apparel offerings and the failure to design the apparel for Allbirds' core target consumer.

143.    The Registration Statement further stated that a key part of the Company's growth strategy and continued success included deepening its relationship with its core customer:

> By deepening our relationships with our repeat customers, we believe we are well-positioned to capture a greater share of the approximately seven pairs of shoes and 68 pieces of clothing that the average American bought in 2018 and realize substantial growth in our business.

144.    These statements misled investors and had no reasonable basis because, in reality, the Company was not deepening its relationship with repeat customers, but rather was underinvesting in the core offerings that resonated with its existing customers, shifting focus instead to ill-conceived new apparel offerings with fit and quality issues.

145.    The Registration Statement cited the Company's plan to increase its store fleet as part of its strategy to accelerate growth, citing historical profitability of its existing stores as its basis for representing the new stores would similarly be "highly profitable":

> We are in the early phase of a ramp towards hundreds of potential locations in the future, ***with strong unit economics***. Furthermore, as our store fleet expands, ***we expect our growth to accelerate***, as compared to 2020, through more efficient customer acquisition, while also receiving the benefit of increasing digital traffic as more people learn about our brand through our stores. ***Based on our stores' pre-COVID-19 performance, we believe our new stores will also be highly profitable***, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.

146.    These statements misled investors and had no reasonable basis because, though claiming the "potential locations" had "strong unit economics," the Company in fact planned store openings in locations in close proximity to existing store locations, with the risk therefore of negatively impacting the profitability of both the preexisting stores and the new locations as a result of cannibalization. Moreover, the Registration Statement did not disclose that past performance could not foretell future performance for these new locations given that many of its existing locations were not profitable and given that new product offerings that strayed from the Company's core DNA, poor inventory management in its retail locations, and the Company's

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

underinvestment in brand marketing all raised a significant risk that the new stores would also struggle to attain profitability.

147.    Despite the essentiality of brand awareness to the Company's long-term success, which the Registration Statement acknowledged, Defendants had shifted most of the Company's marketing resources to performance marketing, leaving inadequate resources dedicated to brand marketing. The Registration Statement nevertheless represented that Defendants "focused on increasing awareness," going as far as comprehensively detailing the Company's brand marketing strategies such as:

◦*Thought leadership moments.* We will continue to be leaders in the fight against climate change, from open-sourcing our Carbon Footprint methodology to vocally challenging copycat brands to copy our sustainability practices and not just our designs. This has helped to amplify our voice and introduce us to new customers who connect with the values of our brand.

◦*Community.* In 2020, we formalized our community marketing efforts by launching the Allgood Collective, a global community of ambassadors who promote the power of collective action as a force for good, embracing the Allbirds brand and products as a vehicle for positive change. The Allgood Collective is how we personify and extend our mission and values into tangible experiences, encouraging meaningful conversations and strengthening our relationship with our existing fans while also allowing us to reach and engage new groups of people.

◦*Expanding our brand beacon through physical touchpoints.* Our stores are situated in high-traffic, popular locations and serve as billboards while providing an immersive and tactile introduction to the brand. Historically, we have seen significant awareness boosts in store markets and efficient new customer acquisition, and we expect this trend to continue with the rollout of additional locations throughout the world.

◦*Full-funnel marketing.* We are at a scale now where it is effective to broaden our marketing funnel from emphasizing direct, digital conversion marketing to a full-funnel approach that utilizes TV and other mediums. We anticipate this will result in expanding our consumer reach to a wider population, showcasing a broader array of products, and taking consumers through the entire brand journey, from awareness through consideration to conversion. As we increase awareness, add stores, and broaden our product assortment, we believe this full-funnel approach will increase marketing efficiency.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

148.    The Registration Statement did not reveal that the Company had in fact materially cut its brand marketing budget beginning in 2019, continuing to reduce the brand marketing budget by half every year thereafter, shifting the majority of the Company's marketing budget to performance marketing instead.

149.    The Securities Act Defendants also issued three Forms S-8 during the Class Period, as described *supra*, which incorporated the Registration Statement and thus the false and misleading statements contained therein.

150.    Therefore, the negligently prepared False Registration Statements contained materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects, including: (i) that Allbirds overemphasized products that extended beyond the Company's core offerings; (ii) that the Company's non-core products, such as apparel, had lower quality, a narrower appeal, and thus did not resonate with customers; (iii) that Allbirds was underinvesting in its core consumers' favorite products to push the Company's newer products with narrower appeal; (iv) that underinvesting in Allbirds' core products was negatively impacting the Company's sales; (v) that the Company engaged in an overly aggressive and unprofitable store opening strategy that did not succeed due to cannibalization, lack of focus on core offerings, and ineffective inventory management; (vi) Allbirds' retail stores had significant inventory issues including insufficient inventory of core products that customers wanted and excess inventory of new products that did not resonate with consumers, and thus did not sell; (vii) that the Company shifted its marketing strategy toward performance marketing at the expense of brand marketing despite the significance of brand awareness to its success; and (viii) that, as a result of the foregoing, Defendants' positive

statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Regulation S-K Item 105

151.    The False Registration Statements were subject to the disclosure requirements of Item 105 of Regulation S-K, 17 C.F.R. §229.105, which governs disclosure of risk factors and requires, among other things, that an issuer "provide under the caption ' Risk Factors' a discussion of the material factors that make [the securities] speculative or risky."

152.    Defendants violated their disclosure duties imposed by Item 105 of Regulation S-K, 17 C.F.R. §229.105 by failing to disclose the material risk that Allbirds' underinvestment in core products and overinvestment in new products, the inventory shortages of core products and inventory excess of new products, its overly aggressive and unprofitable pace of store openings, and its evisceration of the brand marketing budget had and would continue to negatively impact the Company's financial results.

### Regulation S-K Item 303

153.    The False Registration Statements were subject to the disclosure requirements of Item 303 of Regulation S-K, which among other things requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2). Companies must also disclose events that the registrant knows will "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. § 229.303(b)(2).

154.    In violation of Item 303, the False Registration Statements failed to disclose the known trends that Allbirds' underinvestment in core products and overinvestment in new products, the inventory shortages of core products and inventory excess of new products, its

overly aggressive and unprofitable pace of store openings, and its evisceration of the brand marketing budget were having a material adverse impact on its business and financial results. Allbirds had a duty to disclose these material adverse trends under Item 303 of Regulation S-K yet failed to do so.

### Materially False and Misleading Statements Issued During the Class Period in Violation of Section 10(b) of the Exchange Act

155.    Beginning with the Registration Statement and continuing throughout the Class Period in press releases, Form 10-Q reports, Form 10-K reports and on quarterly earnings calls, the Exchange Act Defendants issued false and misleading public statements stating that the Company continued to focus on its core products and core consumer, enjoyed success from its retail store fleet, and focused on brand awareness using brand marketing. The Exchange Act Defendants failed to disclose: (i) that Allbirds was overemphasizing and overinvesting in new products, including apparel, that extended beyond the Company's core offerings; (ii) that the Company's non-core products had a narrower appeal and did not resonate with customers as well as the Company's core products; (iii) that Allbirds was underinvesting in its core consumers' favorite products to push the Company's newer products with narrower appeal; (iv) that underinvesting in Allbirds' core products was negatively impacting the Company's sales; (v) that the Company pursued an unprofitable and overly aggressive pace of store openings though its existing stores struggled and even while new stores failed to attain profitability due to ill-received product offerings, market saturation, and cannibalization; (vi) Allbirds' retail stores had significant inventory issues including insufficient inventory of core products that customers wanted and excess inventory of new products that did not resonate with consumers, and thus did not sell; (vii) that the Company shifted its marketing strategy toward performance marketing at the expense of brand marketing despite the significance of brand awareness to its success; and

(viii) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

156.    On November 30, 2021, the Company issued a press release announcing its third quarter 2021 financial results. Therein, Defendant Zwillinger stated:

> [W]e saw **strong consumer response** in the quarter to our new product innovation, including our new Perform Apparel line."
>
> ***
>
> [W]e're aligning our purpose of reversing climate change with our **product quality** and financial outcomes.

157.    The foregoing statements misled investors because Allbirds did not see a "strong consumer response" to apparel, which the Company struggled to sell from the moment of its launch in October 2020, due in part to poor "product quality."

158.    That same day, Allbirds held an earnings call with analysts, during which Defendants Zwillinger, Brown, and Bufano presented. On the call, Defendant Zwillinger addressed Allbirds' existing retail stores and expansion, representing that existing stores had "strong" economics and returns, and that new stores "increased brand awareness, provid[ing] a halo effect on the overall business":

> We opened our first store in 2017. And despite the slowdown of this channel during the pandemic, we now operate a fleet of 35 stores globally with 23 in the U.S. **Each store has strong standalone four wall economics**…
>
> ***
>
> **Our stores generate strong returns on invested capital** and have attractive payback periods. And **when we open new stores, it drives increased brand awareness, provides a halo effect on the overall business**. And hence we approve the efficacy of our marketing spent these impacts along with lower return rates and more efficient transportation means that growth in physical retail also drives margin expansion.
>
> **We have a strong pipeline of new stores ahead, and ultimately we see white space for hundreds of stores over time**.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

159.    Defendant Zwillinger did not reveal that the Company's store opening strategy was overly aggressive, unprofitable, and unlikely to lead to profitability, as was discussed during multiple monthly meetings attended by Defendants Zwillinger, Brown, and Bufano (*see supra*). Defendant Zwillinger also falsely stated that the new stores would benefit the "overall business" because Allbirds opened stores in close proximity to existing locations raising the risk of market saturation and cannibalization and did not develop effective plans to manage inventory overage in the stores caused by unsuccessful apparel products that strayed from the Company's core DNA and which the stores could not sell due to poor quality, design, and marketing.

160.    Regarding the Company's foray into apparel, which began over a year prior, Defendant Zwillinger stated:

> And **now that we have gained consumers trust, we believe they will now embrace our material innovations apply to apparel categories**.
>
> ***
>
> Underpinning the opportunity to drive growth in our retail and international businesses is an incredible product pipeline, led by footwear **with a growing and important apparel offering**. Our robust R&D engine means that we're continually innovating, in our short history, **we've proven that our material and innovation platform creates a powerful flywheel, enabling us to build winning franchises while empowering us to expand into new categories**.

161.    Defendant Brown similarly touted the Company's new apparel offerings:

> [W]e saw a **great response in the quarter to our product innovation with strong traction** from the Wool Piper Mid, Sugar Rover and Perform Apparel launch in August, an exciting new collection to complement our performance footwear offering.

162.    The foregoing statements regarding Allbirds' new apparel "innovations" misled investors because the Exchange Act Defendants failed to disclose that they already knew Allbirds' core customers with whom they had purportedly "gained [] trust" had not and would not embrace apparel because, Allbirds did not create apparel with its core consumer in mind, and the apparel launches which began in October 2020 had already proven unsuccessful due to poor design, quality, and marketing.

163.    On December 7, 2021, the Company filed its Form 10-Q for the quarter ended September 30, 2021 ("3Q21"), signed by Defendants Zwillinger and Bufano. Therein, Allbirds identified "Continued Growth Within Existing Customer Base and Increasing Closet Share" as a "Key Factor Affecting Our Performance." Specifically, the 3Q21 stated:

> In addition to seeking to acquire new customers, **we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions**.

> ***

> [I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, **high performance**, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with **new products appealing to our existing customers**.

164.    Though acknowledging their awareness of the importance of continued focus on Allbirds' core customer base, Defendants falsely stated that they continuously sought ways to engage with core customers when in reality, the Company had been underinvesting in core products and overinvesting in/overemphasizing new offerings that targeted a demographic outside its core customer base. Moreover, Defendants failed to reveal that Allbirds' new apparel offerings already failed to appeal to existing customers and did not qualify as high performance given significant quality and fit issues.

165.    Indeed, the 3Q21 conceded that if Allbirds failed to attract new customers and failed to appeal to existing customers with its product offerings, "our business, financial condition, results of operations, and growth prospects will be harmed."  Specifically, the 3Q21 stated:

> In addition, **our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers**, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. **If existing customers no longer find our products appealing**, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may

not make purchases, or if they do, they may make fewer or smaller purchases in the future.

***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.***

166.    However, in so warning, the Exchange Act Defendants failed to reveal that these risks had already come to pass. Allbirds' new product offerings floundered given poor planning, design, and quality, and failed to appeal to "existing customers" because the Company marketed its new products to a younger demographic outside Allbirds' core customer base.

167.    Additionally, the Exchange Act Defendants detailed the risk of Allbirds failing to remedy quality issues with its products but failed to reveal that from the time they launched apparel in October 2020, they knew existing customers were dissatisfied with their product experience and they knew about widespread quality issues based on both employee and consumer feedback, which was discussed during monthly meetings attended by Defendants Brown, Zwillinger, and Bufano, among other senior executives, yet not only did they fail to remedy these issues, they continued to launch additional apparel lines with similar results.

***If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns***, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. ***If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected. If product quality issues are widespread*** or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected.

168.    The 3Q21 also described Allbirds' marketing efforts, and emphasized the significance of brand awareness and retaining existing customers to that effort:

Marketing expense consists of advertising costs incurred to acquire new customers, ***retain existing customers***, and ***build our brand awareness***. We expect marketing

expense to continue to increase in absolute dollars as we ***continue to expand our brand awareness***, introduce new product innovations across multiple product categories, and implement new marketing strategies.

169.    The foregoing statements misled investors because Allbirds had already shifted its focus away from brand awareness, annually cutting its brand marketing budget materially in favor of performance marketing starting in 2019.

170.    Indeed, the 3Q21 described the Company's marketing efforts in detail but failed to reveal that a majority of the marketing budget went to performance marketing at the expense of brand awareness, despite the fact that, as explained *supra*, Allbirds' "brand" is integral to its success:

> We create differentiated brand marketing content and utilize performance marketing to drive customers from awareness to consideration to conversion, and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app.

171.    The 3Q21 also cited the Company's plan to increase its store fleet as part of its strategy to accelerate growth, citing historical profitability of its existing stores as its basis for representing the new stores would similarly be "highly profitable":

> With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns…We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic***.

172.    While predicting new stores would similarly thrive, the 3Q21 did not inform investors that such expectation lacked a reasonable basis because the Company's store opening

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

strategy was overly aggressive and unprofitable, included opening stores too close to existing locations raising the risk of market saturation and cannibalization, and did not include an effective plan to manage inventory in the stores. Moreover, the new product offerings that strayed from the Company's core DNA, poor inventory management in its retail locations, and the Company's underinvestment in brand marketing, raised the material risk that its stores would continue struggling to reach profitability.

173.    Moreover, the 3Q21 included misleading risk warnings regarding inventory levels:

> ***Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows***. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices at our outlet store in Northern California.
>
> Conversely, ***if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.***

174.    The foregoing risk warnings misled investors because Allbirds' retail stores already experienced inventory levels "in excess of customer demand" for new product offerings that they could not sell due to poor quality, fit, and design, and because they did not resonate with new or existing customers, and Allbirds' retail stores also already experienced "inventory shortages" of the core product offerings that its consumers actually wanted. These risks manifested as a result of Allbirds' overinvestment in new products and underinvestment in core

products as well as Allbirds' overly aggressive pace of store openings with insufficient inventory planning.

175.    On February 23, 2022, the Company issued a press release announcing its financial results and business highlights for the quarter and fiscal year ended December 31, 2021. Therein, Defendant Zwillinger stated:

> Importantly, we believe that our innovation engine, continued retail store expansion, and increasing international presence will continue to drive an accelerating topline growth rate in 2022.

176.    The foregoing misled investors because Defendant Zwillinger had no basis for stating that "innovation" and "continued retail store expansion" would "continue to drive" growth because they were not ***currently*** driving growth. Allbirds overemphasized and overinvested in purportedly innovative new apparel products that floundered, the Company underinvested in the core offerings that made the brand successful, the Company's retail store expansion was too aggressive and doomed to elude profitability given market saturation, cannibalization, and excess inventory of unsuccessful apparel products with quality and fit issues.

177.    That same day, Defendants held an earnings call with analysts to discuss the quarterly results, during which Defendants Zwillinger, Brown, and Bufano presented. Regarding the Company's new apparel products, loungewear in particular, Defendant Zwillinger claimed that consumers "had a positive reaction":

> ***Consumers had a positive reaction … on the apparel side***, to our comfy and cozy loungewear.

178.    Similarly, Defendant Brown touted its latest apparel launch as being "well received by our customers" and claimed the Company's apparel strategy "is working."

> In apparel, we launched a switch product that has been ***well received by our customers*** and embodies our key differentiator, leveraging unique natural materials to deliver next to skin comfort, a hallmark of the Allbirds brand, which we expect will help us win long-term.

51

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

*** 

And then lastly, apparel is a journey. We continue to see that as something that can augment footwear franchises increase average order value, repeat purchase rate, *the strategy is working*.

179.    The foregoing statements misled investors because since apparel launched in October 2020, consumers had not had a "positive reaction" to any of the new products and their apparel strategy was not working, as Defendants Zwillinger and Brown well knew based on numerous meetings during which the poor response to apparel and the issues with the apparel products were discussed.

180.    Defendant Zwillinger also discussed how Allbirds' "brand awareness in the U.S. is 11%, leaving us unknown to a vast majority of Americans," and falsely stated that, "*awareness is one aspect that we're focused on*," but failed to disclose that despite this, and despite having acknowledged the significance of brand awareness to Allbirds' ability to succeed, Allbirds had shifted focus away from brand marketing and cut the brand marketing budget materially in favor of performance.

181.    On March 16, 2022, Allbirds filed its annual Form 10-K for the quarter and fiscal year ended December 31, 2021 ("2021 10-K"), signed by Defendants Zwillinger, Brown, and Bufano. The 2021 10-K highlighted why the Company had been successful prior to the IPO and why it had a "durable, competitive advantage." In describing one such strength, "product innovation based on materials R&D and simple, purposeful design," the Exchange Act Defendants represented that they continue to focus on core products, i.e., existing designs like the Dasher, and pointed to the credibility and trust they built with consumers with their "high-quality" core products as the reasons the Company would succeed with apparel:

Our emphasis on design that removes unnecessary details to highlight our "Hero" materials *allows us to capitalize on existing designs*. Between our major materials

innovations, we deliver product newness and brand excitement from ***incremental launches*** across color, pattern, exclusive partnerships, and additional features.

182.    The 2021 10-K did not disclose that not only did the Company fail to "capitalize on existing designs" but rather underinvested in its core products and overinvested in new apparel offerings that were not launched incrementally, were not "high-quality" and which the Company did not tailor toward its core target consumer.

183.    Moreover, while acknowledging the significance of Allbirds' core customers to the brand's success, the 2021 10-K failed to disclose that the Company had begun neglecting its "deep connection with [its] community of customers" by shifting focus away from its core consumer and putting its resources toward overemphasizing new product offerings (e.g., apparel) extending beyond its core DNA. The 2021 10-K acknowledged the "importance of engaging our customer base" and went on to boast that the Company's digitally-led vertical retail distribution strategy enabled the Company to precisely determine who Allbirds' customers are, what is important to them, and therefore what products would resonate with them:

> As a brand with a digitally-led vertical retail distribution strategy, we are able to own the customer experience, which allows us to use data to determine ***who our customers are, what is important to them, and what products are most relevant and when, allowing us to create a strong connection with our customers***. We have learned that our customers live an active and curious lifestyle, care about health and well-being, prioritize quality over price, frequently purchase products online, live in urban center settings, and appreciate socially conscious brands. In addition to communicating more effectively with our customers, ***these insights allow us to meet customers' needs through the creation of new products and enhancements to our existing line***.

184.    However, nowhere did the 2021 10-K indicate that the Company no longer focused on its existing customer base and began underinvesting in its core consumers' favorite products, like the Runner and Dasher, and instead spent significant time and resources on new poorly crafted and poorly marketed products that neither resonated with its core consumer nor new customers.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

185.    Similarly, in the 2021 10-K, Allbirds identified "Continued Growth Within Existing Customer Base and Increasing Closet Share" as a "Key Factor Affecting Our Performance." Specifically, the 2021 10-K stated:

In addition to seeking to acquire new customers, *we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions*.

\*\*\*

[I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, *high performance*, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with *new products appealing to our existing customers*.

186.    Though acknowledging their awareness regarding the importance of continued focus on Allbirds' core customer base, the Exchange Act Defendants falsely stated that they continuously seek ways to engage with core customers when in reality, the Company had been underinvesting in core products and overinvesting in/overemphasizing new offerings that targeted a demographic outside its core customer base. Moreover, the Exchange Act Defendants failed to reveal that their new apparel offerings already failed to appeal to existing customers and did not qualify as high performance given significant quality and fit issues.

187.    Indeed, the 2021 10-K conceded that if Allbirds failed to attract new customers and failed to appeal to existing customers with its product offerings, "our business, financial condition, results of operations, and growth prospects will be harmed." Specifically, the 2021 10-K stated:

In addition, *our future success depends in part on our ability to increase sales to our existing customers over time*, *as a significant portion of our net revenue is generated from sales to existing customers*, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. *If existing customers no longer find our products appealing*, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

*If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.*

188.    However, in so warning, the Exchange Act Defendants failed to reveal that these risks had already come to pass. Allbirds' new product offerings floundered given poor planning, design, and quality, and failed to appeal to "existing customers" because the Company marketed its new products to a younger demographic outside Allbirds' core customer base.

189.    Additionally, the Exchange Act Defendants detailed the risk of Allbirds failing to remedy quality issues with its products but failed to reveal that from the time they launched apparel in October 2020, they knew about quality issues based on both employee and consumer feedback, which was discussed during monthly meetings attended by Defendants Brown, Zwillinger, and Bufano, among other senior executives, yet not only did the Exchange Act Defendants fail to remedy these issues, they continued to launch additional apparel lines with similar results.

If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. *If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.* If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected.

190.    The 2021 10-K also described Allbirds' marketing efforts, and emphasized the significance of brand awareness and retaining existing customers to that effort:

Marketing expense consists of advertising costs incurred to acquire new customers, *retain existing customers*, and *build our brand awareness*. We expect marketing expense to continue to increase in absolute dollars as we *continue to expand our brand awareness*, introduce new product innovations across multiple product categories, and implement new marketing strategies.

191.    Moreover, the 2021 10-K claimed that marketing aimed at brand awareness remained Allbirds' focus:

> **We are focused on increasing brand awareness and consumer touchpoints through the following marketing initiatives**:
>
>    •Spreading our message through word-of-mouth, thought leadership and PR, partnerships, and community.
>
>    •Extending our reach and connecting with our customers through digital and performance marketing, TV and other media, stores as physical brand beacons, and customer experience.

192.    The foregoing statements misled investors because Allbirds had already shifted its focus away from brand awareness, cutting its brand marketing budget by half annually beginning in 2019, and putting the lion's share of its marketing budget into performance marketing.

193.    Indeed, the 2021 10-K described the Company's marketing efforts in detail but failed to reveal that a majority of the marketing budget went to performance marketing at the expense of brand awareness, despite the fact that, as explained *supra*, Allbirds' "brand" is integral to its success:

> **We create differentiated brand marketing content** and utilize performance marketing to drive customers from awareness to consideration to conversion, and **promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing** campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app.

194.    The 2021 10-K also cited the Company's plan to increase its store fleet as part of its strategy to accelerate growth, citing historical profitability of its existing stores as its basis for representing the new stores would similarly be "highly profitable":

> With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns…We expect our stores to rebound to pre-COVID levels over time following

the broader reopening of the economy. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic***.

195.    These statements were false and misleading because, while predicting new stores would similarly thrive, the 2021 10-K did not inform investors that such expectation lacked a reasonable basis because the Company's store opening strategy was overly aggressive and unprofitable, included opening stores too close to existing locations raising the risk of market saturation and cannibalization, and did not include an effective plan to manage inventory in the stores. Moreover, the new product offerings that strayed from the Company's core DNA, poor inventory management in its retail locations, and the Company's underinvestment in brand marketing, raised the material risk that its stores would continue struggling to reach profitability.

196.    Defendants conceded that they regularly monitored inventory levels and thus would have known of the excess inventory plaguing its retail stores:

> We periodically review inventory and make provisions as necessary to appropriately value slow-moving, damaged, and excess inventory.

197.    Moreover, the 2021 10-K included misleading risk warnings regarding inventory levels:

> Inventory levels in excess of customer demand ***may result*** in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which ***could*** cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices at our outlet store in Northern California.
>
> Conversely, ***if we underestimate customer demand for our products*** and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and ***we may experience inventory shortages***. Inventory shortages in our stores or third-party distribution centers ***could*** result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation

57

CONSOLIDATED THIRD AMENDED COMPLAINT<br>FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

198.    The foregoing risk warnings misled investors because Allbirds' retail stores already experienced inventory levels "in excess of customer demand" for new product offerings that they could not sell due to poor quality, fit, and design, and because they did not resonate with new or existing customers, and Allbirds' retail stores also already experienced "inventory shortages" of the core product offerings that its consumers actually wanted. The Exchange Act Defendants did not disclose that these risks manifested as a result of Allbirds' overinvestment in new products and underinvestment in core products as well as Allbirds' overly aggressive pace of store openings with insufficient inventory planning.

199.    On May 10, 2022, the Company issued a press release announcing its first quarter 2022 financial results. The press release announced a reduction to its financial targets but failed to state that the Company had shifted its focus toward attracting new customers at the expense of its core customers. Defendant Zwillinger was quoted saying the following about the Company's performance:

> [W]e remain focused on driving the topline through our core growth pillars of *delivering product innovation, growing our store portfolio* and expanding internationally, with those growth pillars highlighted in 2022 by what we believe is the most exciting new product roadmap in the history of the company.

200.    The foregoing statements misled investors because Allbirds had underinvested in its core products, introduced new apparel lines as part of its "product innovation" that did not succeed and did not target Allbirds core customer, and its efforts at "growing our store portfolio" were too aggressive, led to market saturation and cannibalization, suffered from poor inventory management, and did not attain profitability.

201.    That same day, Allbirds held an earnings call with analysts to discuss the quarterly results, during which Defendants Zwillinger, Brown and Bufano presented. On the call,

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Defendant Brown touted the release of the Flyer, which he described as "our third performance shoe and our latest best performing and most visually bold design yet." Comprehensively describing the shoe and claiming it could stand up to "even the best runners," Defendant Brown stated:

> ***Designed to perform equally well on a first run on race day or anything in between. The Tree Flyer has gone through extensive development and testing both in our innovation lab and on the road with countless iterations developed to perfect the shoe. The shoe has been road tested by more than 100 runners over 6,000 miles across a wide array of conditions and climates to validate its remarkable performance attributes.*** We are incredibly excited about this launch and as our first high-performance product expected to meaningfully increase our credibility in this category.
>
> The core of what makes the Tree Flyer so special is SweetFoam a first of its kind midsole technology. ***The result is a shoe made for runners of all stripes*** with our highest rebound rate yet at 70%. While midsoles are usually made from petroleum and logan at 100% synthetic, SweetFoam leverages plant-based oils enabling a 20% reduction in carbon footprint versus petroleum-based synthetic alternatives.
>
> Tree Flyer's bouncy airy SweetFoam midsoles are 30% more responsive, 25% lighter and require less energy to manufacture than our existing SweetFoam. A strong testament to Allbirds' ***commitment to sustainable innovation and relentless improvement***, while continuing to tap into the design white space of reductive design to provide style versatility for ***even the best runners***.

202.    Defendant Brown failed to disclose that the Company had overinvested in the Flyer at the expense of its core products and that even though Allbirds marketed the Flyer to runners, the shoe could not withstand the wear and tear of running due to its construction from natural materials.

203.    Defendant Zwillinger also touted the Company's retail footprint, once again stating that it is an "efficient means" of acquiring customers, increased brand awareness, and "provides a halo effect on the overall business":

> Now I'll turn to our third growth pillar, the store portfolio and our broader distribution strategy. ***Our retail footprint is highly productive and serves as an efficient means to acquire new customers. Opening new stores drive increased brand awareness and provides a halo effect on the overall business***, including an increase in the absolute number and mix of repeat customers who shop with us both digitally and in stores.

204.    Defendant Zwillinger did not inform investors that the Company's store opening strategy was overly aggressive, unprofitable, and unlikely to lead to profitability, as was discussed during multiple monthly meetings attended by Defendants Zwillinger, Brown, and Bufano (*see supra*). Defendant Zwillinger also failed to mention that the new stores would not benefit the "overall business" because Allbirds opened stores in close proximity to existing locations raising the risk of market saturation and cannibalization, and did not develop effective plans to manage inventory overage in the stores caused by its unsuccessful apparel products that strayed from the Company's core DNA, which the stores could not sell due to poor quality, design, and marketing.

205.    In response to an analyst question regarding brand awareness, Defendant Bufano stated that Allbirds had "great [brand] marketing" and "great brand building techniques" when in reality, Allbirds had shifted focus away from brand marketing and cut the brand marketing budget materially in favor of performance marketing:

> We're continuing to see that trend really positively. And this is all about using that flywheel of distribution and then, great brand great brand building techniques around partnerships and other campaigns that we're running.

> So it's all about methodically building that with stores with great marketing. And as we're doing that we're seeing not only good awareness lift, but also good awareness lift in the right factors.

206.    Regarding the Flyer launch, Defendant Brown stated:

> So I think all that consumer research is saying, yes sustainability matters, but it's only in service of better product experiences. And that's our focus. And I think in performance and in ***the flyer I think is a great example of us executing that at a very high level.***

207.    However, Defendant Brown failed to reveal that the Flyer in fact did not represent a great example "in performance" of Allbirds executing sustainability mixed with a better product experience "at a very high level." In reality, the Company overinvested in the Flyer at the expense of its core products and marketed it to runners even though its natural material construction meant it could not actually withstand the wear and tear of running.

208.    Defendant Zwillinger also represented on the call that Allbirds' new store openings flourished when they actually struggled given market saturation, cannibalization, and unsuccessful new product offerings which also led to excess inventory:

So during COVID we started signing leases in lifestyle centers in suburban malls and whatnot. ***Those have performed really, really well. And those have proven to be much more resilient regardless of the consumer behaviors, or restrictions in the regions and whatnot***.

So we are continuing to – we are continuing to focus on those types of real estate transactions when we're signing leases and ***we're seeing quite a bit of positive uplift in those as we start up new stores as well***. But that said, ***looking at the Flatiron launch that we just did about a month ago it's been a really, really fantastic launch for us for a new store*** and gives us a lot of confidence in the comeback for Manhattan, which is I think a really nice bellwether for a lot of urban environments. ***And if you couple that with our store in SoHo we're just seeing a nice trend and that gives us a lot of confidence to hit on those targets we mentioned***.

209.    The foregoing statements misled investors because the Company's store opening strategy was overly aggressive, unprofitable, included opening stores too close to existing locations raising the risk of market saturation and cannibalization, and did not include an effective plan to manage inventory in the stores. Moreover, the new product offerings that strayed from the Company's core DNA, poor inventory management in its retail locations, and the Company's underinvestment in brand marketing, raised the material risk that its stores would continue struggling to reach profitability.

210.    On May 11, 2022, the Company filed its quarterly Form 10-Q for the first quarter ended March 31, 2022 ("1Q22"), signed by Defendants Zwillinger and Bufano. Therein, Allbirds identified "Continued Growth Within Existing Customer Base and Increasing Closet Share" as a "Key Factor Affecting Our Performance." Specifically, the 1Q22 stated:

In addition to seeking to acquire new customers, ***we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions***.

\*\*\*

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

[I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, **high performance**, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with **new products appealing to our existing customers**.

211.    Though acknowledging their awareness regarding the importance of continued focus on Allbirds' core customer base, the Exchange Act Defendants falsely stated that they continuously seek ways to engage with core customers when in reality, the Company had been underinvesting in core products and overinvesting in/overemphasizing new offerings that targeted a demographic outside its core customer base. Moreover, Defendants failed to reveal that their new apparel offerings already failed to appeal to existing customers and did not qualify as high performance given significant quality and fit issues.

212.    Indeed, the 1Q22 conceded that if Allbirds failed to attract new customers and failed to appeal to existing customers with its product offerings, "our business, financial condition, results of operations, and growth prospects will be harmed." Specifically, the 1Q22 stated:

In addition, ***our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers***, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. ***If existing customers no longer find our products appealing***, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.***

213.    However, in so warning, the Exchange Act Defendants failed to reveal that these risks had already come to pass. Allbirds' new product offerings floundered given poor planning, design, and quality, and failed to resonate with "existing customers" because the Company marketed its new products to a younger demographic outside Allbirds' core customer base.

214.     Additionally, the Exchange Act Defendants detailed the risk of Allbirds failing to remedy quality issues with its products but failed to reveal that from the time they launched apparel in October 2020, they knew about quality issues based on both employee and consumer feedback, which was discussed during monthly meetings attended by Defendants Brown, Zwillinger, and Bufano, among other senior executives, yet not only did Defendants fail to remedy these issues, they continued to launch additional apparel lines with similar results.

> If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. ***If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.*** If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected.

215.     The 1Q22 also described Allbirds' marketing efforts, and emphasized the significance of brand awareness and retaining existing customers to that effort:

> Marketing expense consists of advertising costs incurred to acquire new customers, ***retain existing customers***, and ***build our brand awareness***. We expect marketing expense to continue to increase in absolute dollars as we ***continue to expand our brand awareness***, introduce new product innovations across multiple product categories, and implement new marketing strategies.

216.     The foregoing statements misled investors because Allbirds had already shifted its focus away from brand awareness, cutting its brand marketing budget materially in favor of performance marketing.

217.     Indeed, the 1Q22 described the Company's marketing efforts in detail but failed to reveal that a majority of the marketing budget went to performance marketing at the expense of brand awareness, despite the fact that, as explained *supra*, Allbirds' "brand" is integral to its success:

> We create differentiated brand marketing content and utilize performance marketing to drive customers from awareness to consideration to conversion, and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our

marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app.

218.    The 1Q22 also cited the Company's plan to increase its store fleet as part of its strategy to accelerate growth, citing historical profitability of its existing stores as its basis for representing the new stores would similarly be "highly profitable":

With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns…We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic***.

219.    While predicting new stores would similarly thrive, the 1Q22 did not inform investors that such expectation lacked a reasonable basis because the Company's store opening strategy was overly aggressive, unprofitable, included opening stores too close to existing locations raising the risk of market saturation and cannibalization, and did not include an effective plan to manage inventory in the stores. Moreover, the new product offerings that strayed from the Company's core DNA, poor inventory management in its retail locations, and the Company's underinvestment in brand marketing, raised the material risk that its stores would continue struggling to reach profitability.

220.    Moreover, the 1Q22 included misleading risk warnings regarding inventory levels:

Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

of our products at discounted prices through our own channels and certain third-party retailers.

Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

221.    The foregoing risk warnings misled investors because Allbirds' retail stores already experienced inventory levels "in excess of customer demand" for new product offerings that they could not sell due to poor quality, fit, and design, and because they did not resonate with new or existing customers, and Allbirds' retail stores also already experienced "inventory shortages" of the core product offerings that its consumers actually wanted. The Exchange Act Defendants did not disclose that these risks manifested as a result of Allbirds' overinvestment in new products and underinvestment in core products as well as Allbirds' overly aggressive pace of store openings with insufficient inventory planning.

222.    On August 8, 2022, the Company issued a press release reporting its second quarter 2022 financial results. The press release announced a reduction in guidance targets but failed to state that the Company had shifted its focus away from core customers. Defendant Bufano was quoted saying the following but did not disclose that the Company's focus was at the expense of core customers:

In this operating environment, we are focused on controlling what we can control and have implemented a series of Simplification Initiatives focused on automating and expanding our supply chain and streamlining our operating structure. These Simplification Initiatives are expected to generate annualized SG&A expense savings of $13 million to $15 million beginning in 2023 and significant cost of revenue savings in future years. ***We will reinvest some of these savings into building brand momentum*** through product innovation, marketing, retail stores, and marquee third party partnerships. ***We are confident that these investments in the customer,*** coupled with our Simplification Initiatives, will help us navigate this

consumer slowdown and position us for accelerated profitable growth when the headwinds pass.

223.     The foregoing statements misled investors because Allbirds had shifted its focus away from building brand awareness by significantly cutting its brand marketing budget in favor of performance marketing, and could not build brand momentum through product innovation because its new products, e.g. apparel and Flyer (which launched June 2022), did not resonate with either new customers or Allbirds' core customers.

224.     That same day, Allbirds held an earnings call with analysts during which Defendants Zwillinger, Brown, and Bufano presented. On the call, Defendant Zwillinger touted the recent Flyer launch:

> As per product, Q2 also saw the ***highly successful launch of our first high-performance running shoe, the Flyer.***

225.     Defendant Brown similarly called the Flyer launch "successful" and "extraordinary," referencing "2.5 years researching, designing, testing and iterating to create a running shoe that is a key building block of our performance journey." Defendant Brown went on to state:

> And the response from both consumers and media alike has been ***overwhelmingly positive***. In fact 43% of Flyer sales in the first 30 days post launch were to new customers, which we believe is a ***strong proof point that our performance offering is not only resonating with our existing audience, but bringing new customers into the Allbirds' brand***.

226.     However, the foregoing statements misled investors because the Flyer launch was not "highly successful." Defendants Zwillinger and Brown failed to reveal that the Company had overinvested in the Flyer at the expense of its core products and marketed it as a high-performance running shoe to runners outside Allbirds' target consumer "sweet spot," even though its natural material construction meant it could not actually withstand the wear and tear of running, and thus did not resonate with either existing or new customers.

227.    Defendant Zwillinger went on to comprehensively discuss Allbirds' retail stores, including new store openings, which he portrayed as successful:

***Our stores are not only the best expression of the Allbirds brand, but are a fantastic customer acquisition tool, all while delivering strong four-wall economics.***

\*\*\*

During the quarter, our US store sales increased nearly 120% year-over-year. We opened seven stores in Q2, bringing us to a total of 46 as of June 30. To highlight a few. In the US, we opened in Fashion Island in Newport Beach in early June, which is our first store in Orange County and seventh in Southern California and it has exceeded our expectations.

As we build stores in the region, such as Southern California, ***we see meaningful gains in awareness, drive strong store economics across the region, while substantially lifting overall commerce across channels***.

228.    The foregoing statements misled investors because, while portraying the Company's store expansion as a brand builder, fantastic customer acquisition tool, and a source of strong four-wall economics, Defendant Zwillinger failed to disclose that most of Allbirds' stores were not profitable, Allbirds opened stores at a far too aggressive pace, and its retail stores floundered as a result of its overinvestment in new products that did not sell resulting in excess inventory with no markdown or transfer strategy, and underinvested in core products and thus had insufficient inventory of items consumers actually wanted.

229.    Defendant Brown also touted some of Allbirds' new apparel offerings:

When we decided to connect our successful footwear franchises to apparel offerings, we leverage unique natural materials to deliver next to skin comfort, a consistent hallmark of the Allbirds brand. ***This is reflected in the success of some of our core apparel offerings including our socks, underwear, our classic T-shirts, and sweats, which continue to perform well as expansions of our material platforms and articulations of supernatural comfort***.

However, on the same call Defendant Brown also represented that, "***The innovation and product focus remains vastly on footwear.***"

230.    The foregoing statements misled investors because apparel was not successful from the time of its October 2020 launch given poor planning, design, fit, and quality, which

Defendants Brown, Zwillinger, and Bufano knew based on their attendance at numerous meetings throughout the Class Period where attendees discussed the failure of apparel at length. Moreover, in reality, the Company overinvested in new product offerings like apparel and underinvested, and did not focus sufficiently, on core products like footwear.

231.    Addressing marketing spend on the call, Defendant Zwillinger stated:

We've done such a good job of early diversification of the media spend that we have that we come back to a place where our overall business can still have leverage on the marketing line item, ***while we're investing and doubling down in brand. And that to us is the right long-term formula, so that we can be adaptive and dynamic to the current situation, while not sacrificing any of the long-term possibility that this brand has.***

232.    However, not only did Allbirds not "double down" in brand, they cut the brand marketing budget markedly, allocating the lions' share of the budget to performance marketing, which is not about long-term ROI or brand awareness.

233.    On August 9, 2022, Allbirds filed its quarterly Form 10-Q for the second quarter ended June 30, 2022 ("2Q22"), signed by Defendants Zwillinger and Bufano. Therein, Allbirds identified "Continued Growth Within Existing Customer Base and Increasing Closet Share" as a "Key Factor Affecting Our Performance." Specifically, the 2Q22 stated:

In addition to seeking to acquire new customers, ***we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions***.

\*\*\*

[I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, ***high performance***, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with ***new products appealing to our existing customers***.

234.    Though acknowledging their awareness regarding the importance of continued focus on Allbirds' core customer base, the Exchange Act Defendants falsely stated that they continuously seek ways to engage with core customers when in reality, the Company had been underinvesting in

core products and had overinvested in/overemphasized new offerings that targeted a demographic outside its core customer base. Moreover, the Exchange Act Defendants failed to reveal that their new product offerings already failed to resonate with existing customers and did not qualify as high performance given significant quality and fit issues.

235.    Indeed, the 2Q22 conceded that if Allbirds failed to attract new customers and failed to appeal to existing customers with its product offerings, "our business, financial condition, results of operations, and growth prospects will be harmed."  Specifically, the 2Q22 stated:

> In addition, ***our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers***, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. ***If existing customers no longer find our products appealing***, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.
>
> ***If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.***

236.    However, in so warning, the Exchange Act Defendants failed to reveal that these risks had already come to pass. Allbirds' new product offerings floundered given poor planning, design, and quality, and failed to appeal to "existing customers" because the Company marketed its new products to a younger demographic outside Allbirds' core customer base.

237.    Additionally, the Exchange Act Defendants detailed the risk of Allbirds failing to remedy quality issues with its products but failed to reveal that from the time they launched apparel in October 2020, they knew about quality issues based on both employee and consumer feedback, which was discussed during monthly meetings attended by Defendants Brown, Zwillinger, and Bufano, among other senior executives, yet not only did the Exchange Act

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Defendants fail to remedy these issues, they continued to launch additional apparel lines with similar results.

> If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. *If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.* If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected.

238.    The 2Q22 also described Allbirds' marketing efforts, and emphasized the significance of brand awareness and retaining existing customers to that effort:

> Marketing expense consists of advertising costs incurred to acquire new customers, *retain existing customers*, and *build our brand awareness*. We expect marketing expense to continue to increase in absolute dollars as we *continue to expand our brand awareness*, introduce new product innovations across multiple product categories, and implement new marketing strategies.

239.    The foregoing statements misled investors because Allbirds had already shifted its focus away from brand awareness, cutting its brand marketing budget materially in favor of performance marketing.

240.    Indeed, the 2Q22 described the Company's marketing efforts in detail but failed to reveal that a majority of the marketing budget went to performance marketing at the expense of brand awareness, despite the fact that, as explained *supra*, Allbirds' "brand" is integral to its success:

> We create differentiated brand marketing content and utilize performance marketing to drive customers from awareness to consideration to conversion, and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

241.    The 2Q22 no longer referenced a thriving retail store fleet nor made assurances that "new stores will be highly profitable.

242.    Moreover, the 2Q22 included misleading risk warnings regarding inventory levels:

> Inventory levels in excess of customer demand may result in inventory write-downs, inventory write-offs, donations by us of our unsold products, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices through our own channels and certain third-party retailers. Additionally, for the three months ended June 30, 2022, we recognized a non-cash inventory write-down, primarily for certain first-generation apparel products.

> Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

243.    The foregoing risk warnings misled investors because Allbirds' retail stores already experienced inventory levels "in excess of customer demand" for new product offerings that they could not sell due to poor quality, fit, and design, and because they did not resonate with new or existing customers, and Allbirds' retail stores also already experienced "inventory shortages" of the core product offerings that its consumers actually wanted. The Exchange Act Defendants did not disclose that these risks manifested as a result of Allbirds' overinvestment in new products and underinvestment in core products as well as Allbirds' overly aggressive pace of store openings with insufficient inventory planning.

244.    On November 9, 2022, the Company filed its quarterly Form 10-Q for the third quarter ended September 30, 2022 ("3Q22"), signed by Defendants Zwillinger and Bufano.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Therein, Allbirds identified "Continued Growth Within Existing Customer Base and Increasing

Closet Share" as a "Key Factor Affecting Our Performance." Specifically, the 3Q22 stated:

> In addition to seeking to acquire new customers, **we continuously seek ways to engage with our large and growing base of over four million existing customers. We aim to grow our closet share within our existing customer base, especially as we expand into new product categories and line extensions**.
>
> \*\*\*
>
> [I]t is critical that we maintain our long-trusted commitment to offering the most comfortable, **high performance**, and sustainable products. Our continued growth within our existing customer base will depend in part on our ability to continue to innovate with **new products appealing to our existing customers**.

245.    Though acknowledging the importance of continued focus on Allbirds' core

customer base, Defendants falsely stated that they continuously seek ways to engage with core

customers when in reality, the Company had been underinvesting in core products and had

overinvested in/overemphasized new offerings that targeted a demographic outside its core

customer base. Moreover, Defendants failed to reveal that their new product offerings already failed

to appeal to existing customers and did not qualify as high performance given significant quality

and fit issues.

246.    Indeed, the 3Q22 conceded that if Allbirds failed to attract new customers and failed

to appeal to existing customers with its product offerings, "our business, financial condition, results

of operations, and growth prospects will be harmed." Specifically, the 3Q22 stated:

> In addition, **our future success depends in part on our ability to increase sales to our existing customers over time, as a significant portion of our net revenue is generated from sales to existing customers**, particularly those existing customers who are highly engaged and make frequent and/or large purchases of the products we offer. **If existing customers no longer find our products appealing**, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

> *If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.*

247.    However, in so warning, the Exchange Act Defendants failed to reveal that these risks had already come to pass. Allbirds' new product offerings floundered given poor planning, design, and quality, and failed to appeal to "existing customers" because the Company marketed its new products to a younger demographic outside Allbirds' core customer base.

248.    Additionally, Defendants detailed the risk of Allbirds failing to remedy quality issues with its products but failed to reveal that from the time they launched apparel in October 2020, they knew about quality issues based on both employee and consumer feedback, which was discussed during monthly meetings attended by Defendants Brown, Zwillinger, and Bufano, among other senior executives, yet not only did the Exchange Act Defendants fail to remedy these issues, they continued to launch additional apparel lines with similar results.

> If existing customers are dissatisfied with their product experience due to defects in the materials or manufacturing of our products or other quality related concerns, then they may stop buying our products and may stop referring others to us, and we could experience an increase in the rate of product returns. *If we are unable to retain existing customers and attract new customers due to quality issues that we fail to identify and remedy, our growth prospects would be harmed and our business could be adversely affected.* If product quality issues are widespread or result in product recalls, our brand and reputation could be harmed, we could incur substantial costs, and our results of operations and financial condition could be adversely affected.

249.    The 3Q22 also described Allbirds' marketing efforts, and emphasized the significance of brand awareness and retaining existing customers to that effort:

> Marketing expense consists of advertising costs incurred to acquire new customers, *retain existing customers*, and *build our brand awareness*. We expect marketing expense to continue to increase in absolute dollars as we *continue to expand our brand awareness*, introduce new product innovations across multiple product categories, and implement new marketing strategies.

250.    The foregoing statements misled investors because Allbirds had already shifted its focus away from brand awareness, cutting its brand marketing budget materially in favor of performance marketing.

251.    Indeed, the 3Q22 described the Company's marketing efforts in detail but failed to reveal that a majority of the marketing budget went to performance marketing at the expense of brand awareness, despite the fact that, as explained *supra*, Allbirds' "brand" is integral to its success:

> We create differentiated brand marketing content and utilize performance marketing to drive customers from awareness to consideration to conversion, and promoting awareness of our brand and products is important to our ability to grow our business, drive customer engagement, and attract new customers. Our marketing strategy includes brand marketing campaigns across platforms, including email, digital, display, site, direct-mail, streaming audio, television, social media, and our Allgood Collective, as well as performance marketing efforts, including retargeting, paid search and product listing advertisements, paid social media advertisements, search engine optimization, personalized emails, and mobile push notifications through our app.

252.    Moreover, the 3Q22 included misleading risk warnings regarding inventory levels:

> Inventory levels in excess of customer demand may result in inventory write-downs, inventory write-offs, donations by us of our unsold products, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices through our own channels and certain third-party retailers. Additionally, in the second and third quarters of 2022, we recognized non-cash inventory write-downs, primarily for certain first-generation apparel products.

> Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

253. The foregoing risk warnings misled investors because Allbirds' retail stores already experienced inventory levels "in excess of customer demand" for new product offerings that they could not sell due to poor quality, fit, and design, and because they did not resonate with new or existing customers, and Allbirds' retail stores also already experienced "inventory shortages" of the core product offerings that its consumers actually wanted. The Exchange Act Defendants did not disclose that these risks manifested as a result of Allbirds' overinvestment in new products and underinvestment in core products as well as Allbirds' overly aggressive pace of store openings with insufficient inventory planning.

254. The above statements identified in ¶¶ 132-252 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Exchange Act Defendants failed to disclose to investors: (i) that Allbirds was overemphasizing and overinvesting in new products, including apparel, that extended beyond the Company's core offerings; (ii) that the Company's non-core products had a narrower appeal and did not resonate with customers as well as the Company's core products; (iii) that Allbirds was underinvesting in its core consumers' favorite products to push the Company's newer products with narrower appeal; (iv) that underinvesting in Allbirds' core products was negatively impacting the Company's sales; (v) that the Company pursued an overly aggressive and unprofitable pace of store openings though its existing stores struggled and its new stores failed to attain profitability due to ill-received product offerings, market saturation, and cannibalization; (vi) Allbirds' retail stores had significant inventory issues including insufficient inventory of core products that customers wanted and excess inventory of new products that did not resonate with consumers, and thus did not sell; (vii) that the Company shifted its marketing strategy toward performance marketing at the expense of brand marketing

despite the significance of brand awareness to its success; and (viii) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Regulation S-K Item 105

255.    Allbirds' annual and quarterly reports were subject to the disclosure requirements of Item 105 of Regulation S-K, 17 C.F.R. §229.105, which governs disclosure of risk factors and requires, among other things, that an issuer "provide under the caption 'Risk Factors' a discussion of the material factors that make [the securities] speculative or risky."

256.    Defendants violated their disclosure duties imposed by Item 105 of Regulation S-K, 17 C.F.R. §229.105 by failing to disclose the material risk that Allbirds' underinvestment in core products and overinvestment in new products, the inventory shortages of core products and inventory excess of new products, its overly aggressive and unprofitable pace of store openings, and its evisceration of the brand marketing budget had and would continue to negatively impact the Company's financial results.

### Regulation S-K Item 303

257.    Allbirds' annual and quarterly reports filed with the SEC were subject to the disclosure requirements of Item 303 of Regulation S-K, which among other things requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2). Companies must also disclose events that the registrant knows will "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. § 229.303(b)(2).

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

258.    In violation of Item 303, Allbirds' annual and quarterly reports failed to disclose the known trends that Allbirds' underinvestment in core products and overinvestment in new products, the inventory shortages of core products and inventory excess of new products, its overly aggressive and unprofitable pace of store openings, and its evisceration of the brand marketing budget were having a material adverse impact on its business and financial results. Allbirds had a duty to disclose these material adverse trends under Item 303 of Regulation S-K yet failed to do so.

**The Truth Emerges**

259.    On March 9, 2023, after the market closed, Allbirds issued a press release announcing that Defendant Bufano was stepping down as the Company's CFO and that Annie Mitchell was taking his place, effective April 24, 2023.

260.    Also on March 9, 2023, after the market closed, Allbirds issued a press release reporting fourth quarter and full year 2022 financial results (the "4Q22 Press Release"), which revealed, among other things, a full year 2022 net loss of $101.4 million, a fourth quarter net loss of $24.9 million, a 13% decrease in net revenue as compared to the fourth quarter of 2021, a full year 2022 adjusted EBITDA loss of $60.4 million, and a fourth quarter 2022 adjusted EBITDA loss of $12.5 million that included "a $3.5 million loss primarily associated with the previously announced discontinuation of certain first-generation apparel."

261.    In discussing the cause of the disappointing results, Allbirds admitted to its underinvestment in brand marketing and its core consumer, as well as its overly aggressive pace of store openings. Specifically, Allbirds set forth a "strategic transformation plan to reignite growth in the coming years, as well as improve capital efficiency, and drive profitability." In addition, to improving cost savings and capital efficiency as well as evaluating its international go-to-market strategy, Allbirds emphasized that it needs to:

- **Reignite product and brand**

  - ○ *Executing a highly-focused brand strategy that reconnects with core consumers*.

- **Optimize U.S. stores and slow pace of openings**.

  - ○ Driving traffic and conversion to our U.S. fleet and selectively expanding our third party wholesale channel.

262.  Also on March 9, 2023, after the market closed, the Company held an earnings call with analysts to discuss the disappointing results. Defendant Zwillinger admitted that, *for at least two years*, the Company had "*made some strategic and executional missteps that impacted results*." Expanding on this, Defendant Zwillinger stated:

> However, in this journey we also made some missteps. ***First, we overemphasized products that extended beyond our core DNA***. And as a result, some products and colors have had narrower appeal than expected. ***Because we were spending significant time and resources on these new products that did not resonate well, we underinvested in our core consumers' favorite products***. Finally, we ***did not increase our brand awareness*** to the level that we anticipated.
>
> ***In essence, over the past couple of years, we shifted our focus away from our core consumer and we must refocus sharply on this large and attract* [sic] *group***. Taking a look at Q4 specifically this dynamic was exacerbated by the fact that the final weeks of December were exceptionally promotional and we did not sufficiently promote to meet consumers' expectations. As a result, Q4 was the first quarter of negative growth in our history. We are disappointed with these results. And we know that, as we look ahead the status quo is not enough.

263.  In other words, since before the IPO (as multiple CWs corroborated), Defendants underinvested in Allbirds' core products, shifted focus away from its core consumer, overinvested in new products (e.g., apparel, the Flyer and Pacer) that did not resonate with consumers, overemphasized products that extended beyond Allbirds' core DNA (e.g., footwear like the Dasher and Runner), and failed to increase brand awareness due to its evisceration of the Company's brand marketing budget. At no point in either the False Registration Statements nor in the public statements Defendants issued in other publicly filed documents during the Class Period did they alert the market to these "missteps," instead representing that Allbirds continued

to focus on its core consumer, had successfully launched new product offerings, and continued to focus on brand awareness.

264.    After admitting to these "missteps," which Defendants Zwillinger, Brown and Bufano each knew about given their hands on managerial style, decision making control, and participation in multiple meetings that met at least monthly where these "missteps" were continuously discussed with them, Defendant Zwillinger described the strategic transformation plan that had been set forth in the 4Q22 Press Release. Regarding the initiative to "reignite product and brand," Defendant Zwillinger stated as follows:

> **Roughly two years ago**, and after a period of considerable growth, we made a decision to diversify our product **beyond the core DNA** of what has made us one of the most beloved brands in footwear in an effort to reach a younger fashion forward and performance-oriented consumer. **We overinvested in seasonal trend colors and new silhouettes like the Pacer and Flyer**.

> Ultimately, we have come to recognize that **our overinvestment on newness came at the expense of focus on consumers who are loyal to our brands and on nurturing our core franchises** such as the Runner and Dasher.

265.    Later on the call, in response to an analyst question, Defendant Zwillinger pointed to the Flyer and Pacer launches as two examples of products that did not resonate with core consumers and where Allbirds "missed execution," both in terms of "product development" and marketing:

> So first on the Pacer that was both the product execution and a marketing campaign that was really oriented around a younger consumer really outside the sweet spot of the group of people who have really fell in love with us and love the core franchise for what we do.

> And similarly with the Flyer that was a product that was really marketed with heavy orientation around the technical running performance that that item delivers. And it's a great product. We just found out that the customers that were -- that really in our sweet spot aren't resonating with a core technical performance messaging. And some of that missed execution by us.

266.    Moreover, as part of the commitment toward reigniting product and brand, and conceding the need to spend additional marketing funds on brand awareness, Defendant Bufano

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

explained that "we plan to spend additional US marketing dollars on a year-over-year basis in 2023 to support our brand…"

267.   Defendant Zwillinger also addressed Allbirds' decision to slow down the aggressive pace of store openings:

> After a year in which we opened 19 new stores in the US we are significantly slowing the pace of new store openings in 2023. This year we plan to open three stores in the US against leases signed in early 2022 and rebalance our focus from opening new stores towards driving profitability and new customer acquisition from our existing fleet, including the roughly half of our US stores that have been opened for less than a year.

268.   With the opening of those 19 stores, Allbirds increased its store count by 80%, yet its store revenues grew a paltry 8% in the fourth quarter of 2022. Conceding their store opening spree did not work, Allbirds committed to only opening three new stores in 2023 and focusing on improving the productivity of existing locations.

269.   On this news, the Company's stock price fell $1.11, or 47%, to close at $1.25 per share on March 10, 2023, thereby injuring investors.

270.   As analyst Wedbush noted, where other emerging footwear brands have demonstrated exceptional growth, Allbirds has lagged:

> The thing that makes this even more stark is that several other "emerging" footwear brands are putting up exceptional growth, on top of a larger revenue base than BIRD. On Running, Hoka, and HeyDude all grew revenues in the 55-70% range in 2022 (with multiple guidance raises for each), and each of them had 2021 revenue bases that were 2x-3x the size of BIRD's 2021 revenues. Thus, we're seeing a stark difference in performance between BIRD and other "high growth" footwear brands.

271.   Defendants' revelations, detailing their many internal missteps in the last couple of years, explain that lag.

272.   Following these revelations, Morgan Stanley stated that it would review its estimates and price targets in light of brand awareness concerns, concerns that Allbirds' TAM is much smaller than initially contemplated, and due to "bloated" inventory levels as a result of the

Company's "lower-than-expected sell-thru of non-core product." Subsequently, on April 24, 2023, Morgan Stanley slashed its price target for Allbirds from $4 down to $1.

273.    On May 4, 2023, the Company announced amidst a series of layoffs that Defendant Brown would step down as co-CEO effective immediately and would transition into the role of Chief Innovation Officer, a non-executive role.

274.    By the commencement of this action, the Company's stock price had closed as low as $1.06 per share, a 92.9% decline from the Company's $15.00 per share IPO price.

## SECTION 10(b) SCIENTER ALLEGATIONS

275.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Allbirds, their control over, and/or receipt and/or modification of Allbirds' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Allbirds, participated in the fraudulent scheme alleged herein.

276.    CW4 and CW7 both described Defendants Zwillinger and Brown's managerial stye as very hands on and controlling. As CW4 explained, Allbirds was "the Tim and Joe show," and CW7 confirmed that "no decisions were made without them."

277.    Numerous CWs confirmed that the Individual Defendants attended countless meetings during which they were informed, based on concrete data presented, that apparel had quality and fit issues, apparel did not resonate with customers, retail stores struggled to sell apparel

and had excess inventory, Allbirds retail fleet was not profitable, and Allbirds needed to grow brand awareness and thus needed to correct its lopsided marketing budget. These meetings took place both before and during the Class Period and included:

- Monthly sales and operations meeting, attended by approximately ten participants including the Individual Defendants;

- Monthly real estate meeting, attended by approximately twenty participants including the Individual Defendants;

- Monthly retail store performance meeting, attended by approximately twenty participants including the Individual Defendants;

- Monthly apparel meeting; attended by approximately twenty participants including the Individual Defendants;

- Monthly marketing meetings, attended by approximately thirty participants including the Individual Defendants;

- Monthly leadership meetings, attended by the Individual Defendants and Travis Boyce;

- Monthly "all hands" meetings;

- Flock Week in January, for the purpose of reviewing financials and goal setting for the year; and

- Back to the Birdhouse in September, to check in on how they performed in the previous year and to look ahead to the following year.

278. As noted above, the Exchange Act Defendants personally implemented each of Allbirds' undisclosed fundamental strategy pivots and thus had firsthand knowledge of the shifted focus from core, the aggressive retail store openings, and the lopsided marketing budget that

prioritized performance marketing over brand marketing, which rendered their Class Period misstatements on these topics false and misleading.

279. Moreover, the Exchange Act Defendants knew from the aforementioned meetings, *during which they reviewed hard data including financial performance (e.g., ¶120), ROI (e.g., ¶137), retail store metrics (e.g., ¶120), marketing budget (e.g., ¶137), apparel fabric samples (with visibly poor quality) (e.g., ¶102), and consumer feedback (e.g., ¶100)*, that apparel had quality and fit issues (*e.g., ¶99*), apparel did not resonate with core customers (*e.g., ¶104*), retail stores struggled to sell apparel (*e.g., ¶101*), Allbirds' retail fleet was not profitable overall due to the aggressive pace of store openings (*e.g., ¶121*), and Allbirds' lopsided marketing budget neglected brand awareness (*e.g., ¶137*). The Exchange Act Defendants also *admitted* at the Back to the Birdhouse meeting in September 2021 that their focus on new product expansion detrimentally impacted core, and *admitted* during Flock Week that their aggressive store opening strategy did not work. Nevertheless, the Exchange Act Defendants recklessly pushed forward with their strategic missteps to provide investors with the misimpression that Allbirds continued to grow and expand post-IPO though the appearance of short-term growth was smoke and mirrors, and their strategic missteps sacrificed long term growth.

280. The Exchange Act Defendants' awareness that operations had deteriorated as a result of their strategic "missteps" led them to bring in Chief Operating Officer Joseph Vernachio in July 2021 to clean up the "mess," according to CW4. Then in 2022, Defendants hired Chief Transformation Officer Jared Fix, who brought in the Boston Consulting Group, to transform and reignite the brand in the wake of Defendants' failed pivots.

281. In the corrective disclosure, Defendants admitted that they "made some strategic and executional missteps that impacted results," (i.e., the issues discussed at the many meetings

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

described *supra*) which included that they: 1) "overemphasized products that extended beyond our core DNA;" 2) "were spending significant time and resources on these new products that did not resonate well;" 3) "overinvested in seasonal trend colors and new silhouettes;" 4) "underinvested in our core consumers' favorite products," 5) "shifted our focus away from our core consumer;" 6) "did not increase our brand awareness," and 7) opened stores too aggressively and thus needed to "slow[] the pace of new store openings."

282.    On March 9, 2023, after the market closed, Allbirds issued a press release announcing that Defendant Bufano was stepping down as the Company's CFO and that Annie Mitchell was taking his place, effective April 24, 2023.

283.    On May 4, 2023, the Company announced amidst a series of layoffs that Defendant Brown would step down as co-CEO effective immediately and would transition into the role of Chief Innovation Officer, a non-executive role.

284.    During the Class Period, Defendant Zwillinger sold 166,665 shares of Allbirds stock for proceeds of $461,786. All of these sales took place between January 25, 2023 and February 23, 2023. In other words, Defendant Zwillinger disposed of his holdings in the weeks leading up to the March 9, 2023 corrective disclosure.

285.    During the Class Period, Defendant Bufano sold 32,739 shares of Allbirds stock for proceeds of $103,408 in three separate sales, the last of which occurred on March 2, 2023, seven days before the corrective disclosure.

286.    In 2022, Defendants Zwillinger and Brown each received a $365,462 salary, $2,012,471 in stock awards, and $2,059,226 in option awards. Defendants Zwillinger's and Brown's performance-based stock awards exceeded their base salaries by an astounding ~ 450%, and each of their total compensation in 2022, at the height of the fraud, skyrocketed to more than 950% of their total compensation in 2021 (each receiving $4,449,210 in 2022 compared to $392,827 in 2021). Defendant Bufano received a $395,557 salary, and $1,296,687 in stock

awards, as well as beneficially acquired 328,706 additional shares through conversions of Restricted Stock Units ("RSUs") at no transaction cost – a substantial savings.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

287. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Allbirds: (a) Class A common stock pursuant and/or traceable to the Company's false and/or misleading Registration Statement issued in connection with the Company's IPO or the Forms S-8 filed on November 3, 2021 or March 28, 2022 which incorporated the Registration Statement by reference; and/or (b) securities between November 4, 2021 and March 9, 2023, inclusive; and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

288. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. In the IPO, the Company sold approximately 16,850,799 shares of Class A common stock at a price of $15.00 per share. Moreover, record owners and other members of the Class may be identified from records maintained by Allbirds or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

289. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

290.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

291.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the False Registration Statements, statements made by Defendants to the investing public in connection with the Company's IPO, and statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Allbirds; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

292.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

293.    The market for Allbirds' securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Allbirds' securities traded at artificially inflated prices during the Class Period. On November 18, 2021, the Company's share price closed at a Class Period high of $26.76 per share.

Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Allbirds' securities and market information relating to Allbirds and have been damaged thereby.

294.    During the Class Period, the artificial inflation of Allbirds' shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Allbirds' business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Allbirds and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

295.    At all relevant times, the market for Allbirds' securities was an efficient market for the following reasons, among others:

(a)    Allbirds shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Allbirds filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Allbirds regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Allbirds was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

296.    As a result of the foregoing, the market for Allbirds' securities promptly digested current information regarding Allbirds from all publicly available sources and reflected such information in Allbirds' share price. Under these circumstances, all purchasers of Allbirds' securities during the Class Period suffered similar injury through their purchase of Allbirds' securities at artificially inflated prices and a presumption of reliance applies.

297.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**UNDISCLOSED ADVERSE FACTS**

298.    The market for Allbirds' securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Allbirds' securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Allbirds' securities relying upon the integrity of the market price of the Company's securities and market information relating to Allbirds and have been damaged thereby.

299.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Allbirds' securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Allbirds' business, operations, and prospects as alleged herein.

300.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Allbirds' financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted

in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

301.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

302.    During the Class Period, Plaintiffs and the Class purchased Allbirds' securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## NO SAFE HARBOR

303.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Allbirds who knew that the statement was false when made.

## COUNT I

### (Violations of Section 11 of the Securities Act Against the Securities Act Defendants)

304.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

305.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

306.    This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 11. Any allegation or implication of fraud or fraudulent intent is hereby expressly disclaimed and not incorporated by reference in this Count.

307.    The False Registration Statements were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

308.    Allbirds is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the False Registration Statements.

309.    The Underwriter Defendants marketed and underwrote the IPO and sold the majority of Allbirds Class A common stock issued in the IPO to the Securities Act Class.

310.    The Securities Act Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

311.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the False Registration Statements were true and without omissions of any material facts and were not misleading.

312.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

313.    Plaintiffs acquired Allbirds shares pursuant and/or traceable to the False Registration Statements.

314.    Plaintiffs and the Class have sustained damages. The value of Allbirds Class A common stock has declined substantially subsequent to and due to the Defendants' violations

## COUNT II

### (Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)

315.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

316.    This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

317.    The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Allbirds within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Allbirds to engage in the acts described herein.

318.    The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

319.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

**COUNT III**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

**Against Allbirds and the Exchange Act Individual Defendants)**

320.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

321.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Allbirds' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

322.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Allbirds' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

323.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Allbirds' financial wellbeing and prospects, as specified herein.

324.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Allbirds' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Allbirds and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

325.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

326.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Allbirds' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

327.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Allbirds' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Allbirds' securities during the Class Period at artificially high prices and were damaged thereby.

328.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems

that Allbirds was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Allbirds securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

329.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

330.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT IV

### (Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)

331.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

332.    The Individual Defendants acted as controlling persons of Allbirds within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

333.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

334.    As set forth above, Allbirds and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

# DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 14, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Tamar A. Weinrib*
POMERANTZ LLP
Tamar A. Weinrib
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Plaintiffs*

Junbo Hao
HAO LAW FIRM
BEIJING HAO JUNBO LAW FIRM
Room 3-401 No. 2 Building,
No. 1 Shuangliubei Street
100024 Beijing
People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel for Lead Plaintiffs*

CONSOLIDATED THIRD AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS