UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GENNADY SHNAYDER, et al.,

Plaintiffs,

v.

ALLBIRDS, INC., et al.,

Defendants.

Case No. 23-cv-01811-AMO

**ORDER RE DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

Re: Dkt. No. 109

Plaintiffs bring this putative securities fraud class action on behalf of all persons and entities that purchased or otherwise acquired: (a) Allbirds Class A common stock pursuant and/or traceable to the registration statement and prospectus (collectively, the "Challenged Registration Statement") issued in connection with the company's November 2021 initial public offering ("IPO"); and/or (b) Allbirds securities between November 4, 2021 and March 9, 2023 (the "Class Period"). The Court granted Defendants' first motion to dismiss in *Shnayder v. Allbirds, Inc.*, No. 23-CV-01811-AMO, 2024 WL 2125598, at *1 (N.D. Cal. May 10, 2024), with leave to amend all claims. Plaintiffs filed the Second Amended Complaint ("SAC") on June 24, 2024. Dkt. No. 89.[1] Subsequently, the Court granted Defendants' motion to dismiss the SAC in *Shnayder v. Allbirds, Inc.*, No. 23-CV-01811-AMO, 2025 WL 1745596, at *1 (N.D. Cal. June 23, 2025), once again with leave to amend. Plaintiffs thereafter filed the Third Amended Complaint ("TAC") on July 14, 2025, which is the subject of the instant motion to dismiss. *See* Dkt. Nos. 105, 109.

The TAC continues to assert four causes of action: 1) violation of Section 11 of the Securities Act, 15 U.S.C. § 77k; 2) violation of Section 15 of the Securities Act by the Individual

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Defendants; 3) violation of Section 10(b) of the Exchange Act; and 4) violation of Section 20(a) of the Exchange Act by the Individual Defendants.  In response, Defendants contend Plaintiffs have failed to plausibly allege the elements of their claims, and so the TAC must be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument.  Having reviewed the parties' submissions, and the relevant legal authority, the Court **GRANTS** the motion to dismiss.

**LEGAL STANDARD**

"To survive a motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Iqbal* and *Twombly*, plaintiffs' allegations must suggest that their claim has at least a plausible chance of success."  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014) (cleaned up).  The district court must assume that the plaintiffs' allegations are true and draw all reasonable inferences in their favor.  *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022).  However, the court need not construe conclusory statements or unreasonable inferences as true.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

For claims sounding in fraud, plaintiffs must "state with particularity the circumstances regarding the fraud or mistake."  Fed. R. Civ. P. 9(b).  So, plaintiffs must set forth "'the who, what, when, where, and how' of the misconduct charged."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).

A claim for violations of Section 10(b) and Rule 10b-5 of the Exchange Act "must meet both the heightened pleading requirements for fraud claims under Fed. R. Civ. P. 9(b) . . . and 'the exacting pleading requirements' of the Private Securities Litigation Reform Act ('PSLRA') . . . ."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (internal citations omitted).  To assess whether a securities fraud claim meets this heightened pleading standard, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

United States District Court
Northern District of California

**DISCUSSION**

In granting the Defendants' motion to dismiss the SAC, the Court surveyed the factual allegations underlying Plaintiffs' claims as well as the 60 allegedly false or misleading statements issued by Defendants. *See generally Shnayder v. Allbirds, Inc.*, No. 23-CV-01811-AMO, 2025 WL 1745596 (N.D. Cal. June 23, 2025). The basis for granting the motion was two-fold. First, Plaintiffs had failed to plausibly allege they could trace their purchased shares to the Registration Statement issued in connection with Allbirds' IPO. *Id*. at *8 - *9. This sunk the Section 11 claim because the allegations did not permit a plausible inference of statutory standing under the Securities Act. *Id*. Second, Plaintiffs had failed to plausibly allege facts "giving rise to a strong inference" of scienter, thus warranting dismissal of the Section 10(b) claim. *Id*. at *20 - *24. Since the Section 15 and Section 20(a) claims required Plaintiffs to plausibly allege underlying violations of Section 11 and Section 10(b), respectively, the Court also dismissed those claims.

Defendants' assert the TAC fails to cure these pleading deficiencies, and so dismissal is required once more. Accordingly, the Court begins with these two bases for dismissal to determine whether Plaintiffs allege facts sufficient to permit a plausible inference of statutory standing and scienter. This order assumes familiarity with the extensive factual background in the order dismissing the SAC, and here reviews only the allegations germane to the instant motion.

## I. SECTION 11 CLAIM

Section 11(a) of the Securities Act of 1933 provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [certain enumerated parties].

*Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) (quoting 15 U.S.C. § 77k(a)) (alterations in original). "As long as 'a plaintiff purchased a security issued pursuant to a registration statement, [they] need only show a material misstatement or omission to establish [their] *prima facie* case.'" *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (citation omitted). There is no

United States District Court
Northern District of California

scienter requirement under Section 11, so "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id*. (citation omitted). "To prevail in such an action, a plaintiff must prove (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotations and citation omitted). Further, a claim under Section 11 has a "traceability" requirement, meaning the plaintiff must plausibly allege the security at issue is "traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC*, 598 U.S. at 768. "Traceability" is understood as a question of statutory standing under the Securities Act. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1109 (9th Cir. 2013) ("Plaintiffs' failure to plead the traceability of their shares means they lack *statutory* standing under § 11, but failure to allege statutory standing results in failure to state a claim on which relief can be granted[.]").

In the SAC, Plaintiffs offered only conclusory allegations as to traceability. Since some of the Allbirds shares sold on the market were held by current employees, and some were issued under the Registration Statement, Plaintiffs needed to distinguish between those sources of purchasable shares. Plaintiffs offered no such allegations and failed to provide a factual basis for tracing their shares to those issued under the Statement as opposed to those sold by Allbirds employees. *See Shnayder*, 2025 WL 1745596, at *9. On amendment, Plaintiffs assert three theories of traceability. First, they allege the Registration Statement did not exclude the 1,865,398 shares sold by Allbirds employees "during the first seven days of trading post-IPO." Dkt. No. 105 ¶ 66. Second, they aver that even if those shares were not covered by the Registration Statement, it is "mathematically negligible and thus effectively impossible" the Lead Plaintiffs did not purchase as least one share issued under the Statement. *Id*. ¶ 67-68. Third, they allege the Depository Trust Company provides an IPO Tracking Service and a log of Personal Daily Activity Statements that could map shares to determine with certainty whether they were issued pursuant to the Registration Statement. *Id*. ¶¶ 70-72. None of these allegations suffice to permit a plausible inference of statutory standing.

4

To start, Plaintiffs misread the language of the Registration Statement. As to Class A common stock, the Registration states:

> This is an initial public offering of shares of Class A common stock of Allbirds, Inc. We are offering 15,384,615 shares of our Class A common stock, and the selling stockholders identified in this prospectus are offering 3,846,153 shares of our Class A common stock.

Dkt. No. 109-3 at 4. The list of "selling stockholders" is included within the prospectus and notes certain corporate entities by name as well as the executive officers and directors of the company. *Id*. at 208. Within that list, there is also a category of "Certain Other Selling Stockholders," which "[c]onsists of selling stockholders not otherwise listed in this table who collectively own less than 1% of [Allbirds] common stock." *Id*. at 210. Separately, the Registration Statement provides:

> beginning at the commencement of trading of our Class A common stock on the first trading day on which our common stock is listed on Nasdaq and through the seventh consecutive trading day thereafter, any of our current employees (but excluding current executive officers and directors) may sell in the public market up to 25% of the shares of our common stock, including any vested securities convertible into or exercisable or exchangeable for our common stock, held by such individual as of September 8, 2021, which we refer to as the first release period;

*Id*. at 219. "The number of shares eligible for early release in the first release period is up to 1,865,398 shares, including up to 1,426,286 shares issuable upon the exercise of vested options." *Id*. Plaintiffs essentially argue the 1,865,398 shares that could be sold by employees are included within the 19,230,768 Class A common stock shares subject to the Statement. However, they offer no basis for this interpretation, nor could they, since it disregards the text of the Statement. Indeed, it makes little sense for the 19,230,768 shares initially issued to include shares from current employees given there is no guarantee the full 1,865,398 would be sold—the Statement indicates employees may sell "up to" that number of shares. The 19,230,768 Class A common stock shares cannot include the employee shares because it was unknown at the time of issuance exactly how many of the employee shares would enter the market. Further, the list of "Principal and Selling Stockholders" does not mention current employees other than the officers and directors of the company, who are explicitly excluded from the first release period. *See id*. at 208, 219. Though Plaintiffs argue there is no indication the Registration Statement *does not* apply to

5

United States District Court
Northern District of California

employee-sold shares, the reverse is true: there is no reasonable basis to infer the Registration Statement applies to such shares, and ample reason to conclude it does not.

Turning to Plaintiffs' second argument, they contend it is "mathematically negligible and thus effectively impossible" the Lead Plaintiffs did not purchase at least one share issued under the Statement. Dkt. No. 105 ¶ 67-68. In service of this argument, they allege the probability of purchasing only unregistered shares, as a proportion of the total shares on the market, is vanishingly small. *Id*. Regardless of the probability, this method of "statistical tracing" is barred under Ninth Circuit precedent. In *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1190 (9th Cir. 2025), *cert. denied*, 146 S. Ct. 186 (2025), the Ninth Circuit held "that plaintiffs who purchased shares on the exchange must 'trace the chain of title for their shares back to the secondary offering.'" (citation omitted). As a product of that holding, the Circuit rejected the statistical argument that "any purchaser of a large number of shares would have had a very high probability of purchasing at least some registered shares . . . ." *Id*. Plaintiffs here deploy the same reasoning, asserting the statistical likelihood their shares were issued pursuant to the Registration Statement is great. *Pirani* forecloses that theory of pleading and requires Plaintiffs to plausibly allege the chain of title for their shares can be traced back to the Statement.

In opposition, Plaintiffs attempt to distinguish *Pirani*, noting the plaintiff there had waived certain traceability arguments. Dkt. No. 111 at 16. Though Plaintiffs correctly observe waiver was one of the issues presented in *Pirani*, they ignore the Ninth Circuit's subsequent reasoning. The court noted Pirani's statistical tracing arguments were waived, but then continued to explain that, even on the merits, "Pirani's statistical theory is both factually and legally flawed." *Pirani*, 127 F.4th at 1190. Citing *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104, 1106 (9th Cir. 2013), the court held "the theory of statistical tracing is contrary to [Ninth Circuit] precedent" and improperly shifts the pleading burden from plaintiff to defendant. *Pirani*, 127 F.4th at 1190. Whether Pirani's argument was separately waived does not disturb the Ninth Circuit's ultimate conclusion on the permissibility of statistical tracing.

Last, Plaintiffs assert discovery from the Depository Trust Company would provide records tracing the chain of title for Plaintiffs' shares to the Registration Statement. Dkt. No. 105

¶¶ 70-73. Whether such records would ultimately show Plaintiffs purchased such shares is speculative and not grounded in any factual allegations within the TAC. Plaintiffs may not advance to the discovery phase of litigation absent a sufficient factual basis for their claims in the complaint. *See Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1177 (9th Cir. 2021) ("Our case law does not permit plaintiffs to rely on anticipated discovery to satisfy Rules 8 and 12(b)(6); rather, pleadings must assert well-pleaded factual allegations to advance to discovery."). For their Section 11 claim to survive, Plaintiffs must plausibly allege their shares are traceable to the Registration Statement *now*, not after some uncertain amount of discovery.

Consequently, Plaintiffs have failed to plausibly allege statutory standing, and Defendants' motion to dismiss the Section 11 Claim is **GRANTED**. Additionally, a claim under Section 15 of the Securities Act requires an underlying primary violation of the securities laws. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). Since Plaintiffs have failed to plausibly allege an underlying violation of Section 11, Defendants' motion to dismiss the Section 15 claim is similarly **GRANTED**.

## II.    SECTION 10(b) CLAIM

"Section 10(b) of the Exchange Act proscribes 'manipulative or deceptive' practices in connection with the purchase or sale of registered securities on a national securities exchange." *Shnayder*, 2025 WL 1745596, at *10 (citing 15 U.S.C. § 78j(b)). "Implementing Rule 10b-5 is 'coextensive' with Section 10(b). To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024) (internal citations omitted).

Plaintiffs categorize the 60 statements they allege were false or misleading into five broad categories: 1) statements "touting" Allbirds' focus on core products; 2) statements about the performance of new product offerings; 3) statements regarding Allbirds' retail store expansion strategy and its success; 4) statements regarding inventory shortage or excess; and 5) statements about Allbirds' focus on its brand and marketing. *See* Dkt. No. 111 at 18-23 (noting which of the

United States District Court
Northern District of California

alleged false or misleading statements fall within these particular categories). Assuming, without deciding, the statements constituted material misrepresentations or omissions, the Court previously held Plaintiffs had failed to plausibly allege scienter. *Shnayder*, 2025 WL 1745596, at *24. Now, the Court reviews the TAC's new factual allegations as to scienter to determine whether Plaintiffs have cured the pleading deficiency. For the categories of alleged misrepresentations bolstered by *new* scienter allegations, the Court turns to the question of falsity. Finding Plaintiffs have failed to plausibly allege any false or misleading statement supported by these new scienter allegations, the Court ultimately makes no finding as to scienter for those statements. The Court now elaborates on the basis for this conclusion.

### A.    The Third Amended Complaint's Scienter Allegations

"'Scienter' as used in the federal securities laws means the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (citation omitted). Under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "A 'strong inference' exists 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Glazer Cap. Mgmt., L.P.*, 63 F.4th at 766 (citing *Tellabs, Inc.*, 551 U.S. at 324). In determining whether Plaintiffs have plausibly alleged facts to support a strong inference of scienter, the Court "conducts a dual inquiry." *Id.* "[F]irst, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Id.*

The TAC includes amended scienter allegations at paragraphs 278 and 279. In resolving the previous motion to dismiss, the Court addressed the majority of the factual allegations noted in that section of the TAC. That said, Plaintiffs offer two new allegations to bolster their claim. First, Plaintiffs include further information about Confidential Witness 3's (CW3) knowledge of monthly real estate meetings with Defendants, in which profit projections for Allbirds' retail fleet

8

"struggled." *Id*. ¶¶ 106-09.  Second, Defendants Zwillinger and Brown allegedly received performance-based stock awards during the period of alleged fraud that significantly dwarfed their salaries.  Dkt. No. 105 ¶¶ 131, 286.  The first set of allegations regarding the monthly real estate meetings applies only to the third category of false or misleading statements, i.e. statements regarding Allbirds' retail store expansion strategy and its success.  The second set of allegations regarding Zwillinger's and Brown's performance incentives apply across categories of statements.

As to the monthly real estate meetings, Plaintiffs allege in the TAW that CW3 was present with Defendants for a presentation made by Director of Global Real Estate Talia Lowenstein.  *Id*. ¶ 107.  The numbers in this presentation indicated certain retail stores could not attain profitability based on projections, but Zwillinger and Brown would sign off on the stores opening anyway.  *Id*. Plaintiffs go on to offer specific examples of this behavior.  For example, in June 2022, the company considered whether to open a retail location in Boston.  *Id*.  Both Zwillinger and Brown reviewed the Lowenstein presentation as well as "a mock profit and loss statement for the proposed store, showing the store could not generate more than $2 million in top line revenue." *Id*.  Even after acknowledging the store would not yield a profit, Defendants approved the new location anyway, which then opened in November 2022.  *Id*.  CW3 confirmed this happened on multiple occasions in 2022 and that "the only new store opened during CW3's tenure that earned a profit from inception was the Avalon store in Atlanta." *Id*.  Moreover, CW3 indicates Zwillinger and Brown received "monthly profit and loss reports ***on each existing store*** and weekly store performance reports ***on each existing store*** from the finance department that included weekly, month to date, quarter to date and year to date performance numbers and a comparison to key performance indicator goals provided to the stores." *Id*. ¶ 108 (emphasis in original).

When the Ninth Circuit has found statements false or misleading, similar allegations have permitted a strong inference of scienter.  For instance, in *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 924-25 (9th Cir. 2023), the court considered whether the plaintiffs had plausibly alleged the president and CEO of NVIDIA had misled investors about the company's exposure to volatility in the cryptocurrency market.  Finding certain alleged statements misleading, *id*. at 928, the court went on to hold the allegations of scienter against the CEO were

United States District Court
Northern District of California

sufficient to survive a Rule 12(b)(6) motion, *id*. at 940. These allegations included the CEO's access to, and review of, various reports about sales and crypto demand as well as his high level of involvement and oversight in the company. *Id*. Indeed, the Ninth Circuit observed "[the CEO's] access and review of contemporaneous reports are the most direct way to prove scienter." *Id*. Assuming, *arguendo*, Defendants' statements regarding Allbirds retail stores were false or misleading, the volume of detailed reporting and presentations reviewed by Zwillinger and Brown could permit a strong inference of scienter.

The allegations regarding Zwillinger's and Brown's performance incentives are less compelling. "A strong correlation between financial results and stock options or cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004 (9th Cir. 2009). But, these allegations, alone, are not enough to establish a strong inference of scienter: "[i]f simple allegations of pecuniary motive were enough to establish scienter, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *Id*. at 1005 (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)). Given the allegations of Zwillinger's and Brown's knowledge of retail store performance metrics, the performance-based compensation plan adds additional support to a *holistic* consideration of scienter. *See Glazer Cap. Mgmt., L.P.*, 63 F.4th at 766. However, these allegations do not impact the Court's prior analysis as to the scienter allegations for the *other categories* of false or misleading statements beyond those regarding Allbirds' retail fleet. *See Shnayder*, 2025 WL 1745596, at *22 - *24. Plaintiffs have offered effectively no new allegations regarding Defendants' intent for the remaining four categories of statements: 1) statements "touting" Allbirds' focus on core products; 2) statements about the performance of new product offerings; 3) statements regarding inventory shortage or excess; or 4) statements about Allbirds' focus on its brand and marketing. Ultimately, the mere connection between a company's performance and an executive's compensation is too thin a reed to support the high pleading burden required under the PSLRA.

Accordingly, the Court **GRANTS** Defendants' motion to dismiss the Section 10(b) claim

based upon the above-mentioned four categories of statements. Plaintiffs have failed to allege facts permitting a strong inference of scienter as to those statements. For the remaining statements regarding Allbirds' retail fleet, the Court addresses whether Plaintiffs have plausibly alleged falsity to determine if a finding as to scienter is necessary.

### B.    Falsity of Defendants' Statements Regarding the Allbirds Retail Fleet

Plaintiffs have identified eleven statements related to Allbirds' retail fleet. *See* Dkt. No. 111 at 21 n.7. These include Statement Numbers 4, 8, 11, 19, 21, 31, 33, 35, 38, 43, and 48. *Id*. Of these eleven statements, Numbers 4 and 8 pertain to the Section 11 claim, which has been dismissed. *See* Dkt. No. 105 ¶¶ 139, 145. Consequently, the Court considers only the allegations as to falsity of the remaining statements:[2]

> **Statement 11:** We opened our first store in 2017. And despite the slowdown of this channel during the pandemic, we now operate a fleet of 35 stores globally with 23 in the U.S. ***Each store has strong standalone four wall economics***.
>
> ***Our stores generate strong returns on invested capital*** and have attractive payback periods. And ***when we open new stores, it drives increased brand awareness***, ***provides a halo effect on the overall business***. And hence we approve the efficacy of our marketing spent these impacts along with lower return rates and more efficient transportation means that growth in physical retail also drives margin expansion.
>
> ***We have a strong pipeline of new stores ahead, and ultimately we see white space for hundreds of stores over time.*** *Id*. ¶ 158.
>
> **Statement 19:** With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns. We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.*** *Id*. ¶ 171.
>
> **Statement 21:** Importantly, we believe that our innovation engine, continued retail store expansion, and increasing international presence will continue to drive an accelerating topline growth rate in

---

[2] In the TAC, Lead Plaintiffs use "[b]old and italics . . . to identify the misleading portion of alleged misstatements. Bold and italics are not used where falsity is alleged as to the entire statement/paragraph." Dkt. No. 105 at 38 n.10. The statements are reproduced here consistent with the manner in which Lead Plaintiffs have incorporated bold and italics in the TAC.

2022. *Id*. ¶ 175.

**Statement 31:** With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns. We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.*** *Id*. ¶ 194.

**Statement 33:** We remain focused on driving the topline through our core growth pillars of ***delivering product innovation, growing our store portfolio*** and expanding internationally, with those growth pillars highlighted in 2022 by what we believe is the most exciting new product roadmap in the history of the company. *Id*. ¶ 199.

**Statement 35:** Now I'll turn to our third growth pillar, the store portfolio and our broader distribution strategy. ***Our retail footprint is highly productive and serves as an efficient means to acquire new customers. Opening new stores drive increased brand awareness and provides a halo effect on the overall business***, including an increase in the absolute number and mix of repeat customers who shop with us both digitally and in stores. *Id*. ¶ 203.

**Statement 38:** So during COVID we started signing leases in lifestyle centers in suburban malls and whatnot. ***Those have performed really, really well. And those have proven to be much more resilient regardless of the consumer behaviors, or restrictions in the regions and whatnot.***

So we are continuing to – we are continuing to focus on those types of real estate transactions when we're signing leases and ***we're seeing quite a bit of positive uplift in those as we start up new stores as well. But that said, looking at the Flatiron launch that we just did about a month ago it's been a really, really fantastic launch for us for a new store*** and gives us a lot of confidence in the comeback for Manhattan, which is I think a really nice bellwether for a lot of urban environments. ***And if you couple that with our store in SoHo we're just seeing a nice trend and that gives us a lot of confidence to hit on those targets we mentioned***. *Id*. ¶ 208.

**Statement 43:** With strong pre-COVID-19 unit economics, our store operations have historically been highly profitable, capital-efficient, and provided strong investment returns. We expect our stores to rebound to pre-COVID levels over time following the broader reopening of the economy. ***Based on this pre-COVID performance, we believe our new stores will be highly profitable, have attractive payback periods, serve as good capital investments, and be positioned well to take advantage of physical retail's recovery from the pandemic.*** *Id*. ¶ 218.

**Statement 48:** ***Our stores are not only the best expression of the Allbirds brand, but are a fantastic customer acquisition tool, all while delivering strong four-wall economics***.

> During the quarter, our US store sales increased nearly 120% year-over-year. We opened seven stores in Q2, bringing us to a total of 46 as of June 30. To highlight a few. In the US, we opened in Fashion Island in Newport Beach in early June, which is our first store in Orange County and seventh in Southern California and it has exceeded our expectations.
>
> As we build stores in the region, such as Southern California, ***we see meaningful gains in awareness, drive strong store economics across the region, while substantially lifting overall commerce across channels.*** *Id*. ¶ 227.

Beginning with Statement 11, Plaintiffs have failed to plausibly allege a false or misleading statement by Defendants because the content constitutes inactionable puffery. "In the Ninth Circuit, 'vague, generalized assertions of corporate optimism or statements of "mere puffing" are not actionable material misrepresentations under federal securities laws' because no reasonable investor would rely on such statements." *Lamontagne v. Tesla, Inc.*, No. 23-CV-00869-AMO, 2024 WL 4353010, at *8 (N.D. Cal. Sept. 30, 2024), *aff'd sub nom. Oakland Cnty. Voluntary Employees' Beneficiary Ass'n v. Tesla Inc.*, No. 25-55, 2025 WL 3459471 (9th Cir. Dec. 2, 2025) (citation omitted). Here, Defendants' reference to "strong" economics, "strong" returns, and "a strong pipeline of new stores" falls within the bounds of corporate optimism. Dkt. No. 105 ¶ 158. Indeed, various courts have recognized nearly identical language as puffery. *See, e.g.*, *Park v. GoPro, Inc.*, No. 18-CV-00193-EMC, 2019 WL 1231175, at *9 (N.D. Cal. Mar. 15, 2019) (holding description of sales as "strong" or "solid" was puffery); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) (holding statement that sales momentum was a "testament to the strength of" the company's brand was puffery); *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) (holding statement that "retail level remained very strong" was puffery); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004) (holding statement that business "remained 'strong'" was puffery).

Statements 38 and 48 exhibit a similarly vague, generalized corporate puffery rather than actionable misrepresentation. There, Defendants remark on Allbirds stores that have "performed really, really well" and are "resilient." Dkt. No. 105 ¶ 208. They go on to discuss specific store locations, such as Flatiron or SoHo, describing "positive uplift," a "fantastic launch," and a "nice trend" that gives them "confidence" in the future success of the store. Plaintiffs allege no facts

about the performance of the Flatiron or SoHo locations to contradict these assertions, and even if they did, this kind of nebulous language has been held inactionable in various circumstances. *See, e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("The 'mere puffery' rule has been interpreted to include statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years.'" (cleaned up)); *Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-CV-04883-BLF, 2017 WL 1508991, at *12 (N.D. Cal. Apr. 27, 2017) (holding statements that merger was "exceeding expectations," "going very well," and "moving in the right direction" were puffery). Statement 48 relies on this same kind of language when referring to "strong" economics and a "fantastic customer acquisition tool." Dkt. No. 105 ¶ 227. Such statements do not constitute misrepresentations to investors.

As for Statements 19, 31, and 43, each contains identical language offered by Defendants at different times. The statements indicate Defendants believed that retail performance would improve based on pre-COVID performance and recovery of the economy post-pandemic. Such statements are corporate opinion and are inactionable. "An opinion is 'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.' Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). When pleading falsity of an opinion statement, the Ninth Circuit has articulated three theories a plaintiff may advance:

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that "the speaker did not hold the belief she professed" and that the belief is objectively untrue. Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that "the supporting fact [the speaker] supplied [is] untrue." Third, when a plaintiff relies on a theory of omission, the plaintiff must allege "facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."

14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (internal citations omitted).  Here, Plaintiffs assert "Defendants did not ***reasonably hold*** the opinion because they knew *existing* stores *currently* struggled *overall* due to oversaturation, cannibalization, and inventory imbalance."  Dkt. No. 111 at 21 (emphasis in original).  This argument falls under the first theory of falsity, namely a theory of material misrepresentation.  However, a plaintiff cannot advance a material misrepresentation theory by alleging there is no reasonable basis for the defendant's belief.  *See City of Dearborn Heights*, 856 F.3d at 616 ("We thus hold that to the extent our current standard permits plaintiffs to plead falsity by alleging that 'there is no reasonable basis for the belief' under a material misrepresentation theory of liability, it is 'clearly irreconcilable' with *Omnicare*, and is therefore overruled.").  This reasoning applies equally to Statement 21, and Defendants' belief that "continued retail store expansion" would accelerate "topline growth."  Dkt. No. 105 ¶ 175.  Therefore, Plaintiffs' claim as to these statements must be dismissed.

Last, Plaintiffs fail to plausibly allege how Statements 33 and 35 are false or misleading.  Both Statements involve the expansion of Allbirds' "store portfolio" and how the Allbirds "retail footprint" can be used "to acquire new customers."  *Id*. ¶¶ 199, 203.  In comparison, Plaintiffs' theory of falsity for both statements is that the stores were not actually profitable because of an overly aggressive expansion approach that "led to market saturation and cannibalization."  *Id*. ¶¶ 200, 204.  Neither Statement 33 nor 35 makes a representation about the profitability of any individual store; rather, they discuss how the retail locations can increase the number of Allbirds customers by amplifying the company's brand.  If anything, these are statements about how retail stores interact with Allbirds' marketing goals, not independent statements of retail sales or profit.  Thus, Plaintiffs have failed to plausibly allege either Statement 33 or 35 constitutes a false or misleading representation.

For these reasons, the Defendants' motion to dismiss the Section 10(b) claim based on Statements 4, 8, 11, 19, 21, 31, 33, 35, 38, 43, and 48 is **GRANTED**.  Since Plaintiffs have not alleged a false or misleading statement by Defendants, the Court does not return to, nor ultimately rule on, whether Plaintiffs have plausibly alleged facts to support a strong inference of scienter for

those statements.  Further, because liability under Section 20(a) relies on an underlying violation of securities law, Defendants' motion as to that claim is similarly **GRANTED**.  *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th at 1180 ("Controlling persons liability under Section 20(a) of the Exchange Act is derivative, such that there is no individual liability where there is no primary violation of securities law.").

## III.    LEAVE TO AMEND

"Generally, Rule 15 advises the court that leave shall be freely given when justice so requires. This policy is to be applied with extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotations and citations omitted).  Courts may deny leave to amend "only if there is strong evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc." *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.,* 708 F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (modification in original).

Plaintiffs have been given leave to amend on two prior occasions and have failed to supply a factual basis for their claims to advance.  Further, in the Court's previous order granting Defendants' motion to dismiss, the Court advised: "In drafting their further amended complaint, Lead Plaintiffs should consider including only the statements they can fully defend within the default page limits applicable to any future briefing.  The Court also puts the parties on notice that in the event either side fails to sufficiently address any particular statement in future briefing, the Court may deem any arguments as to that statement waived." *Shnayder*, 2025 WL 1745596, at *25.  Plaintiffs declined to heed this advice.  Instead, they again pursued a kitchen-sink approach to pleading 60 different allegedly false statements, and in opposing this motion, failed to address the substance of many of the alleged statements.  The Court determines further amendment would be futile and **GRANTS** Defendants' motion to dismiss *without leave to amend the claims*.

//

//

//

16

United States District Court
Northern District of California

**CONCLUSION**

Consequently, Defendants' motion to dismiss all claims is **GRANTED**.  The dismissal is without leave to amend.  Judgment will issue.

**IT IS SO ORDERED.**

Dated: February 26, 2026

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**